Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

MICHAEL PRINCE

              PLAINTIFF

VS.

CAUSE NUMBER: 4:13cv165-SA-JMV

WASHINGTON COUNTY, MISSISSIPPI
SHERIFF MILTON GASTON, in his Official
Capacity, LIEUTENANT MACK WHITE,
in his individual and official capacity,
DEPUTY MARVIN MARSHALL,
in his individual and official capacity, and
JOHN DOES 1-10

              DEFENDANTS

\*\*\*\*\*\*\*

DEPOSITION OF LIEUTENANT MACK WHITE

Taken at the law offices of Campbell Delong,
923 Washington Avenue,
Greenville, Mississippi,
on Thursday, March 20th, 2014,
beginning at approximately 1:46 p.m.
\*\*\*\*\*\*\*\*\*\*

REPORTED BY:

DEBRA A. WILLIAMS, CCR, #1748
CERTIFIED COURT REPORTER
NOTARY PUBLIC

---

Page 3

1
2              PAGE

Title Page............................ 1

3

Appearance Page......................... 2

4

Table of Contents..................... 3

5

Exhibits Page........................... 4

6

Stipulation Page....................... 5

7
8  EXAMINATION OF LIEUTENANT MACK WHITE:
9     By Mr. Hall...................... 6
       By Mr. Phillips.................. 102
10    By Mr. Hall.................... 110
11

Signature Page........................ 117

12
13  Certificate Page..................... 118
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 2

A P P E A R A N C E S

For the Plaintiff:

  DEREK L. HALL, ESQ.
  Derek L. Hall, PLLC
  1911 Dunbarton Drive
  Jackson, Mississippi 39216-5002

For the Defendants:
  SCOTT PHILLIPS, ESQ.
  ANDREW F. TOMINELLO, ESQ.
  Campbell DeLong, LLP
  923 Washington Avenue
  Post Office Box 1856
  Greenville, Mississippi 38702-1856

Also Present:
  Rebecca Gramling

TABLE OF CONTENTS

---

Page 4

E X H I B I T S

(EXHIBIT 1 WAS MARKED IN THE DEPOSITION OF
MICHAEL PRINCE.)

Exhibit 2, Notice of Deposition............ 6
Exhibit 3, Judgment of Dismissal.......... 50
Exhibit 4, Incident Report................ 55
Exhibit 5, Washington County Sheriff's
  Department Policy and Procedures
  Manual.............................. 88
Exhibit 6, Washington County Sheriff's
  Department Policy and Procedures
  Manual.............................. 88
Exhibit 7, Washington County Regional
  Correctional Facility Personnel
  Manual.............................. 88
Exhibit 8, Interrogatories............... 95
Exhibit 9, Voluntary Statement........... 110
Exhibit 10, Copies of Photographs........ 113

STIPULATION

---

Providence Court Reporting, LLC
Phone: (601)720-3862

EXHIBIT
"A"

PENGAD-Bayonne N.J.

## Page 5

1
2      It is hereby stipulated and agreed by
3 and between the parties hereto, through their
4 respective attorneys of record, that this
5 deposition may be taken at the time and place
6 hereinbefore set forth, by DEBRA WILLIAMS, Court
7 Reporter and Notary Public, pursuant to the
8 Rules;
9      That the formality of reading and
10 signing is specifically NOT WAIVED;
11      That all objections, except as to the
12 form of the questions and the responsiveness of
13 the answers, are reserved until such time as
14 the deposition, or any part thereof, may be
15 used or sought to be used in evidence.
16
17            * * *
18
19
20
21
22
23
24
25      LIEUTENANT MACK WHITE

## Page 6

1      having been first duly sworn,
2      was examined and testified as follows,
3      EXAMINATION
4 BY MR. HALL:
5    Q  Okay. Would you just state your
6 name, please?
7    A  Mack White.
8    Q  All right. And where are you
9 employed?
10    A  With Washington County Sheriff's
11 Department.
12    Q  Okay.
13    MR. HALL: So this deposition is being
14 taken pursuant to notice.
15    And I will ask if we could get this
16 marked. And I think this will be Exhibit
17 2.
18    (EXHIBIT 2 MARKED FOR THE RECORD.)
19 BY MR. HALL:
20    Q  Have you ever given a deposition
21 before?
22    A  Yes, I have.
23    Q  All right. Well, I'm not going to
24 make any assumptions, but I will assume that
25 you kind of know what depositions are all

## Page 7

1 about. This is a statement, and the court
2 reporter is taking down word for word what
3 we're saying. Just simply if I ask you a
4 question, if you give me an answer, I'm going
5 to assume you understand it. Okay?
6    A  Yes, sir.
7    Q  And you've been sworn to tell the
8 truth, right?
9    A  Yes, sir.
10    Q  And, look, I'm terrible at asking
11 questions. And a lot of times if I read it
12 back, I don't even understand what I asked. So
13 if I ask a terrible question or if you don't
14 understand what I'm asking, if you would, ask
15 me to clarify it, and we'll get through it that
16 way. Is that okay?
17    A  Yes, sir.
18    Q  All right. And at the end of the
19 deposition or when it's through and she's
20 transcribed it, you have the right to read and
21 sign your deposition. Do you want to do that?
22    A  Yes, sir.
23    Q  Okay. And you've given your name, and
24 you said you were employed at the sheriff's
25 department here in Washington County. What

## Page 8

1 rank are you?
2    A  I'm a lieutenant.
3    Q  Okay. And in March of 2012, what rank
4 were you?
5    A  A sergeant.
6    Q  Okay. So I guess that's a promotion?
7    A  Yes, sir.
8    Q  All right. Well, congratulations.
9    A  Thank you.
10    Q  What's your address?
11    A  My physical address? I mean my home
12 address or work?
13    Q  Yes.
14    A  ██████████
15    Q  Okay. And your employment address?
16    A  ████████████ and that's here in
17 ████████
18    Q  And you're still a deputy with
19 Washington County?
20    A  Yes, sir.
21    Q  And how long have you been a deputy
22 with Washington County?
23    A  Eleven going on twelve years.
24    Q  All right. Before that, where were
25 you?

2 (Pages 5 to 8)

Page 9

1   A   I was with ████████Police
Department.
2   Q   And how long were you with them?
3   A   Three or four years, something like
that.
4   Q   All right.  Why did you leave the
5   ████████Police Department?
6   A   Better pay.
7   Q   That makes a lot of sense.  And then
8   before ████████Police, what did you do?
9   A   I was in school, in college, yeah.
10  Q   All right.  Student, ████████
11  Police, Washington deputy.  Here we are.
12  A   Since I've been with the sheriff's
13  department, I've been with numerous amount of
14  task forces.  I've worked with the U. S.
15  Marshal Task Force, also the ████████
16  Homeland Security Task Force.
17  Q   Okay.  Is all that by and through
18  Washington County?
19  A   Yes, sir, it is.
20  Q   Okay.  So it's not different
21  employers?
22  A   Oh, no, sir.
23  Q   But that's kind of an adjunct onto

Page 10

1   what you're currently doing?
2   A   Yes, sir.
3   Q   Okay.  Additional responsibilities,
4   additional jobs and that kind of thing?
5   A   Yes, sir.
6   Q   All right.  Are you married?
7   A   Yes.
8   Q   Okay.  And what's your wife's name?
9   A   Felicia, F-e-l-i-c-i-a, White.
10  Q   And were you married before her?
11  A   No.
12  Q   Okay.  You have any children over the
13  age of 18?
14  A   No.
15  Q   Any relatives in the area?
16  A   No.  I'm the only one here from my
17  family.  All of my folks live in ████ and in
18  ████ and Georgia.
19  Q   Okay.  How about your wife, she's got
20  any relatives in the area?
21  A   Yes.  She's from here.  Yes, all of
22  her relatives are here in this area.
23  Q   Does she have a mother and a father
24  here?
25  A   Her mother is here.

Page 11

1   Q   Okay.  What's her name?
2   A   Sharon Norris.
3   Q   Does she have any brothers or sisters?
4   A   Yes.  Alfred Norris, Joe Norris, Kim
5   Norris and Erma Norris.
6   Q   So if we get any Norrises on our jury,
7   I'll need to ask them a lot of questions,
8   right?
9   A   Yes, sir.
10  MR. PHILLIPS:  Norrises, Masons, you
11  need to look out for.
12  BY MR. HALL:
13  Q   You know, that's why we ask those
14  questions.  I'm not trying to pry into your
15  wife's family.
16  A   That's fine.
17  Q   Any other relatives that your wife has
18  in the area?  When I say in the area, I mean
19  Washington County.
20  A   I think she has a sister that lives
21  here by the name of Keisha Porter, I think.
22  Q   Keisha Porter?
23  A   Yes, sir.
24  Q   And what's your educational
25  background?

Page 12

1   A   I have two years of college.
2   Q   Where did you go?
3   A   Mississippi Delta Community College.
4   Q   Did you graduate with an associate's
5   degree?
6   A   No, sir.
7   Q   Okay.  What were you studying?
8   A   Criminal justice.
9   Q   All right.  And could you just
10  generally describe what your day-to-day
11  involvement is with law enforcement operations?
12  A   Okay.  I oversee the night shift this
13  month, make sure all the tasks or assignments
14  is handled, make sure everybody is working his
15  own, make sure the day-to-day operations goes
16  fine, all the assignments at hand is handled.
17  Also, if something comes up that I need to
18  communicate with a member of the command staff,
19  I call my supervisor and let him know what I
20  have as far as answering calls, checking with
21  units on call, stuff like that.
22  Q   Okay.  Who is your direct supervisor?
23  A   Chief Miles -- Assistant Chief Miles.
24  Q   What's his first name?
25  A   Percy Miles.

3  (Pages  9  to  12)

Page 13

```
1     Q    And now that you're a lieutenant, are
2  you a desk jockey or are you still out in the
3  field?
4     A    Still out in the field.
5     Q    All right. Back in March of 2012, you
6  said you were a sergeant?
7     A    Yes, sir.
8     Q    Were your duties different then than
9  they are now?
10    A    No. They're still the same. I was
11 shift supervisor.
12    Q    Okay. So the duties you just
13 described to me are the same duties you were
14 doing in 2012 March, right?
15    A    Yes, sir.
16    Q    Okay. Now, do you have day-to-day
17 involvement in managing other law enforcement
18 officers?
19    A    Yes, sir.
20    Q    Okay. Could you briefly describe what
21 that is?
22    A    I have four, I'm sorry, I have five
23 other guys that I oversee on the shift. I make
24 sure they answer calls, read their reports.
25 Any complaints that comes in on the officers,
```

Page 14

```
1  I'll open up an investigation and look into it
2  and pretty much investigate it and give my
3  findings to Chief Miles.
4     Q    Okay. Is that involvement in managing
5  other officers the same as it was back in March
6  of 2012?
7     A    Yes, sir, it is.
8     Q    Are the same officers reporting to you
9  that did back in 2012?
10    A    No. I have -- they recently switched
11 the shifts up. I can't remember who I had then
12 up until now. But I know I do have some new
13 guys.
14    Q    Okay. So if I were to ask you who you
15 were supervising or managing back in 2012, I
16 think you just told me you don't really
17 remember who all that was.
18    A    I can name some of them but not all of
19 them.
20    Q    All right. Well, who can you
21 remember?
22    A    Deputy Marshall, Deputy Jones, Deputy
23 Brown. I can't remember. But those are the
24 ones I can remember.
25    Q    Okay. Is it fair to say that part of
```

Page 15

```
1  your day-to-day duties as a deputy in 2012
2  would have been as patrol?
3     A    Yes, sir. I get out and ride patrol.
4  I do everything that -- I get out and check
5  with the other deputies and make sure
6  everything is okay with them. I mean, I get
7  out and patrol, too.
8     Q    Okay. In March 2012, did you have an
9  assigned regular partner?
10    A    No, sir.
11    Q    Okay. Would it have been your
12 practice to be on patrol or be by yourself most
13 of the time?
14    A    Yes, sir, be by ourselves most of the
15 time.
16    Q    And is that the way the deputies in
17 Washington County Sheriff's Department are
18 pretty much assigned? They're by themselves?
19    A    Unless they aren't certified or unless
20 they're training. I mean, they're training
21 with another officer.
22    Q    So all full-fledge deputies, for lack
23 of a better word, all people that are certified
24 deputies that are employed with Washington
25 County are single riders, unless they're
```

Page 16

```
1  training somebody?
2     A    Yes, sir.
3     Q    Okay. And are you assigned a specific
4  vehicle?
5     A    Yes, sir.
6     Q    In 2012 were you assigned a specific
7  vehicle?
8     A    Yes, I was.
9     Q    And is that true for all deputies who
10 do patrol?
11    A    Yes, sir.
12    Q    Okay. And is part of your day-to-day
13 involvement as a deputy making arrests?
14    A    Yes, sir.
15    Q    And prior to testifying here today,
16 did you review any documents?
17    A    Yes. I went over my report. When I
18 found out we had a -- I had a deposition, I
19 pulled a copy of my report.
20    Q    Okay. Anything else?
21    A    I can't recall. Yes, I can. Yes, I
22 can. We had a -- I can't remember what it was.
23 It was one of these (indicating).
24    MR. PHILLIPS: Interrogatory answers?
25    THE WITNESS: Interrogatory answers,
```

4 (Pages 13 to 16)

Page 17

```
 1        yes.  Yeah, that's what it was.
 2   BY MR. HALL:
 3        Q   Okay.  You reviewed those?
 4        A   Yes.
 5        Q   Anything else?
 6        A   Not to my knowledge.
 7        Q   Okay.  You talk about this report that
 8   you generated.  You talk about your
 9   interrogatory responses.  Did you review any
10   other documents related to Michael Prince?
11        A   No, sir.
12        Q   Have you ever reviewed any other
13   documents relating to Michael Prince?
14        A   No.
15        Q   Like his criminal files or do a
16   criminal background check or anything like
17   that?
18        A   No, sir.
19        Q   Okay.  Are you familiar with Michael
20   Prince's criminal background?
21        A   No, sir, I'm not.
22        Q   In March of 2012, were you familiar
23   with it?
24        A   The night that I arrested him, that's
25   -- prior to me arresting him, the charges I
```

Page 18

```
 1   charged him with, that's all I remember.
 2        Q   Okay.  And we're going to talk about
 3   that just a little later.  That's fine.
 4        Before you encountered him in the
 5   field, were you familiar with his background?
 6        A   No, sir.
 7        Q   I'm not fussing with you.  You're a
 8   lot bigger than I am.  But if you'll let me
 9   finish my question because you're going to
10   drive her crazy with her trying to type both of
11   us.  Okay?
12        A   Yes.
13        Q   I know conversationally that doesn't
14   -- you know, we're accustomed to going ahead.
15   But if you will, let me finish.  It'll help.
16   It'll read back a lot smoother.  Okay?
17        A   Okay.
18        Q   All right.  And as a Washington County
19   deputy sheriff, are you required to adhere to
20   all the policies and procedures of the
21   Washington County Sheriff's Department?
22        A   Yes.
23        Q   And what do you do to ensure you're
24   following those policies?
25        A   Handbooks.  We have a handbook.
```

Page 19

```
 1        Q   Handbooks?
 2        A   Yeah.  I mean a policy and procedure
 3   book or manual, rather.
 4        Q   And do you sometime get updates on
 5   those policies and procedures?
 6        A   Sometime do we get updates?
 7        Q   Um-hum, yeah.
 8        A   No, sir.  When you first sign on with
 9   them, they give you a policy and procedure
10   book.  Since I've been here, I have two policy
11   and procedure books.  See, I got hired under
12   the old sheriff, and it was his policy and
13   procedure book.  Then when the new sheriff took
14   over, he come out with his policy and procedure
15   book.  So I have two.
16        Q   All right.  And those policy and
17   procedures with the new sheriff, who would that
18   be?  Who is the new sheriff?
19        A   Sheriff Gaston, Milton Gaston.
20        Q   Okay.  And in March of 2012, you were
21   operating under Sheriff Gaston's policies and
22   procedures?
23        A   Yes, sir.
24        Q   Okay.  And when we talked earlier, you
25   said Marvin Marshall was one of the deputies
```

Page 20

```
 1   that you supervise?
 2        A   Yes, sir.
 3        Q   And how do you know him?
 4        A   I know him from working the shift.  I
 5   mean, he's a hard worker.  He's dedicated.
 6   He's loyal.  I mean, all of the above.
 7        Q   How long has he been with the
 8   sheriff's department, if you know?
 9        A   I don't know exactly.
10        Q   Was he here when you came?
11        A   I know it's more than three years.
12        Q   More than three years?
13        A   Yes, sir.
14        Q   Was he on the department when you came
15   in?
16        A   No, sir.
17        Q   So he's been hired since you were
18   hired?
19        A   Yes, sir.
20        Q   He's a more recent hire than you?
21        A   Yes, sir.
22        Q   You know where he came from?
23        A   No, sir.
24        Q   You know what his background and
25   training was before he came on?
```

Page 21

1    A    The only thing I know, before he come
2   here, the only thing I can testify to is that
3   we all have to go through the Mississippi Law
4   Enforcement Training Academy. So that's all I
5   know about him.
6        Q    Okay. And you, in fact, have been
7   through the law enforcement training academy?
8        A    Yes, sir.
9        Q    All right. Did you have any input
10  into hiring Marvin Marshall?
11       A    No, I didn't.
12       Q    Now, let's talk about your training.
13  You mentioned that you graduated from the
14  Mississippi Law Enforcement Training Academy.
15  Any other training that you've had since you've
16  been a deputy here?
17       A    Yes, sir. With Homeland Security --
18  well, before then, the sheriff's department,
19  they sent us to class, different types of
20  classes. Then with Homeland Security, they
21  would send us through classes through Homeland
22  Security.
23       Q    Do you remember what classes you went
24  through through Homeland Security?
25       A    Use of force -- let's see -- executive

Page 22

1   protection, OC certifications. It was -- I
2   can't recall all of them. It's quite a few.
3        Q    Okay. Were you required to take any
4   tests at the end of each of these classes?
5        A    Yes.
6        Q    Okay. And what is OC certification?
7        A    Tear gas certification.
8        Q    And you mentioned three separate
9   classes through Homeland Security. Can you
10  recall any other ones?
11       A    Excuse me?
12       Q    Can you recall any other classes
13  through the Department of Homeland Security?
14       A    Yeah. Let me see. It was -- we had
15  80 hours -- I think 80 hours of force
16  protection that was done in Pearl out of
17  Jackson.
18       Q    Force protection?
19       A    Force protection, yes, sir.
20       Q    What is that?
21       A    That's when you ride -- basically like
22  ride control.
23       Q    Okay. Do you receive booklets,
24  pamphlets, handouts, those types of things in
25  these classes?

Page 23

1        A    Yes, sir.
2        Q    For every one of those classes?
3        A    I know for the executive protection.
4   I think it was just for the executive
5   protection class we got a handout on. But I
6   can't recall the other two.
7        Q    Okay. What about use of force, did
8   you receive any materials when you went through
9   that class?
10       A    I think so. Yeah, I think so, yes,
11  sir.
12       Q    Do you have a file where you keep
13  those materials?
14       A    No, sir. What I bring back, we
15  normally run a copy of the certificate off.
16  And we keep the original, and we give a copy to
17  the sheriff's secretary.
18       Q    Okay. And so you don't have a common
19  place where you normally keep your materials
20  that you receive except for your certificate
21  that you get?
22       A    Yes, sir.
23       Q    All right. Now, you mentioned you
24  went through different courses as a deputy
25  sheriff. Can you name what those are?

Page 24

1        A    It was quite a few. I went through --
2   the most recent one I went through was a
3   leadership course for front-line supervisor.
4        Q    Is that since you've been promoted to
5   lieutenant?
6        A    That was in 2010. I think I was a
7   sergeant then.
8        Q    Okay. Anything else you can recall?
9        A    Not right offhand. I'll have to go
10  dig it up and look at it.
11       Q    Where would you go dig it up?
12       A    All of my stuff is at -- on my shelf
13  in my closet.
14       Q    All right. So what would be in that
15  stuff in your closet?
16       A    Certificates. The certificates I
17  received for going to each class and each
18  training.
19       Q    Okay. And the same question as to the
20  materials that you received as a deputy in
21  training separate from Homeland Security. Did
22  you keep any pamphlets, booklets, anything like
23  that other than the certificate of completion
24  for the courses?
25       A    No.

Providence Court Reporting, LLC
Phone:  (601)720-3862

Page 25

```
 1      Q   Okay.  Let's just talk about a few
 2   terms so that you and I are talking from the
 3   same sheet of music.  Can you define what use
 4   of force is?
 5      A   Use of force.  My definition of use of
 6   force, it can go from hands-on, which is
 7   soft-hand control all the way up to deadly
 8   force.  It depends on the situation.
 9      Q   Okay.  Can you define what is
10   excessive force?
11      A   Excessive force is just what it says.
12   I mean, when you overdo something.
13      Q   Can we agree that excessive force
14   would be that force that is utilized in excess
15   of the force necessary to subdue or apprehend
16   someone?
17      A   Yes, I agree.
18      Q   Is that a pretty good definition?
19      A   Yes, sir.
20      Q   When I use the term "excessive force,"
21   can we agree that that's what we're going to be
22   talking about?
23      A   Yes, sir.
24      Q   Okay.  Are you familiar with the term
25   "use of force policy"?
```

Page 26

```
 1      A   Yes, sir.
 2      Q   And in March of 2012, did Washington
 3   County Sheriff's Department have a use of force
 4   policy?
 5      A   Not in our current manual, no.
 6      Q   Okay.  Well, that's a little different
 7   than the question I asked.  Which I'm okay with
 8   the answer you gave.  That's not a problem.
 9   But was there a use of force policy in effect
10   in March of 2012 for Washington County
11   Sheriff's Department?
12      A   When I come on in 2003 under the old
13   sheriff, it was a use of force policy in place.
14   When the new -- Sheriff Gaston switched over,
15   in the manual, there's not a use of force
16   policy in the manual.  But we all know and
17   we've all been trained, as going through the
18   law enforcement academy, that you use the least
19   amount of force necessary to effect an arrest.
20   That's -- you learn that in the academy and in
21   the different classes and different training
22   you go to.  They would teach you that.  Also,
23   in our meetings, departmental meetings that we
24   have, the sheriff or his chief deputy or
25   assistant chief, they always talk to us about
```

Page 27

```
 1   the use of force.
 2      Q   This would be Sheriff Gaston that
 3   would be talking to you about that?
 4      A   Yes, sir.
 5      Q   Or his deputies?
 6      A   Yes.  Or his chief deputy, Gerald
 7   Readman or either Assistant Chief Miles, Percy
 8   Miles.
 9      Q   Have you ever given talks on use of
10   force?
11      A   Have I?
12      Q   Um-hum (affirmative response).
13      A   No, sir.
14      Q   How many times a month would these
15   discussions in these meetings occur with regard
16   to use of force since Sheriff Gaston took over?
17      A   We don't have monthly meetings.  It's
18   just whenever he calls a meeting.  It might be
19   every three months.  It might be -- it's just
20   when they call a meeting.  I mean, they get up
21   there and they talk and lay everything out
22   there and also talk about the use of force.
23      Q   Okay.  Do you remember prior to March
24   2012 how many of those type meetings that you
25   had with just Sheriff Gaston?  Strike that.
```

Page 28

```
 1   That's a terrible -- that's not really the
 2   question I'm trying to ask.
 3          Since Sheriff Gaston took over, up to
 4   March of 2012, do you remember how many of
 5   those types of meetings that you had?
 6      A   No.  It was -- we had -- it was quite
 7   a few.  I mean, I can't give you an exact
 8   number.
 9      Q   Okay.  More than five?
10      A   I can't give you an exact number.
11      Q   Okay.  Now, you stated that the new
12   handbook that Sheriff Gaston had delivered to
13   you, you received a copy of that?
14      A   Yes, sir.
15      Q   And you operate under that handbook as
16   a deputy sheriff in Washington County?
17      A   Yes, sir.
18      Q   Okay.  And that contains the most
19   specific use of force policy; is that fair?
20      A   Not to my knowledge.
21      Q   Okay.  All right.  Can you define the
22   term "reasonable suspicion"?
23      A   Reasonable suspicion?
24      Q   Um-hum (affirmative response).
25      A   I believe -- no, I can't.
```

Providence Court Reporting, LLC
Phone:  (601)720-3862

Page 29

1    Q   Can you tell us what probable cause
2    is?
3    A   Yeah. I know probable cause. I mean,
4    probable cause is that you have a -- it's like
5    having a -- it's not a haunch. It's like that
6    you have -- let me see how I want to word it.
7    You have to have I'm going to say enough
8    information or enough knowledge knowing that
9    something is there. I mean enough information
10   knowing that something is there.
11       I mean, what are you looking for? I
12   might not be saying it the correct way you want
13   me to say it. I'm just saying, probable
14   cause --
15   Q   You didn't know you were going to be
16   taking a test today, did you?
17   A   Not really.
18   Q   You're not exactly sure how to say it,
19   but you know it when you see it; is that fair?
20   A   Yes, sir.
21   Q   Okay. What does the term "under
22   arrest" means to you?
23   A   When you place a person under arrest
24   and he's not free to leave.
25   Q   Okay. And what would you define as

Page 30

1    the status of a person who is placed under
2    arrest but has not yet been found guilty of a
3    crime?
4    A   It's just what it is, he's under
5    arrest. I mean, he's not -- that just means he
6    was placed under arrest for that charge. It
7    doesn't mean he's guilty or anything.
8    Q   If I called the person a detainee,
9    would that make sense to you?
10   A   Yes, sir.
11   Q   Okay. And do you know what the term
12   "strike" means?
13   A   Strike?
14   Q   Yes.
15   A   That means to hit.
16   Q   Okay. Is there any definition of
17   strike in your current manual, employee manual?
18   A   I don't know. I'm not aware.
19   Q   All right. Are there any prohibitions
20   against striking detainees in your current
21   employee manual or handbook?
22   A   I think so. I'm not for sure, but I
23   think so.
24   Q   Okay. What is your understanding of
25   what those prohibitions would be?

Page 31

1    A   You mean striking a detainee?
2    Q   Yes.
3    A   Okay. I mean, if he's detained, he's
4    already in cuffs. So, therefore, that's
5    totally against departmental policy. I mean,
6    you can't do that.
7    Q   Okay. A detainee that is not in
8    cuffs, is that -- according to your policy,
9    would a deputy be authorized to strike the
10   detainee at that point?
11   A   A detainee. Is the detainee in cuffs
12   or is he out of cuffs?
13   Q   No, he's not been cuffed.
14   A   He's not cuffed. Well, if he's making
15   an arrest or if the deputy is trying to make an
16   arrest and if he's resisting, they use the
17   least amount of force that's necessary to
18   effect an arrest.
19   Q   Okay. And is striking authorized in
20   certain circumstances like what we were talking
21   about? You said, okay, he's not in cuffs, and
22   you said he was resisting. In what
23   circumstances would it be authorized that the
24   deputy be allowed to strike him, according to
25   your understanding of the policy and procedure

Page 32

1    manual?
2    A   Rephrase the question for me.
3    Q   Sure. I absolutely will do that.
4    According to your policy and procedure manual,
5    if a subject, a detainee is not yet cuffed but
6    resisting, what authority does a deputy have to
7    strike that person?
8    A   Use the minimal amount of force to get
9    that subject into custody. I mean minimal. It
10   depends on the situation. I mean, if a
11   detainee is being aggressive, you really have
12   to -- it's different scenarios, I mean. But
13   we're going to go back to using the least
14   amount of force that's necessary.
15   Q   Okay. According to your handbook, is
16   striking a detainee in the head ever
17   authorized?
18   A   No, sir.
19   Q   Now, because I've seen this in some of
20   the literature that was given, what does that
21   term "10-23" mean?
22   A   You're on scene.
23   Q   What does the term "10-8" mean?
24   A   You're in service.
25   Q   And under your policy and procedure

Providence Court Reporting, LLC
Phone: (601)720-3862

Page 33

```
 1   manual that's currently in effect, would you
 2   classify a blow to the head as deadly force?
 3        MR. PHILLIPS:  Object to form.
 4        THE WITNESS:  No.
 5        MR. PHILLIPS:  Do you understand it?
 6   BY MR. HALL:
 7        Q   And your answer is no?
 8        A   No.
 9        Q   Okay.  In what circumstances are you
10   required to initiate blue lights when you're in
11   a patrol vehicle?
12        A   We have a policy -- a memorandum that
13   come out a couple of years ago that all -- if
14   you're not a supervisor, you have to -- and
15   you're just a regular deputy, you have to go
16   through your supervisor.  The supervisor can
17   clear you to run blue lights and sirens.  But
18   as for me being a supervisor, any calls for
19   assistance or from another deputy or accidents,
20   traffic stops or home invasions, any kind of
21   crime that's in progress.
22        Q   Okay.  And that authority goes from
23   sergeant on up?
24        A   Yes.
25        Q   So once a deputy in Washington County
```

Page 34

```
 1   obtains the rank of sergeant, then they are
 2   authorized to use blue lights whenever they
 3   respond to a call?
 4        A   Um-hum.  And he clears -- I'm not
 5   cutting you off.
 6        Q   No.  I want you to answer.  I don't
 7   want to cut you off.
 8        A   All right.  The supervisor, just say
 9   for instance, for example, we've got a bad
10   wreck on 82 with injuries.  The supervisor will
11   clear -- the supervisor of the shift will clear
12   his guys or tell them it's clear to go ahead
13   and run code.  That's meaning it's clear to run
14   blue lights and sirens to that call.
15        Q   Okay.  And in March of 2012, how were
16   you told to go to different and various
17   locations for call?
18        A   They dispatch them.
19        Q   Okay.  So all of your calls for
20   service would go through dispatch?
21        A   Yes, sir.
22        Q   Is that true for all deputies?
23        A   When the calls come in, they come in
24   through dispatch.  Yes, sir.
25        Q   And then as you answer a call, you
```

Page 35

```
 1   respond back to dispatch to tell them what your
 2   status is; is that fair?
 3        A   Yes, sir.
 4        Q   And is that a requirement every time a
 5   status change?
 6        A   No, it's not a requirement, but it's
 7   just courteous.  It's officer courtesy.  I
 8   mean, they'll tell them -- just say if I clear
 9   this call, I'll say "6 S.O., I'm back.  10-8."
10   That means I'm in service from this call.  The
11   call is taken care of.
12        Q   You're available to answer other
13   calls?
14        A   Yes, sir.
15        Q   You mentioned the term "memorandum."
16   Did I make that up?
17        A   Yeah, you made that up.  I don't
18   remember that.
19        Q   Did you say memo?  You received an
20   memo?
21        A   Oh, memorandum, yes, yes, sir.  I had
22   a brain twist.  Yes, sir.  Yes, sir, I did.
23        Q   All right.  Those memorandums are sent
24   through Sheriff Gaston?
25        A   Yes, sir.
```

Page 36

```
 1        Q   Or other supervisors?
 2        A   It goes -- this case here, I think it
 3   was put out by I want to say Assistant Chief
 4   Barber.  But the sheriff has the final approval
 5   on it.  So they'll see it.
 6        Q   Those memorandums that you mentioned,
 7   do those become policy of the sheriff's
 8   department?
 9        A   It's just what it's called.  It's a
10   memorandum.
11        Q   And your understanding of that is it's
12   like an order you're supposed to follow; is
13   that fair?
14        A   Yes, sir.
15        Q   Since Sheriff Gaston has been there,
16   other than the meetings that you had where you
17   discussed use of force, have you participated
18   in any other training sessions on use of force?
19   Now, I don't want you to repeat the Homeland
20   Security that we've already talked about.  Is
21   there anything else?
22        A   No, sir.
23        Q   All right.  Any other use of force
24   sessions that we haven't talked about that you
25   attended?
```

Page 37

1    A   No, sir.
2    Q   All right.  And, to your knowledge, in
3  the handbook that we've been discussing that's
4  currently in force and effect, are there any
5  discussions about the different types of force
6  that's allowable?  You mentioned the gradation
7  all the way from soft hands up to lethal force.
8  Anything else that's written down in that
9  handbook that we haven't talked about?
10   A   No, sir.
11   Q   Are there any policies regarding
12 documentation of use of force in your current
13 handbook?
14   A   No, sir.
15   Q   That current handbook was in effect in
16 March of 2012, right?
17   A   Yes, sir.
18   Q   Do you have any idea of why the
19 policies and procedures changed from the ones
20 that were in effect prior to Sheriff Gaston to
21 the current ones?
22   A   No, sir, I have no idea.
23   Q   And are you required to document every
24 time you use force?
25   A   Yes, sir.

Page 38

1    Q   Okay.  Tell me a little bit about
2  that.  What are you required to document?
3    A   You document -- you have to do a
4  report and give detailed -- you have to do a
5  detailed incident report on what happened,
6  dates and times, and what led up to you using
7  use of force.  And you also have to notify your
8  supervisor.
9    Q   What particularly triggers the
10 requirement that you document?
11   A   What triggers?
12   Q   Yes.
13   A   Anytime you have to use -- well, if
14 you use force, I mean, you have to do a -- it's
15 departmental policy that you have to do an
16 incident report and notify your supervisor.
17   Q   Okay.  You mentioned soft hands.  For
18 example, if you simply just place your hands on
19 a suspect and move him aside, are you required
20 to initiate a report for that?
21   A   Anytime you put your hands on a person
22 and you have to arrest them, you have to do a
23 report on it.
24   Q   Okay.  So it's mandatory under
25 Washington County Sheriff's departmental policy

Page 39

1  that anytime you touch a subject, detainee,
2  arrestee, whether it's to place them in cuffs
3  or assist them in the back of the car,
4  etcetera, you do a report?
5    A   You do a report.  As a matter of fact,
6  it's departmental policy that every call you go
7  on you do a report on.  Whether it's an alarm
8  call or a house burglary or a rape or whatever,
9  you do a report on it.
10   Q   Okay.  And what types of things are
11 documented?
12   A   I'm not understanding your question.
13   Q   When you do your report, is there a
14 standard who, what, when, where, a
15 particularized form that you utilize to do the
16 report?
17   A   No.  You just do a regular incident
18 report.
19   Q   And you keep pointing at an incident
20 report, and we're going to get to it.  But
21 that's the type of report that you would be
22 required or that any deputy would be required
23 to do when they effect an arrest or answer the
24 called, as you just said, right?
25   A   Yes, sir.

Page 40

1    Q   Okay.  Since Sheriff Gaston has been
2  the sheriff, have you been required to undergo
3  any training regarding effecting arrests?
4    A   When I went to that leadership class
5  in Slidell, Louisiana back in 2010, all of that
6  was in that class.  That's the only class I
7  have had dealing with that.
8    Q   Is there a current policy -- I say
9  current, when the new handbook -- regarding use
10 of a force to strike a suspect or detainee?
11   A   Ass batons, nightsticks and all that,
12 we don't carry those.
13   Q   Only the manual discussed the use of a
14 baton.
15   A   Yes.
16   Q   You're aware of that?
17   A   Yes, sir.
18   Q   Okay.  And your statement was that you
19 don't need a -- and you didn't say this.  I'm
20 going to put these words in your mouth.  You
21 don't need a baton policy at this point because
22 y'all don't carry them?
23   A   I don't.  Well, I'm going to say --
24 let me rephrase that.  I don't carry a baton.
25   Q   Okay.  Are there other officers that

10  (Pages 37 to 40)

Page 41

1  do in Washington County Sheriff's Department?
2      A   I see -- they don't carry a baton, one
3  of the long batons.  They have a little metal
4  -- I think they're called ass batons or
5  something.
6      Q   Could you spell that?
7      A   I'm not for sure.
8      Q   You're saying ash baton?
9      A   Ass baton.  Ass baton, not ash.
10     Q   Like a-s-s?
11     A   Um-hum (affirmative response).
12     Q   That's what I thought you meant.
13 That's why I asked you to spell it.  I didn't
14 want to say it if you weren't going to spell
15 it.
16         Okay.  You don't know how it got that
17 name, do you?
18     A   No, sir.  But to add on to the
19 question you asked, we do -- in the academy,
20 they do train you on how to use an ass baton, a
21 nightstick.  They show you where to strike a
22 person at if it just so happens you would have
23 to use that.  You would get all that training
24 through the law enforcement training academy.
25     Q   Okay.  Have you received any training

Page 42

1  on the use of a baton since you've been at
2  Washington County Sheriff's Department under
3  Milton Gaston?
4      A   No, sir.
5      Q   Under the previous administration?
6      A   I think so.
7      Q   Okay.  Is there any policy and
8  procedure that was in place in March of 2012
9  regarding use of a flashlight to strike a
10 detainee?
11     A   No, sir.
12     Q   Was there any prohibition to using a
13 flashlight to strike a detainee or an arrestee?
14     A   No, sir.
15     Q   No prohibition.  Okay.  Is there any
16 policy that was in effect in March of 2012 for
17 reporting criminal activity of a fellow
18 officer?
19     A   Yes.
20     Q   What policy?
21     A   You're saying policy?  No, no, it's
22 not.
23     Q   And can you just define what simple
24 assault is?
25     A   Assault that constitutes injuries but

Page 43

1  not -- non-life-threatening injuries.
2      Q   Okay.  And aggravated assault?
3      A   Aggravated assault is the injuries
4  that's severe and is almost life-threatening or
5  put a person in fear of immediate danger.
6      Q   Okay.  And when a detainee or an
7  arrestee is injured in March of 2012, what was
8  the policy regarding reporting such injuries?
9      A   When a person is injured, first of
10 all, you have to -- you take them down and you
11 book them in.  Then you call -- get them
12 checked out by paramedics.  Then you take them
13 to the Washington County Regional.
14     Q   Okay.  How is an injury regarding an
15 injured detainee communicated to dispatch?
16     A   It's different ways.  You can come
17 across the radio and advise that a subject has
18 been injured.  You can call them on the phone
19 and let them know that the subject has been
20 injured.
21     Q   Okay.  Is there any particular policy
22 that requires you to utilize certain channels
23 of communication to report the injury?
24     A   No.
25     Q   And that's -- when I'm referring to

Page 44

1  that, I mean that was in effect in March of
2  2012?
3      A   No.
4      Q   Okay.  Prior to March of 2012, had you
5  ever talked with Michael Prince before?
6      A   No.
7      Q   Since that time, have you ever talked
8  with him other than today?
9      A   No.
10     Q   Have you ever talked to Michael
11 Prince's parents?
12     A   No.
13     Q   Okay.  During the 2011-2012 year, did
14 you have familiarity with the Wayne Pearson
15 Trailer Park?
16     A   Yes, sir.
17     Q   You grinned really wide when I said
18 that and that's okay.  Tell me a little bit
19 about what your impression of that trailer park
20 is as an officer.
21     A   Well, the manager, Bobbie White, she
22 was the manager out there during this time.
23 She had a tendency of calling the sheriff's
24 department a lot.
25     Q   And did you have occasion to go out

Page 45

1  there from 2011 to March of 2012 on more than
2  one occasion?
3      A   Yes, sir, from house burglaries to
4  just general complaints about disturbances,
5  just animal complaints like dogs just running
6  around.  I mean, yes, sir.
7      Q   Gunshots?
8      A   On several occasions, yeah.
9      Q   Is it fair to say it would not be
10  unfamiliar to the Washington County Sheriff's
11  Department to get disturbance calls on a weekly
12  basis for Wayne Pearson Trailer Park during the
13  2011-2012 year?
14      A   Yes, sir.
15      Q   Okay.  From January 1, 2012 to March
16  17th of 2012, about how many times had you been
17  out personally to the Wayne Pearson Trailer
18  Park?
19      A   I can't give you an exact number.
20  More than ten.  I mean, we went out a lot.
21      Q   Pretty regularly?
22      A   Yes, sir.
23      Q   And would that be true for the
24  officers that were under you tutelage or under
25  your management supervision?

Page 46

1      A   Yes, sir.
2      Q   Y'all went out there a good bit,
3  didn't you?
4      A   Yes, sir.
5      Q   Had you ever had an occasion prior to
6  March 16th, 17th, 2012 to run into Michael
7  Prince out there?
8      A   No, sir.
9      Q   Do you know or did you receive any
10  reports from any of your officers that you
11  supervised prior to March 16th, 2012 that they
12  had had any run-ins with Michael Prince out at
13  the Wayne Pearson Trailer Park?
14      A   No, not to my knowledge.
15      Q   All right.  Were you familiar with a
16  gentleman named Steven Johnson at the Wayne
17  Pearson Trailer Park?
18      A   No, sir.
19      Q   Any particular person from January
20  1st, 2012 to March 2012 that you gained
21  familiarity with by going out to the Wayne
22  Pearson Trailer Park other than Ms. White?
23      A   It's a lady up on the first trailer
24  when you turn in off of Raceway.  I think her
25  name was Shell.  I knew her.  I had a couple of

Page 47

1  calls on her about her children out there or
2  those kids out there getting into it.  But
3  that's about it.
4      Q   Okay.  Were there other neighborhoods
5  that had similar call frequencies in your
6  patrol area and to the Wayne Pearson Trailer
7  Park?
8      A   You get a few calls off Wilmont, off
9  Duck Tape Trailer Park.  It's the same thing.
10  You know, they had some of the same crimes that
11  -- same calls, rather, that Pearson had.
12      COURT REPORTER:  Did you say duck
13  tape?
14      THE WITNESS:  Yes, ma'am.  That's a
15  nickname we gave them.  It's kind of a
16  run-down trailer park.
17  BY MR. HALL:
18      Q   All right.  Now I'm curious.  What's
19  the real name of it?
20      A   Normally, when they call a call in out
21  there, it's get off Avondale Drive or Bristol
22  Place or something like that.
23      Q   So you officers have you been out
24  there enough you've got your own nickname for
25  it, right?

Page 48

1      A   Yes, sir.
2      Q   Okay.  So let's say between January
3  1st, 2012 and March 17th, 2012, had you had any
4  information of any of the officers that you
5  supervised being involved in altercations at
6  the Wayne Pearson Trailer Park?
7      A   No.
8      Q   Had you had any information at the
9  Wayne Pearson Trailer Park where officers
10  conduct had been reported as excessive in terms
11  of using force?
12      A   No.
13      Q   Do you know a person by the name of
14  Merick Cleveland?
15      A   Merick Cleveland.  Merick Cleveland.
16  Yes, I know Merick.
17      Q   Who is that?
18      A   His mom used to be my -- as a matter
19  of fact, his mom is Betsy Ann Cleveland.  She
20  do all the catering for my wife and I.
21      Q   Anything else you know about Merick
22  Cleveland?
23      A   I want to say he was in a vehicle
24  pursuit under the old sheriff or something.
25  No.  It could have been Sheriff Gaston.  A

Page 49

```
1   vehicle pursuit or something like that.  But I
2   don't know the details of it.
3        Q   What about Brenda Gibbs, do you know
4   her?
5        A   Brenda Gibbs?  Yeah, I know Brenda.  I
6   think I was involved in an accident with her.
7   Brenda Gibbs, yeah.
8        Q   Did she file a lawsuit against you?
9        A   Yes, sir.
10       Q   And this would be involving an auto
11  accident?
12       A   Yes, sir.
13       Q   Okay.  What were the allegations, if
14  you remember?
15       A   She said I ran a stop sign or
16  something right there at Colorado and Lowe's
17  Road, in which I had stopped.
18       Q   Would this have been while you were on
19  duty or is this in your personal vehicle?
20       A   On duty.
21       Q   Okay.  And were you sued in your
22  capacity as a deputy sheriff or individually?
23       A   A deputy sheriff.
24       Q   Okay.  And do you know who Breanna
25  Pennington is?
```

Page 50

```
1        A   Yeah.  She was also listed in the
2   lawsuit.
3        Q   Okay.  And Breanna Pennington and
4   Brenda Gibbs, that was the same lawsuit?
5        A   Yes, sir.
6        Q   These weren't two separate suits?
7        A   No.
8        Q   If they were two separate suits, it's
9   the same incident?
10       A   Yes, it's the same incident.
11       Q   Okay.  And would this have been in
12  2011, if you remember?
13       A   I can't remember when it was.  It was
14  like more so 2009 or 2010, something like that.
15       Q   Okay.
16           MR. HALL:  And if we can, we'll have
17  this marked as an exhibit.
18           (EXHIBIT 3 MARKED FOR THE RECORD.)
19  BY MR. HALL:
20       Q   I'm going to show you Exhibit 3.  And
21  the reason I referenced 2011, this is a lawsuit
22  by Brenda Gibbs and Breanna Pennington v. Mack
23  White, individually and officially.  There's a
24  judgment of dismissal on December 2nd, 2011.
25           Does that refresh your memory as to
```

Page 51

```
1   the two individuals in the incident we were
2   discussing?
3        A   Yes.
4        Q   Okay.  And you said it probably
5   happened in 2009?
6        A   Yeah, it was somewhere around 2009.
7        Q   And then that's not unusual for a
8   legal process.  It takes a little while.  So it
9   was dismissed in 2011; is that fair?
10       A   Yes, sir.
11       Q   And that had nothing to do with use of
12  force or anything to that affect while you were
13  an officer at Washington County?
14       A   No, sir.  It was from a car wreck.
15       Q   Okay.  I have to ask.  Okay.  Let's
16  spring forward to March 16th, March 17th, 2012.
17  Were you on duty that evening?
18       A   Yes, sir, I was.
19       Q   Okay.  And what were your duty
20  assignments on that day?
21       A   Just like normal -- normal duty
22  assignments.  We'll come in for a shift
23  meeting.  I let them know what I have.  If
24  somebody needs to be picked up or transported
25  to the hospital or do anybody need a relief at
```

Page 52

```
1   the hospital with a lunacy or an inmate or
2   something, I'll have a guy assigned to go and
3   take care of it.  But if not, we fill up with
4   gas and get out and just ride and check the
5   county.
6        Q   Were you assigned to a specific
7   portion of the county?
8        A   No, sir, not as a supervisor.  I roam
9   all over.
10       Q   And do you remember what day of the
11  week this was?
12       A   No, sir.
13       Q   Okay.  And do you remember being
14  called to go to the Wayne Pearson Trailer Park
15  about a disturbance?
16       A   I wasn't called.  Actually, I was on a
17  call on Stokes Road or L and W Fish Farm when
18  Sergeant Parson come across the radio, him and
19  Deputy Marshall, about a disturbance call at
20  Wayne Pearson.  And Sergeant Parson come across
21  the radio advising dispatch that he had these
22  shots fired in the area.  So I finished up my
23  call and proceeded to call -- to the area they
24  was at.
25       Q   Okay.  Tell us what you remember about
```

Page 53

1    that incident.
2        A   Okay.  When I proceeded to the area,
3    when I got there, Sergeant Parson was standing
4    -- was walking along the fence line in the back
5    of Pearson Trailer Park there.  I asked him
6    what he had.  He said the guy just run out in
7    the woods and went to shooting.  You could hear
8    -- you could hear him walking in the woods.  At
9    that time I said, well, I'm going to go into
10   the woods this way.  You just make sure he
11   don't come -- he don't come and double back on
12   us.
13       I went into the woods.  I had my radio
14   and my flashlight in my hands.  I went into the
15   woods shining my light.  And, therefore, I
16   located Mr. -- I located a black male laying on
17   the ground with no shirt on, sweating and with
18   his hands under him.  At that time I told him
19   didn't move -- I mean don't move.  And as he
20   tried to run -- he got up and tried to run, his
21   legs got tangled up in some vines and tree
22   branches.  At that point I ran into him and
23   tackled him.
24       When I tackled him, I lost my
25   flashlight and my radio fell out of my hand.

Page 54

1    So as he was still trying to get up, we both
2    were tangled up in vines.  But he got up before
3    I did.  I knocked him down again.  I pushed him
4    down again.  I got on top of him and I put my
5    knee in his back and I had him at gunpoint and
6    told him don't move.  And at that time he was
7    steady trying to fight, so I holstered my gun.
8        I was telling the other guys about him
9    knocking the radio out of my hand.  I was
10   telling the other guys, I said, I got him over
11   here.  "Stop resisting."  "Stop resisting."  He
12   was steady swarming, trying to fight, trying to
13   get away.  At that time Deputy Cartlige come in
14   and took him into custody.
15       Q   Curliss?
16       A   Cartlige.
17       Q   Spell that, please.
18       A   C-a-r-t-i-l-e-d-g-e.  So when he come
19   around there and helped me find -- took him
20   into custody.  It was so heavy and it had so
21   much -- it was so thick in there that you
22   couldn't really -- you really couldn't see
23   nothing.  The only reason why I found my radio,
24   because when they keyed up to talk, I found
25   that.  And I never did find my flashlight.

Page 55

1        Q   And obviously this is in March?
2        A   Um-hum, March the 17th.
3        Q   Okay.
4        A   March 16th, rather.
5        Q   All right.  Now, you came on the
6    scene?
7        A   Yes, sir.
8        Q   Exited your vehicle?
9        A   Yes, sir.
10       Q   Do you remember about what time that
11   was?
12       A   Is it okay to refresh my memory?  I
13   have my report.
14       Q   Please do.  That's fine.
15       A   It had to be around 11 something,
16   11:30 at night.  It was 2330.  Yeah, that's
17   11:30.  All right.
18           MR. HALL:  Well, let's have this
19   marked.  It'll be Exhibit 4, right?
20           COURT REPORTER:  Um-hum (affirmative
21   response).
22           (EXHIBIT 4 MARKED FOR THE RECORD.)
23   BY MR. HALL:
24       Q   Okay.  We've handed you another
25   document.  The document we had marked as

Page 56

1    Exhibit 4 was Bates No. WCM-279, correct?
2        A   Yes, sir.
3        Q   Okay.  And this is for the record for
4    clarity.  Okay?
5        A   Okay.
6        Q   And you've been handed another
7    document that is Bates stamped WCM-281, right?
8        A   Yes, sir.
9        Q   If it's okay, we'll just make those
10   all part of Exhibit 4.  All right?
11       A   Okay.
12       Q   And those are -- both of those pages
13   are your complete report for that incident that
14   we've been discussing; is that fair?
15       A   Yes, sir.
16       Q   Okay.  All right.  You refreshed your
17   recollection with what's been marked as Exhibit
18   No. 4?
19       A   Yes, sir.
20       Q   Now, I'd asked you what time you
21   arrived on scene and exited your vehicle.  Does
22   that document refresh your memory as to the
23   time?
24       A   Yes, it does.
25       Q   And what time is that?

Page 57

1   A   11:30 at night.
2   Q   And is that going to be on March the
3   17th?
4   A   No. That's going to be March the
5   16th.
6   Q   Okay. And so this document that we've
7   marked as Exhibit No. 4 actually has a date
8   stamp of 3/17/2012?
9   A   Yes, sir.
10   Q   Can you explain that?
11   A   Yes, sir. I went to a call on March
12   the 16th. I assisted the units on March 16th
13   at 11:30. I didn't do the report until like at
14   7:00 -- 7:17 a.m. on the next day. That's when
15   I -- after I got all of the information from
16   the hospital and talked with my supervisor, I
17   left. After I went back trying to find some
18   evidence, I left and went back to the office
19   and done a report.
20   Q   Okay. There are parts of your report
21   that appear to continue over into about 1:57
22   and 2 a.m.?
23   A   Yes.
24   Q   Okay. And so is it fair to say then
25   that March 16th and March 17th is a

Page 58

1   continuation of the same incident or series of
2   events involving the incident that we're
3   discussing here?
4   A   Yes, sir. Yes, sir.
5   Q   Okay. And so we're clear on that?
6   A   Yes, sir.
7   Q   Sergeant Parson. You got out of your
8   vehicle sometime around 11:13, right? Is that
9   what you said?
10   A   At 11:13 Sergeant Parson came across
11   the radio and advised that he had shots fired.
12   I didn't make it on scene until 11:30.
13   Q   11:30. Okay. And at 11:30 you got
14   out of your vehicle?
15   A   Yes.
16   Q   Where was Sergeant Parson when you got
17   out?
18   A   When I pulled up, I pulled off of
19   Raceway Road and pulled right behind his car in
20   the trailer park.
21   Q   All right. We've been making pretty
22   little pictures on Exhibit No. 1. If you
23   would, take out that red Sharpie right there
24   and just draw a star where you just pointed to
25   say that that's where you were stopped.

Page 59

1   A   (Witness complies.)
2   Q   Okay. So that's in about the middle
3   of the trailer park?
4   A   Of the trailer park, yes, sir.
5   Q   Okay. And you said Parson was along a
6   fence line. There's a dark line drawn already
7   on that piece of paper. Is that what you're
8   calling the fence line on Exhibit 1?
9   A   Yes, sir.
10   Q   Okay. And you drew a star. And you
11   also pointed to a spot along the fence line
12   that's in between two of those trailers. Is
13   that where you saw Sergeant Parson?
14   A   No. I was pointing at the fence line.
15   Sergeant Parson was walking along the fence
16   line here. I actually -- I went between the
17   trailers and met him. He was walking, and he
18   told me -- well, briefed me on what he had.
19   And the guy was out in the woods.
20       So I left and went around the fence
21   line off of the Raceway Road side here and
22   started in the woods. You could hear him
23   walking.
24   Q   You could hear who walking?
25   A   Michael Prince.

Page 60

1   Q   And that's the person that's in the
2   woods?
3   A   Yes.
4   Q   Did you know at the time you had
5   walked around that fence line going into the
6   woods that was Michael Prince?
7   A   No, sir. No, sir.
8   Q   Okay. Just being clear. All right.
9   So when you got to the fence line and saw
10   Officer Parson, had you heard any shots?
11   A   No, sir.
12   Q   What was your understanding about
13   hearing shots?
14   A   Well, when he come across the radio,
15   he just said, "S.O., I've got a subject that
16   run out in the woods, right at the edge of the
17   woods, and shots have been fired." That's what
18   come across the radio.
19       So immediately when you have a unit
20   that says that, calling for assistance, I mean,
21   you pretty much drop everything and get there.
22   Q   Okay. Did Sergeant Parson ever tell
23   you that the person ran into the woods and then
24   fired the shots?
25   A   That's what he told me. That's what

15 (Pages 57 to 60)

Page 61

1  he said. He said once they was out in the
2  woods, once the subject run out in the woods
3  behind Pearson Trailer Park and fired, he heard
4  the shots. That's what he said.
5      Q   Okay. And so it was your
6  understanding when you got there, that the
7  person in the woods that you were about to go
8  chase, that you could hear, that turned out to
9  be Michael Prince had fired shots from in the
10  woods?
11     A   Yes, sir, that was my understanding.
12     Q   And that came from -- that
13  understanding came from Sergeant Parson to you?
14     A   Yes, sir.
15     Q   So you talked to Sergeant Parson along
16  the fence line. You stated that you walked
17  back around the fence line and went around the
18  fence?
19     A   Um-hum (affirmative response).
20     Q   This fence, did it have gaps or holes
21  that you could crawl through?
22     A   No, sir.
23     Q   Okay. It was a solid fence?
24     A   It was a chain-link fence, yes.
25     Q   Chain link?

Page 62

1      A   Yes, sir.
2      Q   So you could actually see through the
3  fence?
4      A   Yes, sir.
5      Q   But you just couldn't crawl through
6  it?
7      A   No. There was no holes in it.
8      Q   But it wasn't like one of these wooden
9  decorative fence?
10     A   No. It was chain link.
11     Q   Okay. What were the lighting
12  conditions as you rounded this fence line here?
13     A   It was dark. It was dark.
14     Q   Were there any street lights?
15     A   The street lights was in the trailer
16  park. I know they have pole lights. It's a
17  couple of pole lights on Raceway. But as you
18  entered into the woods, it was so thick. I
19  mean it was dark in there.
20     Q   Okay. And you had a flashlight?
21     A   Yes, sir.
22     Q   And were you alone or were there other
23  officers following you?
24     A   I was the only one.
25     Q   So you were the sole officer that was

Page 63

1  going into the woods after someone who had --
2  was your understanding, who had fired shots?
3      A   Yes, sir.
4      Q   Okay. Did you have any type of
5  protection? A bulletproof vest or anything
6  like that?
7      A   I always wear my vest. Yes, sir.
8      Q   Okay. I have to ask.
9          MR. PHILLIPS: You were wearing your
10  vest?
11         THE WITNESS: Yes, sir.
12         MR. HALL: You thought he said no,
13  right?
14         MR. PHILLIPS: I couldn't hear him.
15         MR. HALL: Okay. That's what it
16  sounded like to me, too.
17  BY MR. HALL:
18     Q   Okay. Yeah, it sounded like you said
19  you weren't wearing your vest.
20     A   No. I was wearing my vest. Yes, sir.
21     Q   Okay. I just want to make sure. But
22  you were wearing your vest, all joking aside?
23     A   Yes, sir.
24     Q   And so you proceed on into the woods?
25     A   Yes, sir.

Page 64

1      Q   And your statement was you could hear
2  someone walking?
3      A   Yeah, you could hear someone walking,
4  yes, sir.
5      Q   Okay. Did you initiate any verbal
6  commands?
7      A   Yes. When I come across him, at that
8  time I told him didn't move. And at that time
9  when I told him didn't move, he was climbing up
10  to his -- climbing up using his -- he was
11  laying there with his hands -- hands up under
12  him, and he was sweating profusely. So when I
13  told him -- gave him the verbal command to
14  don't move, that's when he started to get up
15  and try to run, but he got tangled up in the
16  vines. That's when I tackled him the first
17  time.
18     Q   Okay. Maybe you got a little ahead of
19  me and maybe you didn't. As you rounded the
20  fence line right here, the part closest to the
21  road, and this, I believe, is marked as North
22  Raceway Road; is that right?
23     A   Yes, sir.
24     Q   That's on Exhibit 1. So there's a gap
25  between this black line what looks like is a

16 (Pages 61 to 64)

Page 65

1    fence and north Raceway Road?
2        A   Yes, sir.
3        Q   And that's the route that you took,
4    right?
5        A   Yes, sir.  I come right around --
6    walked behind the trailers and come right
7    around the fence and made that sharp right and
8    walked back down.
9        Q   This, what I'm calling a gap between
10   Raceway and this black fence line that we've
11   drawn in here, looks like there's a little
12   opening right there.  Is that fair enough to
13   say?
14       A   Yes, sir.
15       Q   When you reached that opening, before
16   you went into those woods, did you initiate any
17   verbal commands?
18       A   No, sir.  No, sir, not at that time.
19       Q   All right.  So when you rounded there,
20   you just headed straight into the woods?
21       A   Headed straight in the woods.
22       Q   Did you identify yourself at all to
23   the person that was in the woods?
24       A   No, sir.
25       Q   Did you let him know you were coming?

Page 66

1        A   No, sir.
2        Q   Why not?
3        A   Why not?  I'm trying to sneak up on
4    him.  You can't have somebody out there
5    shooting.  I'm trying to get up on him.  I
6    mean, if you're out there shooting, we can't
7    have somebody just running out of the woods, I
8    mean, just shooting.
9        Q   Okay.  Well, you said you could hear
10   him?
11       A   Yeah.  So I know if he could hear -- I
12   could hear him, he could hear me.  I know that.
13       Q   Right.  So you assumed that he could
14   hear you, too?
15       A   Yeah.  He knew that the police was
16   there.
17       Q   Did he know you were a policeman?
18       A   No, sir, he didn't.
19       Q   You never identified yourself?
20       A   No, sir, I didn't.
21       Q   Okay.  You had a flashlight?
22       A   Yes, sir.
23       Q   And a radio?
24       A   Yes, sir.
25       Q   What hand did you have your flashlight

Page 67

1    in?
2        A   My flashlight was in my right hand and
3    my radio was in my left.
4        Q   Okay.  And did you walk along the
5    fence line or were you into the woods?
6        A   I come along the fence line for so
7    many feet.  Then I cut off at -- cut back at
8    south.  So that would be I took a left to the
9    south.
10       Q   Okay.  About how deep were you away
11   from the fence line?
12       A   A good 20, 25, 30 feet.
13       Q   Okay.  When you looked back towards
14   the trailer park, could you see the trailers?
15       A   Yes, sir.
16       Q   You could see the lights?
17       A   Yeah.  Very little lighting.
18       Q   Could you see any of your deputies
19   along the fence line?
20       A   No, I couldn't.
21       Q   And you said you were alone.  No
22   deputies were following you?
23       A   No.  Because at the time when I made
24   it there, the only deputy I saw was Sergeant
25   Parson.  I didn't even see Deputy Marshall.

Page 68

1    The only somebody I saw was Sergeant Parson.  I
2    just told him to monitor the fence line while I
3    go in and try to flush him out.  We just -- we
4    didn't want him to double back on us.
5        Q   Okay.  So along the fence line, that's
6    where you told the officers to station
7    themselves?
8        A   Yes.  That was -- Parson was already
9    there shining lights prior to my arrival.
10       Q   Okay.
11       A   So I just told him just to monitor the
12   fence line while I go out and make sure he
13   don't -- the guy don't double back on us.
14       Q   Okay.  This fence along the trailer
15   park from Raceway Road, how far does it run?
16   Does it run the entire length of the trailer
17   park?
18       A   It runs all the way back to here, I
19   think, this house -- this trailer back over
20   here.  I don't know if the fence could -- I
21   can't remember if the fence stops and go south
22   or not.  I can't remember.  But I know it runs
23   along these trailers here (indicating).  It
24   runs all the way.
25       Q   Is the fence closed?  Is it an

Page 69

1  enclosure?
2      A    No. It's just this fence here. I
3  don't know if it goes back. It don't close the
4  whole -- box the whole trailer park off, no.
5  It's just a line here (indicating). I can't
6  remember whether it goes south or not.
7      Q    All right. We've done a lot of
8  pointing on this exhibit. We probably need to
9  draw a dotted line with -- you can use the red
10  marker where you say the fence line runs. If
11  you will, let's go ahead and draw that on
12  Exhibit 1. I don't care what we use. Just
13  mark it. I don't think you can read it if you
14  just use a highlighter. But you can try it and
15  see if it works. No, you're not going to be
16  able to read that.
17          MR. PHILLIPS:  I've got a green one.
18          MR. HALL:  That's fine. That'll
19  probably show up. Nothing is going to
20  show up when we copy it.
21          MR. PHILLIPS:  Does that work at all?
22          THE WITNESS:  Yeah, it works.
23  BY MR. HALL:
24      Q    Okay. You're drawing a green dotted
25  line where, to the best of your knowledge,

Page 70

1  that's where the fence line runs?
2      A    Yes.
3      Q    Okay. Is this fence more like a
4  barrier than an actual fence that encloses
5  anything?
6      A    I would say it's more like a barrier.
7      Q    Yeah. That's what it sounds like.
8  Okay. So you're out there. You hear somebody
9  in the woods. You take your flashlight and
10  you've got a radio in your other hand. You
11  don't have your weapon drawn?
12      A    No, sir, not at that point.
13      Q    Why not?
14      A    Because, I mean, I'm still looking. I
15  mean, I'm still looking. I'm communicating. I
16  got the flashlight in one hand shining, and I
17  got the radio communicating with the other
18  guys.
19      Q    And you're in the woods where you
20  understand that someone has fired shots?
21      A    Yes, sir.
22      Q    And you can hear a person. And you've
23  not drawn your service revolver?
24      A    Not yet.
25      Q    Okay. And that's because you haven't

Page 71

1  identified the person?
2      A    I haven't identified him yet.
3      Q    All right. Where were you when -- if
4  you can on this picture, take that green marker
5  and show -- draw a little X where you were when
6  you came upon what later was identified as
7  Michael Prince.
8      A    He wasn't -- he was going to be
9  somewhere -- somewhere right up in here
10  (indicating).
11      Q    Okay. So if we were to go straight
12  north, we'd almost run right into your -- where
13  the little star is where you had your police
14  vehicle parked, right?
15      A    Yes, sir.
16      Q    Okay. When you were there, could you
17  hear voices coming from the trailer park?
18      A    I could hear. What I was telling
19  Mr. Prince, well, the gentleman --
20      Q    You can call him Mr. Prince. That's
21  fine.
22      A    Mr. Prince, when I was telling him to
23  stop resisting, he was steady trying to fight
24  and trying to get away. I'm steady telling him
25  stop resisting, stop resisting. I can hear

Page 72

1  some people in the background when I stopped --
2  when I tell him stop resisting, I can hear some
3  people talking in the background. I don't know
4  whether they were civilians or the other
5  deputies trying to get to me.
6      Q    Okay. You came upon him. You said he
7  was sweating profusely?
8      A    Yes, sir.
9      Q    And he got up. You told him --
10      A    Yeah, he was trying to get up. His
11  feet were tangled up in the vines and the
12  brushes. And at that time I tackled him. And
13  when I tackled him, during the process of me
14  tackling him, I dropped my flashlight, and my
15  radio fell out of my hand. So at that time he
16  tried to get back up. That's when I knocked
17  him down and put my knee in his back and had
18  him at gunpoint.
19      Q    Okay. And at what point did you place
20  the cuffs on him?
21      A    I didn't place the cuffs on him until
22  Deputy Cartlige got there. Deputy Cartlige was
23  the one that helped me put the cuffs on him.
24      Q    All right. So you had your knee in
25  his back?

Page 73

1    A   Yes, sir.
2    Q   And where was his face?
3    A   His face was down in the brush, down
4 in the brushes and, I guess, the tree limbs and
5 all that.
6    Q   Okay. All right. And you came upon
7 him. I don't want to put words in your mouth.
8 This is my recollection of what you said. You
9 hit him with a flashlight.
10   A   I didn't never hit him with a
11 flashlight.
12   Q   Excuse me.
13   A   I didn't never hit him with a
14 flashlight.
15   Q   No, no, no. The beam, the flashlight
16 beam, you shined the light. Let me say this
17 more eloquently.
18   A   Yeah, clarify that.
19   Q   I'm going to get to that in a minute.
20 But you shined the beam on him?
21   A   I shined the light, yes.
22   Q   Yes, the flashlight beam. And he was
23 sweating profusely?
24   A   Yes.
25   Q   What command did you give him at that

Page 74

1 point?
2    A   Not to move. Stop.
3    Q   Okay. At that point did you identify
4 yourself as a police officer?
5    A   No. But my radio -- the radio traffic
6 that I had, I mean, that I was relating to the
7 other officers, he knew I was a police officer.
8    Q   You made that assumption. You didn't
9 tell him you were a police officer?
10   A   No.
11   Q   Okay. So you told him --
12   A   Don't move.
13   Q   And he tries to get up?
14   A   And he tries to get up.
15   Q   You tackle him?
16   A   Yes, sir.
17   Q   And you put your knee in his back?
18   A   The second time, yeah.
19   Q   The second time. And what was the
20 purpose of that?
21   A   He was trying to get away. And he had
22 already lost my radio. I couldn't call for
23 help. And I lost my flashlight. I just wanted
24 to put some weight on him and some pressure on
25 him until the other units got there, I mean,

Page 75

1 because he was fighting.
2        And then after I had my weapon drawn,
3 I didn't want him to get my weapon, so I was
4 keeping his head down like this with my knee in
5 his back with my gun drawn just like this here
6 (indicating).
7    Q   Were you on top of him?
8    A   Yes, sir, I was.
9    Q   Okay. What part of his body were you
10 in contact with?
11   A   What do you mean? I was on his -- I
12 had my knee in his lower part and this hand
13 here (indicating) was around his neck area.
14   Q   And you were holding him down?
15   A   And I was holding him down, yes, sir.
16   Q   And about how -- size wise, what's the
17 comparison?
18   A   What do you mean?
19   Q   Could you tell when you were out there
20 that he was a bit smaller than you?
21   A   I could tell that. But through my
22 training and experience, a little guy will hurt
23 you faster than a bigger guy will. So I ain't
24 taking no chances.
25   Q   Okay. I'm not asking you to. I'm

Page 76

1 just asking you what your observations were.
2    A   Okay.
3    Q   All right. So you're out there.
4 You've got your knee in his back and your hand
5 on the back of his head?
6    A   Yes, sir.
7    Q   Was he acting in any manner aggressive
8 towards you?
9    A   Yeah. He wasn't following commands.
10 He wasn't following my commands.
11   Q   I understand that. You had stated he
12 was trying to run.
13   A   Yeah, he was trying to get away.
14   Q   Was he trying to attack you in any
15 way?
16   A   He was trying to get away. I mean
17 fighting and all that trying to get away.
18   Q   Okay. You used the term "fighting."
19 Describe exactly what he was doing.
20   A   Swinging his arms, I mean, snatching
21 away, I mean, all that.
22   Q   Was he swinging?
23   A   He's swinging his arms, I mean,
24 snatching away, trying to -- scooting and
25 trying to get up. I mean, he's making all

19 (Pages 73 to 76)

Page 77

1 kinds of gesture trying to flee.
2     Q  Did you see a weapon?
3     A  No.
4     Q  Okay.  Were you looking for one?
5     A  I was looking for one.  I didn't see
6 his hands when I first come in contact with
7 him, so I was looking for one, yeah.
8     Q  Okay.  When you had your flashlight
9 shining on him, not when you hit him with your
10 flashlight, when you --
11     A  I never hit him with a flashlight.
12     Q  I understand that.  When you had your
13 flashlight shining on him, you didn't see a
14 gun?
15     A  No.  I didn't even see his hands.
16     Q  Okay.  You're saying his hands were
17 completely under him?
18     A  Under him, yeah.  He was laying on his
19 hands.
20     Q  And he got up to run.  You tackled him
21 the second time, because he got up and tripped
22 the first time.
23     A  When his feet was tangled up -- okay.
24 The first time when his feet was tangled up, he
25 tried to run.  That's when I -- I had my

Page 78

1 flashlight and my radio.  I tackled him, lost
2 my flashlight.  The radio was knocked out of my
3 hand.
4     The second time, as he tried to get
5 up, I knocked him down.  I put my knee in his
6 back and had him at gunpoint.  I hand my hand
7 around his head.  That's what happened.
8     Q  Okay.  And then what we had discussed,
9 you said he was swinging his arms?
10     A  Swinging his arms.
11     Q  Was he swinging his arms in an effort
12 to hit you?
13     A  He was swinging his arms.  I mean, as
14 far as trying to hit me, I can't really say he
15 was trying to hit me.  I know he was swinging
16 his arms trying to get away.  And I'm doing
17 everything I can until I can get some backup
18 there to help me.
19     Q  Okay.  And now I'm going to ask you
20 did you ever strike him with your flashlight?
21     A  No.  I never hit him.
22     Q  Did you ever strike him with any
23 object?
24     A  No, sir, I didn't.
25     Q  Did you ever strike him with your

Page 79

1 hands?
2     A  No, sir, I didn't.
3     Q  Okay.  Now, at some point you put the
4 cuffs on him?
5     A  Myself and Byron Cartlige.  Deputy
6 Cartlige helped me to put cuffs on him.
7     Q  Okay.  What did Deputy Cartlige do to
8 help you put cuffs on him?
9     A  Grabbed his wrists and helped me put
10 his hands behind his back.
11     Q  All right.  And this is while y'all
12 were still in the woods out here?
13     A  Yes, sir, it is.
14     Q  All right.  Did Deputy Cartlige have a
15 light, flashlight?
16     A  Yes, sir.
17     Q  Was he shining the light on Mr. Prince
18 at any point in time?
19     A  I'm not aware of it.
20     Q  Okay.  Did you ever see Deputy
21 Cartlige strike Mr. Prince?
22     A  No, sir, I didn't.
23     Q  Did Deputy Cartlige ever put his hands
24 on Mr. Prince?
25     A  No, sir, besides putting his hands --

Page 80

1 helping me put his hands behind his back.
2     Q  Other than helping you cuff him, you
3 never saw Deputy Cartlige touch him whatsoever?
4     A  No, sir.
5     Q  Okay.  And you certainly never saw
6 Deputy Cartlige hit him with any object?
7     A  No, sir.
8     Q  During that time, was there anyone in
9 the trailer park making any sounds, yelling at
10 you-all?  Did you ever hear anything like that?
11     A  No.
12     Q  Okay.  So when you exited the woods,
13 which way did you go?
14     A  We headed back east.
15     Q  Come back the way you came?
16     A  Yes, sir.
17     Q  All right.  And were you the one that
18 then took Mr. Prince into custody?
19     A  We walked him back -- myself and
20 Deputy Cartlige walked him back to Raceway
21 Road.  He was put into Deputy Jackson's
22 vehicle.  Deputy Jackson transported Mr. Prince
23 down to the sheriff's department.
24     Q  Okay.  So he didn't ride in your car?
25     A  No, sir.

Providence Court Reporting, LLC
Phone:  (601)720-3862

Page 81

1     Q  Okay. Where was Deputy Marshall
2 during all of this?
3     A  I have no idea. I haven't seen him
4 yet.
5     Q  He was not out in the field?
6     A  No, he was not out in the field. The
7 only three people that was out in the field was
8 myself, Deputy Cartlige and Deputy Jackson.
9     Q  Okay. All right.
10       MR. PHILLIPS: We're calling it a
11 field?
12       THE WITNESS: Yes. Or woods.
13       MR. HALL: Woods, field. From here,
14 it looks like it's woods. Is that fair
15 enough? It's woods?
16       MR. PHILLIPS: Yeah. I mean, he said
17 field a couple of times. And I was going
18 I don't remember us talking about any
19 fields until y'all started talking about
20 it.
21       MR. HALL: I guess that's where I
22 picked it up. I don't know.
23       MR. PHILLIPS: I just didn't know if
24 it was like a term of art for him being in
25 service out in the field.

Page 82

1 BY MR. HALL:
2     Q  No. When I use the term "field," is
3 it your understanding that I'm talking about
4 the wooded area?
5     A  Yes, sir.
6     Q  Thank you. I'm not trying to be
7 tricky or anything.
8       MR. PHILLIPS: No, I'm not either.
9 I'm not trying to be technical.
10       MR. HALL: I can see how you --
11       MR. PHILLIPS: When you say "field,"
12 us Delta folks are thinking two different
13 things.
14       MR. HALL: Okay.
15 BY MR. HALL:
16     Q  All right. So you put Prince in a
17 patrol vehicle other than yours. And when is
18 the next time you saw him?
19     A  When I got to the office.
20     Q  That would be the sheriff's
21 department?
22     A  The sheriff's department, yes, sir.
23     Q  Okay. And what was your observation
24 at that point?
25     A  When I got to the office, I noticed

Page 83

1 that he did have a swollen eye. At that time I
2 went on and booked him in. I put him in door
3 No. 2 until the dispatcher got ready for him.
4 Door No. 2 is like a holding cell until
5 dispatch could go ahead and get him booked in.
6     Once we got him booked in, I took him
7 over to Greenville PD where they had an
8 outstanding warrant on him. And from there, I
9 took him to the regional jail. And Jailer
10 Freddie -- the jailers out there told me he
11 needed to be medically cleared. So at that
12 time I called dispatch on the phone and told
13 them to have the ambulance to meet me at the
14 S. O.
15     So I transported Mr. Prince from the
16 S. O. -- I mean from the regional jail back to
17 the S. O. And by that time the ambulance was
18 pulling up. They come in. And at that time he
19 told me, he said -- he told them, rather, that
20 he refuse medical treatment. He didn't want
21 any kind of medical treatment. He signed a
22 refusal form.
23     So I took him back out to the regional
24 jail and told them what had happened, so they
25 went on and accepted him. When they accepted

Page 84

1 him, I get a call around three something from
2 the supervisor out there saying that Mr. Prince
3 wanted to go to the -- need to go to the
4 hospital. I had Deputy Marshall go out there
5 and get him and transport him to the hospital.
6     When he gets to the hospital, Deputy
7 Marshall called me. A couple of hours later,
8 Deputy Marshall called me and told me they was
9 trying to send him to Jackson. I told him, I
10 said, hold on, let me call Major -- call Percy,
11 which is my chief deputy, assistant chief
12 deputy. I called him and told him what I had.
13 He said go ahead and release him, take him back
14 to the regional jail and release him. That's
15 what happened.
16     So after that happened, when daylight
17 come up, I went back out to the scene looking
18 for the gun as well as looking for my
19 flashlight. Which I never did find neither
20 one.
21     Q  Okay. What all did you do to look for
22 a gun?
23     A  What do you mean? I went back there
24 to the area we was in. Which, you know, I was
25 moving the brushes back. I mean, it was thick.

21 (Pages 81 to 84)

Page 85

1  It's thick out there. I'm sitting there moving
2  the brushes back. I didn't have no metal
3  detector or nothing like that. I just went out
4  there and just took a stick and just moved the
5  grass back in the areas where you could see
6  where they walked at. But I never did find one
7  nor did I find my flashlight.
8     Q   Okay. When you had gotten to the
9  scene, initially got out and spoke with Deputy
10 Parson, what was your understanding about how
11 long what later turned out to be Michael
12 Prince was still in those woods? How long was
13 he in there? Do you know?
14    A   I don't know.
15    Q   Were there ever any discussion of
16 that?
17    A   No, it wasn't.
18    Q   Okay. When you first saw him back at
19 the station and you noticed a swollen
20 eye, did you see any blood or anything?
21    A   No, sir, I didn't. I didn't.
22    Q   At any point in time later that night
23 did you see blood on Michael Prince?
24    A   No, sir, I didn't.
25    Q   All right. When you put him in the

Page 86

1  other patrol car to be transported, did you
2  notice any swelling or blood or anything on his
3  face?
4     A   No. I wasn't paying attention. I was
5  just trying to get out of the woods with him
6  and go on and get him from the scene because it
7  was so many people coming up. There was so
8  many people coming up. We just didn't want to
9  cause no ruckus. I just put him in the car and
10 said go ahead. I told them I'll deal with him
11 when I get to the office.
12    Q   People from the trailer park?
13    A   Yes, just people from the trailer park
14 coming out of their houses and all that. So,
15 you know, just being nosy, I guess.
16    Q   Wanting to know what's going on?
17    A   Yeah.
18    Q   All right. Would it be fair to say
19 you kind of walked to his side and rear as you
20 escorted him to the patrol car?
21    A   Yeah, I walked to the side. Both
22 deputies was on each side of him walking to the
23 patrol car.
24    Q   And would you have had an occasion at
25 that point in time to look at him in the face?

Page 87

1     A   I would have, but I didn't. Like I
2  said, my focus was getting him out of the woods
3  into a patrol car.
4     Q   Okay. And do you know what time you
5  would have called the station to tell them you
6  were en route? Or did you?
7     A   What's that?
8     Q   To the jail.
9     A   Do I know what time that I told them I
10 was en route?
11    Q   Right.
12    A   When I called and had her to check
13 warrants on him, it was 11:37. And it was
14 shortly after that 11:37.
15    Q   To your knowledge, was anybody
16 arrested out at the Pearson Trailer Park that
17 night with possession of a firearm?
18    A   Not to my knowledge, no.
19    Q   Okay. You want to take a break for
20 just a second?
21       MR. PHILLIPS: I would. I'd like to
22 take a five-minute break. We've been
23 going a couple of hours.
24       MR. HALL: I know. And I was trying
25 to plow through it.

Page 88

1        (A BREAK WAS TAKEN.)
2  BY MR. HALL:
3     Q   We've been talking about the different
4  policy and procedure manuals.
5        MR. HALL: Can I get this marked?
6  What are we on?
7        COURT REPORTER: Five.
8        MR. HALL: You might as well just go
9  ahead and do six, too. And let's do this
10 one as seven.
11    (EXHIBITS 5 THROUGH 7 MARKED FOR THE RECORD.)
12 BY MR. HALL:
13    Q   All right. I'm going to hand you
14 what's been marked as Exhibit 5 and ask if you
15 can identify that.
16    A   That's copies of the Washington County
17 policies and procedures.
18    Q   Okay. Is this policies and procedures
19 that you're looking at -- we've been referring
20 to policies and procedures that Sheriff Gaston
21 put in place when he came on. Are those the
22 policies and procedures we've been referring to
23 contained in Exhibit 5? Now, if you need to
24 look through there, that's fine.
25    A   (Reviews document.) Yes, sir.

Page 89

1    Q   Okay. Now, these are the ones in
2  Exhibit 5 that were instituted by Sheriff
3  Gaston?
4    A   Yes, sir. No, no, sir, no, sir. No,
5  no, no.
6        MR. PHILLIPS: I don't mean to
7  interrupt, but I can clear it up if you
8  want me to.
9        MR. HALL: I want to know, because I
10  don't know.
11        MR. PHILLIPS: Yeah. I think this is
12  what Victor Smith had.
13        THE WITNESS: No. This is Victor
14  Smith. Yeah, that's --
15        MR. PHILLIPS: I apologize. I mean, I
16  don't want to --
17        MR. HALL: I just want the right
18  answer. I don't care who gives it to me
19  at this point.
20        MR. PHILLIPS: I think Exhibit 5 is
21  going to be the policies which were in
22  place by Victor Smith and continued in
23  place until 2010 when Sheriff Gaston
24  instituted the new policies and procedures
25  which begins at Bates number page 92.

Page 90

1        So 1 through 91 is the old policy. 92
2  begins the new policy.
3  BY MR. HALL:
4    Q   That's the way I had it in my outline
5  I should have referred to. Exhibit 5 is the
6  old policy?
7    A   Yes, sir.
8    Q   Got it. That's what I thought. All
9  right. And I'm going to hand you what's been
10  marked as Exhibit 6 and ask if you can identify
11  that. And that's going to be Bates stamped
12  WCM-92 all the way through WCM-278; is that
13  fair?
14    A   Yes, sir. That's the new policies and
15  procedures from Sheriff Gaston.
16    Q   And I'm going to hand you what's
17  marked as Exhibit No. 7 and ask if you can
18  identify that. Have you seen that document
19  before?
20    A   No, sir. This is dealing with the
21  regional jail. I have not.
22    Q   It states Personnel Manual. That's
23  not something you've ever received a copy of
24  through any sheriff that you've worked for?
25    A   No. This is for the regional jail.

Page 91

1    Q   Okay. All right. Insofar as you
2  know, nothing in the personnel manual, Exhibit
3  No. 7, applies to what you do?
4    A   No, sir.
5    Q   Okay. Now, if you would, turn with me
6  to page 167. It's WCM-167 contained in Exhibit
7  No. 6.
8    A   (Witness complies.)
9    Q   Are you with me?
10    A   Yes.
11    Q   You may want to look back to page 166
12  to just get a frame of reference to where this
13  is coming from. 166 says position: sworn law
14  enforcement officer. Do you agree with that?
15    A   Yes.
16    Q   And this document, sworn law
17  enforcement officer, that pertains to all
18  deputies at the Washington County Sheriff's
19  Department?
20    A   Yes.
21    Q   And that would include you?
22    A   Yes, sir.
23    Q   Okay. And it says supervised by
24  sergeant on there on 166, right?
25    A   Yes.

Page 92

1    Q   All right. And in March of 2012, you
2  were a sergeant?
3    A   Yes, sir.
4    Q   Okay. And on 167 the general duties,
5  No. 27 says, "Protect the constitutional rights
6  of all persons encountered or arrested." That
7  was one of your duties, right?
8    A   Yes, sir.
9    Q   And another one of your duties would
10  be to use force sparingly and only when
11  necessary to effect a lawful end, right?
12    A   Yes, sir.
13    Q   And then on page 168, specific duties,
14  No. 7 states "Protect those in custody."
15  Correct?
16    A   Yes, sir.
17    Q   And all were duties you were required
18  to operate under as a law enforcement officer
19  in Washington County and as a Washington County
20  deputy in 2012 March, right?
21    A   Yes, sir.
22    Q   Okay. Did anybody tell you that the
23  policies and procedures contained in Exhibit 5
24  were no longer in effect at any point in time?
25    A   No.

Page 93

1    Q   They just said -- can you tell me how
2   it came about that you got a new manual?  You
3   got a new sheriff, and he puts this new manual
4   in effect, right?
5    A   Yes.
6    Q   Would you agree with me that they
7   contain less specific information than these
8   policies contained in Exhibit 5?
9       MR. PHILLIPS:  Object to form.
10      THE WITNESS:  Some stuff has been left
11  out, seems to be.
12  BY MR. HALL:
13   Q   Well, what, to you, seems to be left
14  out?
15   A   More detailed verse about the use of
16  force.
17   Q   Do you agree that the use of force
18  policy that is contained in Exhibit 5 is much
19  more detailed than that contained in Exhibit 6?
20   A   Yes, sir.
21   Q   Do you know why that was left out?
22   A   No, sir, I don't.
23   Q   Okay.  Is it your understanding that
24  your use of force policy changed in any way?
25   A   No.  Through our training and

Page 94

1   experience, even at the academy and even in our
2   departmental meetings now with Sheriff Gaston,
3   he stresses all the time use the least amount
4   of force necessary to effect an arrest.  I
5   mean, from day one to when you graduate the
6   academy, they instill that in you.  And
7   throughout the years, throughout my career,
8   different supervisors have been telling me the
9   same thing.
10   Q   Okay.  Who is Major Percy Miles?
11   A   That's Assistant Chief Miles now.  He
12  promoted to assistant chief.
13   Q   Okay.  Was he on duty the night of
14  March 16th?
15   A   No.  He was at home.  He's my
16  supervisor.  That's who I reported to.  That's
17  who I report to.
18   Q   Do you remember filling out
19  interrogatories and requests for production in
20  this matter?
21   A   Yes, sir.
22   Q   And have you had a chance to review
23  those?
24   A   Yes.  But could I see them to go over
25  them again?

Page 95

1    Q   I mentioned interrogatories and
2   request for production.  I'm just first going
3   to hand you your set of interrogatories.  Okay?
4    A   Okay.
5    Q   Would you look on the back page and
6   make sure that's your signature?  It'll be the
7   second to the back page.  I?
8    A   Yes, sir.
9    Q   Okay.  And you swore to these
10  responses under oath?
11   A   Yes, sir.
12   Q   And when you filled these out, to your
13  knowledge, everything in here is true and
14  correct?
15   A   Yes, sir.
16   Q   Okay.
17      MR. HALL:  If we could, let's just go
18  ahead and mark these.
19      (EXHIBIT 8 MARKED FOR THE RECORD.)
20  BY MR. HALL:
21   Q   If you would, look at your response to
22  Interrogatory No. 4.
23   A   (Witness reads document.)  Yes, sir.
24   Q   And you swore to these under oath?
25   A   Yes, sir.

Page 96

1    Q   And to the best of your recollection,
2   is this a fair and accurate representation of
3   what happened?
4    A   Yes, sir.
5    Q   I want to clarify a couple of things.
6   If you'll look about middle of the way down the
7   page on page 3 and answer to Interrogatory No.
8   4, it says, "As I was trying to place plaintiff
9   under arrest, he began to fight me."
10      Do you see that sentence?
11   A   Yes, sir.
12   Q   Okay.  Was he fighting you?  Was he
13  throwing punches at you?
14   A   He wasn't throwing punches at me, but
15  he was fighting, waiving his hands.  We call
16  that fighting.  Snatching away and all that, we
17  call that fighting in law enforcement terms.
18   Q   Okay.  At any point did he threaten
19  you verbally?
20   A   No, sir.
21   Q   Officer White, I'm going to attack
22  you?
23   A   No, sir.
24   Q   Okay.  And at any point did he appear
25  to attack you other than trying to resist and

Page 97

1 get away?
2    A  No, sir.
3    Q  Okay. So when you use the term
4 "fight," you're talking about running away,
5 pushing away?
6    A  Running away, pushing, yeah.
7    Q  Okay. All right.
8    A  Trying to keep from getting arrested.
9 So we call that --
10    Q  And I think more to clarify, you said,
11 "struggling to get free." That's the kind of
12 fighting we're talking about?
13    A  Yeah.
14    Q  Okay. At no point in time did he hit
15 you?
16    A  No.
17    Q  Okay. And your next sentence says
18 plaintiff knocked my radio out of my -- and I
19 skipped a few words -- which I was trying to
20 use to call backup out of my hand. All right.
21 That's a little different than what you
22 testified to earlier. Earlier you said you
23 dropped your radio.
24    A  Well, that means it dropped or was
25 knocked out during the struggle. It was during

Page 98

1 the struggle that my radio come up -- slipped
2 out of my hand, well, come out of my hand.
3    Q  This specifically says, though, that
4 he knocked it out. Did he specifically knock
5 it out or was it just dislodged during the
6 struggle?
7    A  When I tackled him, okay, I had my
8 flashlight and my radio. And my flashlight
9 slipped and fell. But during the struggle, my
10 radio come out my hand.
11    Q  Okay. And I'm not -- this is not to
12 be argumentative. But when I interpreted
13 plaintiff knocked my radio, which I was trying
14 to use to call backup, out of my hand, that
15 appears to me to be a specific intent, almost a
16 violent move. And what I hearing you describe,
17 it was more of a he's trying to just get away.
18 Is that accurate?
19    A  Once again, your definition of
20 fighting and struggling is totally different
21 from mine.
22    Q  Right. And that's what I'm trying to
23 get on the same page with you.
24    A  In law enforcement, when a person is
25 resisting and all that, we classify -- we

Page 99

1 consider that as fighting.
2    Q  Okay. So is any form of resistance
3 considered fighting?
4    A  I mean, if he's swinging and throwing
5 his hands like that, of course he's fighting.
6    Q  Okay.
7    A  But if he's just running, that's a
8 form of resistance. Resistance by running. So
9 it all depends.
10    Q  Okay.
11    A  But in this situation here with the
12 hand -- I mean, the snatching away and with the
13 hand gestures, I classify that as fighting.
14 Yes, sir, I do.
15    Q  Okay. And you're right. And that's
16 what I'm trying to figure out. And in my mind,
17 fighting is like, you know, we got fists drawn
18 and we're ready to go to blows. That's not all
19 what happened, right?
20    A  As far as him squaring up at me or
21 squaring up on me?
22    Q  Right.
23    A  No, that didn't happen.
24    Q  Okay.
25    A  No, that didn't happen. What I mean

Page 100

1 about this here, when he begins to fight, I'm
2 talking about with the hand gestures, snatching
3 away, trying to keep from getting arrested.
4 That's what I'm talking about. But as far as
5 squaring up, no.
6    Q  Okay. I just wanted to be real clear
7 on that. All right?
8    A  Okay.
9    Q  Do you know how Michael Prince's
10 swollen eye occurred?
11    A  Due to the injuries to Michael
12 Prince's eye, the injury had to happen when I
13 tackled him. Like I said, it was a bunch of
14 tree limbs, broken tree limbs, vines and plus,
15 the ground was hard. I mean, it was a lot of
16 stuff out there. His eye could have got
17 injured during the time I tackled him.
18      But I'm going to go on record and say
19 this here: At no point did I hit him with a
20 flashlight. At no point did I hit him with my
21 hand. I got screws in my hand. So no, I
22 didn't hit him with my hand.
23    Q  Okay. All right. And then on top of
24 that, do you have any idea specifically how his
25 injuries occurred?

Page 101

```
 1    A   No, sir, I don't.
 2    Q   Okay.  Was there any indication from
 3  any of your calls that night or coming onto the
 4  property that would have indicated he may have
 5  been in an altercation earlier that day or that
 6  night at the trailer park?
 7    A   They had a disturbance call out there
 8  earlier.  But, like I said, I don't know
 9  nothing about that.  I was on L and W and
10  Stokes Road on another call.  So I can't say.
11    Q   Okay.  Based on what you've looked at
12  and based on what you know, we have no
13  information to show that Michael Prince's
14  injuries occurred earlier in the night?
15    A   Not to my knowledge.
16    Q   Okay.  All right.  Did you hear --
17  when you tackled him, did you hear a breaking
18  or a popping sound or anything like that?  I
19  know you probably weren't listening for that.
20  But if you remember --
21    A   Are you talking about as far as the
22  limbs?
23    Q   I was talking about more like teeth or
24  bones, eye sockets, that kind of thing?
25    A   No.
```

Page 102

```
 1    Q   Okay.  You don't personally make any
 2  entries in the dispatch logs, do you?
 3    A   What do you mean?
 4    Q   Like if you were to call in, dispatch
 5  makes a record of -- say the call that we've
 6  been talking about, you don't make any entries
 7  in that log, do you?
 8    A   No.
 9    Q   Okay.  Do you have any input into,
10  other than your calling in, who write what and
11  what time and that kind of thing?
12    A   No.
13    Q   Have you seen the dispatch log in
14  relation to the night that we're talking about?
15    A   That morning I printed the log off so
16  I could go back and do my initial report so I
17  could get all of my times and stuff down for
18  my --
19    Q   But that was already written and in
20  place?
21    A   Yes, sir.
22         MR. HALL:  Okay.  I'm done.
23         EXAMINATION
24  BY MR. PHILLIPS:
25    Q   Mack?
```

Page 103

```
 1    A   Yes, sir.
 2    Q   You remember when he was asking you
 3  about the training you had gone to?
 4    A   Yes, sir.
 5    Q   And you said you had some certificates
 6  at home?
 7    A   Yes, sir.
 8    Q   Have you delivered to me all the
 9  certificates that you have?
10    A   Most of them.  Not all of them.  Like
11  I said, I have to go -- the current ones I
12  delivered to you.  But I would have to go back
13  and dig.  I mean, they're way back when.
14  They're not -- but the most recent ones I
15  delivered to you.  As far as the ones like my
16  training academy certificates, the one with the
17  leadership training academy, I mean, class I
18  went to, those are the most recent.  But the
19  other ones at home is way back.  They're 2000,
20  2001, something like that.
21    Q   I just want to make sure that Mr. Hall
22  has everything that he needs or he wants.
23  Because we had delivered the Master and
24  Leadership Skills of First Line Supervisors
25  that you took in 2010.
```

Page 104

```
 1    A   Yes.  That's the latest one I took.
 2    Q   And one of them that wasn't mentioned
 3  was PPCT.  What is that?  Do you know?
 4    A   Yes, sir.  That's a class they give.
 5  Like a self-defense class they give you in the
 6  academy.
 7    Q   All right.  And so this was done in
 8  2002 when you took it?
 9    A   2000, wasn't it?
10    Q   Oh, excuse me, 2000.  You're right.
11    A   Yeah, it's 2000.
12    Q   And that's when you got your basic
13  certification?
14    A   Yes, sir.
15    Q   And the PPCT, all caps, Defensive
16  Tactics Systems Basic Certification, did you
17  learn use of force tactics in that?
18    A   Yes, sir, I did.  Submissions and all
19  that.
20    Q   You remember him asking you about --
21  or your testimony about you had the radio in
22  your left hand and the flashlight in your right
23  hand?
24    A   Yes, sir.
25    Q   Describe the radio.  What kind of
```

Page 105

1  radio did you have?
2      A   My radio, it's called a Walkie.  And
3  it's about that tall (indicating) with an
4  antenna on top of it.  And it weighs about --
5  probably about 5 pounds.
6      Q   And when you were walking through the
7  woods, were you talking on it?
8      A   Yes, sir.
9      Q   And who were you talking to?
10     A   To Sergeant Parson at the fence line
11 over there.
12     Q   And describe the flashlight you had in
13 your right hand.
14     A   It was a flashlight -- the police --
15 when this new technology started back, I
16 purchased this Stinger flashlight.  It's about
17 6 inches long.  I purchased it from Dixon
18 Uniform.  They're getting away -- they done got
19 away from the big, bulky flashlights.  Because
20 with these new flashlights, they're LEDs.
21 They're brighter and plus, they're lighter.
22 With the big, bulky Maglites, they're heavy and
23 they're dim.  I mean their light is not as
24 bright as the LED flashlights.
25     Q   You were in here earlier this morning

Page 106

1  when Mr. Prince testified that you hit him with
2  a Maglite?
3      A   Yes, sir.
4      Q   Did you use a Maglite?
5      A   No, sir.  I haven't carried a Maglite
6  since 2004.  I carry a Stinger.
7      Q   Okay.  The Stinger, now, that's the
8  brand name, right?
9      A   Yeah, that's the brand name.  It's a
10 Stinger LED flashlight.
11     Q   And how long, in your estimation, do
12 you think that Stinger is?
13     A   About no more than 7 or 8 inches.  6
14 or 7 or 8 inches, somewhere in there.
15     Q   In diameter, how would you describe
16 it?
17     A   It's about like that (indicating).
18     Q   Is it about like a quarter?  A 50 cent
19 piece or what?
20     A   No, it's a little bigger than that.
21 It's not even the size of this water bottle.
22 The water bottle is too big.  The size of that
23 cup is too big.  So it's real -- it's real
24 small.
25     Q   And do you have any estimation on how

Page 107

1  much that flashlight weighs?
2      A   If that flashlight -- a pound.  Might
3  be two.  Two is probably too much.
4      Q   Did you ever subdue Mr. Prince before
5  Cartlige arrived?
6      A   No, sir.
7      Q   You said you didn't put cuffs on him
8  by yourself.  Why didn't you put cuffs on
9  Prince by yourself?
10     A   At the point he was -- I mean, he was
11 still fighting.  He was still struggling trying
12 to get away.  And I was doing everything I
13 could to just keep my knee in his back and my
14 hand around his head.  And I had my pistol in
15 my right hand trying to keep him down until
16 backup arrived.  I heard Deputy Cartlige and
17 them coming.  So the two would be better.
18     Q   Are you saying Mr. Prince never
19 complied with your directions so that you could
20 cuff him by yourself?
21     A   No, sir, no, sir, he never complied.
22     Q   And when you finally did get him
23 cuffed, what did he look like to you?
24     A   I mean, when I got him up, I mean, he
25 was sweating real bad.  But at that time I

Page 108

1  didn't get a look at his face.
2      Q   It was dark, right?
3      A   It was dark, yes.
4      Q   What did he smell like?
5      A   Like a whiskey still or brewer.  I
6  mean, you could smell the alcohol coming off of
7  him.
8      Q   Based on your perception of him, did
9  he appear to be intoxicated?
10     A   Yes.
11     Q   Was he talking?
12     A   He was saying a few words.  But, like
13 I said, I couldn't understand what he was
14 saying.
15     Q   All right.  So you and Cartlige, I
16 think you testified, took him back out and you
17 put him in Deputy Jackson's car?
18     A   Yes.
19     Q   Did you stay at the scene?
20     A   When Deputy Jackson took him to the
21 office, I was on the radio telling dispatch --
22 at that time we had found the radio.  I was
23 telling dispatch to go ahead and check.  I
24 found out what his name was and all.  I told
25 them to go ahead and check warrants.

27 (Pages 105 to 108)

Page 109

1    I was walking back to my patrol car to
2 go and meet them at the office with him. And
3 when I got to the office, that's when I took
4 over the arrest and booked him in and all that.
5    Q    Did you ever speak to any people who
6 may have witnessed anything out there at the
7 scene?
8    A    I had went back later and talked to --
9 I can't remember her name. I took a statement
10 from her. I took a statement from her.
11    Q    We have a statement from Tekoah
12 Arrington.
13    A    Yes, that's her.
14    Q    And was that the next morning?
15    A    That was the next morning, yeah. That
16 was the next day.
17    Q    And let me make sure I understand.
18 You said -- you testified you went back out
19 there and you looked for the flashlight and you
20 looked for the gun?
21    A    Yes, sir.
22    Q    And you found neither?
23    A    Neither.
24    Q    And that's when you talked to her?
25    A    Yes, sir.

Page 110

1    Q    And just basically, what did she tell
2 you?
3    A    Basically that when the deputies come
4 out there earlier on a disturbance, he was into
5 it with somebody else. And as they was into
6 it, at that time Michael shot, and he run
7 around the trailer and put the gun down and
8 then run out towards the woods. That's what
9 she told me.
10    Q    Okay.
11        MR. PHILLIPS: I don't have anything
12 further.
13        MR. HALL: Okay. Well, I do now. And
14 mark this as Exhibit 9.
15        (EXHIBIT 9 MARKED FOR THE RECORD.)
16            FURTHER EXAMINATION
17 BY MR. HALL:
18    Q    I hand you what's been marked as
19 Exhibit 9 and ask if you can identify that
20 document.
21    A    Okay. Yes, sir, I can.
22    Q    Okay. You had just mentioned when
23 your attorney asked you about taking a
24 statement -- this deals with Tekoah Arrington;
25 is that correct?

Page 111

1    A    Yes.
2    Q    Is this the statement you took from
3 her?
4    A    Um-hum (affirmative response).
5    Q    And this statement was taken the day
6 after?
7    A    Yes. On the 17th, yes, sir.
8    Q    The report finishes up on the 17th for
9 Michael Prince. Did you have this information
10 prior to drafting your report?
11    A    No, sir.
12    Q    Okay. So it's fair to say you drafted
13 your report and then went back out to the
14 Pearson Trailer Park and took this statement
15 from Ms. Arrington?
16    A    Yes, sir.
17    Q    How did you find her?
18    A    Bobbie White.
19    Q    Okay. And that's the manager?
20    A    The manager, yes.
21    Q    What did Bobbie White tell you about
22 her?
23    A    I went back out there and I asked
24 Bobbie. Because I'm thinking Bobbie, you know,
25 knew what's going on. And she told me she did

Page 112

1 have a young lady that knew what happened, and
2 that's when she gave me her. And I made
3 contact with her and that's the statement she
4 wrote me.
5    Q    Okay. All right. I was provided a
6 document that's marked as WCM-284. See if you
7 can look at that and tell me what that is.
8    A    Yes. These are -- I took a picture of
9 this this morning. I mean the morning that I
10 went back looking for the handgun as well as my
11 flashlight.
12    Q    And I'm going to hand you also
13 WCM-283.
14    A    Okay. Now, this picture here is where
15 we was located when I took Mr. Prince into
16 custody.
17    Q    Okay. These pictures that we're
18 looking at on the WCM-283, 284, they're
19 terrible copies. Do you have better copies
20 than those?
21    A    No, sir.
22    Q    You don't?
23        MR. PHILLIPS: That's as good as it
24 gets. I asked the same question.
25        THE WITNESS: This is the fence

Page 113

1 (indicating). This is the trailer park
2 (indicating). That's the fence line
3 (indicating). This is the wooded area
4 (indicating) that show you -- just to give
5 you an overall view of what, I mean, what
6 it looked like. And this here
7 (indicating) I went back to where -- this
8 here, I went back and took that picture
9 there from where Mr. Prince was laying at
10 and we took him into custody and all that.
11 BY MR. HALL:
12    Q   Okay. And you're pointing to WCM-233
13 -- 283, I mean?
14    A   Yes, sir.
15    Q   Yeah.
16       MR. HALL:  Let's just go ahead and
17 mark both of these as the next exhibit.
18 Ten?
19       COURT REPORTER:  Um-hum (affirmative
20 response).
21       MR. HALL:  Those are horrible. It
22 looks like reverse negative copies.
23       (EXHIBIT 10 MARKED FOR THE RECORD.)
24       THE WITNESS:  What I had done, I took
25 the pictures that morning and printed them

Page 114

1 off, and I stapled the pictures to the
2 original report. So I don't know what
3 became of them.
4       MR. PHILLIPS:  Do they have black and
5 white copies of the pictures?
6       THE WITNESS:  I don't know what
7 happened.
8 BY MR. HALL:
9    Q   You actually took colored pictures?
10    A   Yes, sir.
11    Q   All right.
12       MR. PHILLIPS:  I'll get them to check
13 again. But that's what they gave me. And
14 I even asked about --
15       MR. HALL:  But those are useless for
16 any purpose.
17       MR. PHILLIPS:  These are the original
18 black and whites. You want to look at
19 these real quick that I was provided?
20       MR. HALL:  Oh, they're better. Look.
21 The more you copy, the worst they get.
22       MR. PHILLIPS:  Yeah. That's why I
23 wasn't going to let them out of my hands.
24 I was going to give you the best I had.
25 I'd give you access to them anytime you

Page 115

1 want. I don't know if it helps a whole
2 lot.
3       MR. HALL:  Well, let's compare and
4 contrast. I can tell that this is the
5 same photo just because of that little --
6 you know, that's a little -- whatever.
7 All right.
8       MR. PHILLIPS:  I'll get them to check
9 one more time.
10       MR. HALL:  Okay. And a couple more
11 things and I'm done.
12 BY MR. HALL:
13    Q   Do you have any training in DUI
14 detection?
15    A   DUI detection?
16    Q   Yeah.
17    A   In basic -- well, when we went through
18 the training academy, you know, you have to get
19 certified on that intoxilyzer. But that's all
20 I have just an intoxilyzer certification.
21    Q   Okay. So you've been through a little
22 training in alcohol detection?
23    A   Yes, sir.
24    Q   And you know by the smell alone, you
25 can't tell how much anyone has had to drink,

Page 116

1 can you?
2    A   That's right.
3    Q   Because beer and wine and things that
4 are lower in alcohol actually tend to have a
5 stronger smell than maybe vodka or such as
6 that. Do you agree with that?
7    A   I agree to that.
8    Q   So just because somebody smells like
9 alcohol, you can't tell what their level of
10 impairment is, can you?
11    A   No, sir.
12    Q   Okay.
13       MR. HALL:  Okay. That's it. I don't
14 have anything else.
15       MR. PHILLIPS:  I don't have anything
16 further.
17       (DEPOSITION CONCLUDED AT 4:00 p.m.)
18       ****
19
20
21
22
23
24
25

Providence Court Reporting, LLC
Phone:  (601)720-3862

SIGNATURE OF WITNESS

1
2      I, _____ , do solemnly
3  swear that I have read the foregoing pages and
4  that the same is a true and correct transcript
5  of the testimony given by me at the time and
6  place hereinbefore set forth, with the
7  following corrections:
8  PAGE: LINE:  SHOULD READ:   REASON FOR
9  CHANGE:
10  _____  _____  _____
11           _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16           _____  _____
17  _____  _____  _____
18  _____
19              (SIGNATURE)
20
21            NOTARIZATION
22      I, _____ , notary public
23  for the State of _____,
24  _____ County, do hereby certify that
25  _____ personally appeared before

1  me this _____ day of _____, 2014, at
2  _____, _____
3  My Commission Expires
4  _____
5
6            (NOTARY PUBLIC)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE OF COURT REPORTER

1
2      I, Debra A. Williams, CCR, and Notary
3  Public in and for the County of Madison, State
4  of Mississippi, hereby certify that the
5  foregoing pages, and including this page,
6  contain a true and correct transcript of the
7  testimony of the witness, as taken by me at the
8  time and place heretofore stated, and later
9  reduced to typewritten form by computer-aided
10  transcription under my supervision and to the
11  best of my skill and ability.
12      I further certify that I placed the
13  witness under oath to truthfully answer the
14  questions in this matter under the power vested
15  in me by the State of Mississippi.
16      I further certify that I am not in the
17  employ of or related to any counsel or party in
18  this matter, and have no interest, monetary or
19  otherwise, in the final outcome of the
20  proceedings.
21      Witness my signature and seal this the
22  _____ day of _____
23  _____
24  DEBRA A. WILLIAMS, CCR
   My Commission Expires May 12, 2014
25