IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

MICHAEL PRINCE
PLAINTIFF

VS.

CAUSE NUMBER: 4:13cv165-SA-JMV

WASHINGTON COUNTY, MISSISSIPPI SHERIFF MILTON GASTON, in his Official Capacity, LIEUTENANT MACK WHITE, in his individual and official capacity, DEPUTY MARVIN MARSHALL, in his individual and official capacity, and JOHN DOES 1-10
DEFENDANTS

*******

DEPOSITION OF DEPUTY MARVIN MARSHALL

Taken at the law offices of Campbell Delong,
923 Washington Avenue,
Greenville, Mississippi,
on Thursday, March 20th, 2014,
beginning at approximately 4:01 p.m.

**********

REPORTED BY:

DEBRA A. WILLIAMS, CCR, #1748
CERTIFIED COURT REPORTER
NOTARY PUBLIC



APPEARANCES

For the Plaintiff:

DEREK L. HALL, ESQ.
Derek L. Hall, PLLC
1911 Dunbarton Drive
Jackson, Mississippi 39216-5002

For the Defendants:

SCOTT PHILLIPS, ESQ.
ANDREW F. TOMINELLO, ESQ.
Campbell DeLong, LLP
923 Washington Avenue
Post Office Box 1856
Greenville, Mississippi 38702-1856

Also Present:

Rebecca Gramling



TABLE OF CONTENTS

PAGE

Title Page.............................. 1
Appearance Page.......................... 2
Table of Contents........................ 3
Stipulation Page......................... 4

EXAMINATION OF DEPUTY MARVIN MARSHALL:

By Mr. Hall......................... 5

Signature Page......................... 45

Certificate Page....................... 46

EXHIBITS

(EXHIBITS 1 THROUGH 10 WERE MARKED IN PREVIOUS DEPOSITIONS.)

Exhibit 11, Notice of Deposition........... 5

Exhibit 12, Receipt for Policy and Procedures Manual..................... 14
Exhibit 13, Incident Report............... 40



STIPULATION

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys of record, that this deposition may be taken at the time and place hereinbefore set forth, by DEBRA WILLIAMS, Court Reporter and Notary Public, pursuant to the Rules;

That the formality of reading and signing is specifically NOT WAIVED;

That all objections, except as to the form of the questions and the responsiveness of the answers, are reserved until such time as the deposition, or any part thereof, may be used or sought to be used in evidence.

* * *





EXHIBIT "B"

PENGAD-Bayonne N.J.

DEPUTY MARVIN MARSHALL
having been first duly sworn,
was examined and testified as follows,
EXAMINATION
BY MR. HALL:
Q Could you state your full name, please?
A Marvin Gaye Marshall.
Q Okay. And where are you employed?
A Washington County Sheriff's Department.
Q Okay.
MR. HALL: This deposition is being taken pursuant to notice.
And if I could, let's just go ahead and mark this as the next exhibit. This will be the deposition notice.
(EXHIBIT 11 MARKED FOR THE RECORD.)
BY MR. HALL:
Q Deputy Marshall, you are currently employed by the Washington County Sheriff's Department?
A That's correct.
Q Were you so employed back in March 2012?



A I was.
Q All right. Have you ever given a deposition before?
A I have.
Q On what occasion?
A Some family issues.
Q Okay. You ever been involved in a lawsuit before?
A I have.
Q Okay. For what?
A The same, family issues.
Q Would this be civil court?
A Civil.
Q All right. What's your current address?
A [redacted]
Q All right. Just a couple of little housekeeping matters. You have the right to read and sign your deposition when we're finished, or you can waive that right. Would you like to read and sign your deposition? You can ask your attorney.
MR. PHILLIPS: Yeah.
THE WITNESS: Yes.



BY MR. HALL:
Q Okay. Now, you've been placed under oath. The court reporter is taking down everything that we're saying. If I ask a question and you don't understand it, please let me know, and I'll try to do a better job of it. If you do give an answer, then I'm going to accept that as your answer and move on. Okay? Fair enough?
A Fair.
Q If you need a break or anything or you want to stop, need to ask your attorney any questions, feel free to do that. Okay?
A Okay.
Q Just let us know. We'll try to get through this fairly quickly.
How long have you been with Washington County Sheriff's Department?
A October of 2010.
Q Okay. Where did you work before that?
A Leland Manufacturing, formally La-Z-Boy, Leland [redacted].
Q And how long did you work there?
A Sixteen years.
Q Sixteen years?



A Sixteen years.
Q Have you had any officer training prior to becoming a Washington County deputy sheriff?
A I did. I worked some corrections in Arkansas. Well, I went through a training program in Arkansas for corrections.
Q When was that?
A That was in January of 2010.
Q Were you working for Arkansas Corrections in January 2010?
A I was in school.
Q Well, tell me how that worked.
A Well, they have a school program. Once you finish the school program, then you go into the field. But in my situation, I was in the school. And when the school finished, I went straight into the police academy.
Q Okay. All right. So let me track it with you. Leland Manufacturing, you stopped working there and went to training at the Arkansas Correctional deal.
A Right.
Q And then after that, you went straight to the police training academy?

A Correct.
Q And right after police training, you came here to work for Washington County?
A Well, three months later.
Q Okay. That was your first law enforcement job was with Washington County?
A Yeah, first law enforcement.
Q Okay. Well, beyond Leland Manufacturing for 16 years, did you work any law enforcement prior to that?
A If you want to consider the military service, I had law enforcement. Because there was some training in that that was similar to what we do.
Q Okay. But as far as local, city, state, municipal governments, you've never worked as a police or law enforcement officer prior to coming on here, right? Here, I mean Washington County.
A No, prior to Washington County.
Q All right. So in March of 2012, you had been a deputy about a year and a half?
A Give or take, that's about correct.
Q Okay, just ballpark. I mean, I'm not --



A Correct.
Q Other than the training academy when you came on as a Washington County deputy, did you receive any training when you came here in addition to what you received at the training academy? Did Sheriff Gaston train you in any other way?
A You know, I've had some classes since I've been here. I don't know the exact dates.
Q What classes did you have?
A I don't know exactly what the classes were. We had some at the airport. And I know I just recently finished a domestic violence class two months ago.
Q Did you take any of those classes prior to March of 2012?
A That's what I'm not sure of. The ones at the airport, I'm not sure.
Q Okay. All right. Were you in any classes with Deputy White?
A No.
Q Okay. Are you currently married?
A No.
Q Divorced?
A Yes.



Q Is that that domestic matter we were talking about earlier?
A No.
Q No. Okay. So you've been in a lawsuit with a divorce?
A No.
Q You just did a no fault kind of divorce?
A Pretty much.
Q Okay. How long have you lived in Washington County?
A Well, I was born and raised in [redacted], but I moved out briefly. And I did some military time from '84 to '87. And '89 to '93 I lived in Illinois. And I've been back since '93.
Q Okay. You have any relatives in Washington County?
A Sure.
Q Okay. Who?
A A sister.
Q What's her name?
A Julist Marshall.
Q Okay. Who else?
A A son and a daughter.



Q What are their names? Are they over 18?
A No.
Q Okay. Then I don't need to know their names.
A Okay.
Q The reason for it is, at some point we're going to be picking a jury. Okay. I just need to know who your relatives are here so that one of them don't end up on the jury. So you said Juliet Marshall?
A Julist, J-u-l-i-s-t.
Q S-t. I did write an "S" down there. Anybody else?
A We've got several cousins.
Q Who would that be?
A Jerry Hines, Mary Hines, Carolyn Hines. And they have siblings and they have offsprings. So I don't know all of them.
Q All right.
A I've got some cousins on my father side. I don't know all of them.
Q What would their last names be?
A It would be Marshalls.
Q So Marshalls and Hines I need to ask

Page 13

specific questions if they get on my jury, right?
A Okay.
Q All right. Anybody else?
A Not that I know of.
Q Okay. What's your day-to-day involvement in law enforcement operations?
A Patrol, general patrol.
Q Okay. What's your current rank?
A Just patrol.
Q All right. And that's what you were back in March of 2012?
A That's correct.
Q All right. When you came on as a deputy, did you go to work for Sheriff Gaston? Is that who had hired you?
A I did, yes.
Q Okay. And did you receive a copy of a policy and procedure manual?
A I did.
Q Okay. And let me ask you to look at Exhibit 6 and ask if that's the policy and procedure manual that you received?
A Yes. It came in a big, large binder, but this could be it. Yeah, this is some of

Page 14

it. That could be it.
Q Well, look through there and let's make sure that's --
A You know, I wouldn't know every page, but --
Q Well, that's too bad. We're going to ask you about every page.
MR. HALL: Let me get you to mark this.
(EXHIBIT 12 MARKED FOR THE RECORD.)
THE WITNESS: Ask me about every page?
BY MR. HALL:
Q I'm not going to ask you about every page.
A Oh, okay.
Q All right. I'm going to ask you to look at Exhibit 12. See if you can tell me what that is.
A Okay.
Q Would this have been a receipt you signed for a copy of the policy and procedure manual?
A It is.
Q And except for your signature and the dates and all, that's identical to that receipt

Page 15

that's on the front of Exhibit 6, right?
A It is.
Q Okay. All right. So those are the policies and procedures that you've been operating under the whole time you've been a deputy sheriff here, right?
A (Nods head affirmatively.)
MR. PHILLIPS: You need to say yes or no.
THE WITNESS: Yes. Yes.
BY MR. HALL:
Q Okay. Let's just move forward to late evening of March the 16th, early morning March 17. Did you have an occasion to come into contact with a gentleman named Michael Prince?
A I did.
Q Okay. Could you tell us what you remember about your first contact with Mr. Prince?
A My first contact with Mr. Prince was when he was being brought out of the wooded area.
Q Okay. Out of what wooded area?
A A wooded area that sits south of 2500 Old Leland Road in a trailer park.

Page 16

Q Would that be known as the Pearson Park?
A Pearson Trailer Park, correct.
Q Is it Pierce or Pearson?
A Pearson.
Q Pearson. Okay. I wasn't clear on that.
A Pearson Trailer Park.
Q Pearson Trailer Park?
A Yes.
Q Okay. And were you answering a call at the Pearson Trailer Park?
A Yeah, that's why I was out there that night.
Q Tell me about how that came about.
A Dispatch gave me a call at the Pearson Trailer Park in reference to a disturbance.
Q Okay. Can you specifically remember what type of disturbance that you were responding to?
A I was just responding to a disturbance.
Q Okay. Had you been out to Pearson Trailer Park earlier that night?
A No.

Q This was the first time you had been out there?
A This was my first time out there.
Q Prior to this night, had you been out there to Pearson Trailer Park to answer a disturbance call?
A All the time.
Q All the time. This place had a reputation for being --
A You know, just got a lot of high volume of calls out there. And it wasn't just disturbances. It was everything.
Q All right. You went out to this area frequently. You were familiar with it?
A I was familiar with the area.
Q All right. When you got there, were there any other deputies there?
A 12 met me there.
Q 12 deputies?
A Parson. No, Parson. A deputy named Parson. His number is 12. He met me there.
Q All right.
A Not 12 deputies.
Q Well, I had to ask.
A All right. I'll make it plain.



MR. PHILLIPS: I was going to clear that up.
BY MR. HALL:
Q Okay. So Deputy Parson, who is --
A Deputy Parson.
Q -- Unit 12 or No. 12 met you there?
A Yes.
Q Okay. Was any other deputies there when you arrived?
A No.
Q Okay. Was Parson there when you -- Deputy Parson. And I don't mean any disrespect. I'm just communicating. Was Parson there when you got there?
A I think I might have arrived first.
Q All right. When you got there, what's the first thing you remember happening?
A I made contact with the complainant, the person that made the initial call.
Q And who would that have been?
A Deshonda Talbert.
Q Okay. And what did you learn at that point?
A She started to talking to me about what was going on. I asked her did they, you



know, call for a deputy and what's the problem? She started to explain to me what's going on.
Q Okay. And what did you learn?
A Well, she started to explain to me that she and her baby couldn't rest and her family because someone was outside cursing right by her window. And her husband -- she told me her husband went out to tell the person to stop with the cursing because they were trying to sleep. And they got into a verbal altercation.
Q And did you learn who that person was?
A Yeah. She identified him as Michael Prince.
Q Okay. Any indication at that point that there had been any type of physical altercation?
A No.
Q Okay. It's not your understanding?
A It's not my understanding.
Q Okay. What happened next, if you remember?
A Like I said, Parson arrived. And we were getting information from the complainant and we heard gunshots or what appeared to be



gunshots coming from the east end of the trailer park. And while we were taking the information, we heard what sounded like gunshots coming from the east end of that trailer park.
Q When you say that -- we've got Exhibit 1 here. Exhibit 1 purports to be the Pearson Trailer Park. Could you look at Exhibit 1 and see if you agree with that?
A (Witness reviews photograph.) Yes, that's it.
Q Okay. And where did -- could you just take a blue or a green marker here and mark where you heard the gun?
A Sure.
Q Draw a little diamond where you heard the gunshots.
A We don't know exactly, but --
Q No. You said the east side.
A Right. And so the gunshots appeared to come from this area (indicating), in this area (indicating).
Q Okay. All right.
MR. PHILLIPS: He just drew a black square, right?

Page 21

THE WITNESS: Yeah.
MR. PHILLIPS: I just want it for the record.
THE WITNESS: Okay.
BY MR. HALL:
Q The jury can't see that. That's why we're trying to talk and describe what we're talking about.
A Okay.
Q It sounds weird, but that's what we're doing. Okay. So you drew -- it looks like that square diamond that you drew is close to this North Raceway Road and like the entrance of the trailer park?
A Well, it's not exact. The sounds came from the east end of the trailer park. And that's the direction we went to once we heard the sounds.
Q All right. And what did you observe as you went in that direction?
A When we got there, it's a lot of chaos out there. People running. A lot of chaos. You got people talking and running and telling us what's going on and pointing, etcetera. But, now, when we first heard the shots,

Page 22

Parson, he calls dispatch and notify them that gunshots in the area. Because this is fairly close to us. So we don't know where the shots are going. Are they coming towards us? We don't know.
So he calls out for assistance because there are gunshots in the area while deputies are on scene.
Q Okay. Can you take that same blue marker and put a dot where you were when you heard the gunshots?
A Okay. I was in front of Talberts' residence.
Q Okay. All right. And so you heard the gunshots to the east. What did you do next?
A We went toward the gunshots.
Q And then what happened?
A Parson called out for assistance.
Q Right. And I'm not trying to cut you off. I just -- there's no point in you repeating what you said.
A All right.
Q Let's go to the next step. What happened?

Page 23

A Once we're down to this area (indicating), another disturbance breaks out back on the other end that we just come from.
Q On the west side?
A Back to the west end of the park.
Q Okay. All right.
A So now we've got to go back that way.
Q What kind of disturbance in that direction?
A Fighting. I mean different groups of people fighting. It was summertime. A lot of people out just fighting.
Q Weather warm?
A The weather was nice.
Q Okay. So what do you remember happening after that?
A Once we get back in and start to try to get everything straight on that end to try to get -- because he hadn't finished getting all the information, try to get back to get information from the personnel. Then the units start to come in reference to the gunshots. The units start -- other officers started to come on scene in reference to those gunshots.
Q Okay. Where was the information

Page 24

coming from?
A The gunshots?
Q You said other information started coming in reference to the gunshots.
A Other officers started to come.
Q All right. So they were pulling up into the parking lot?
A They were starting to come, yeah, in the area.
Q I see.
A And they'd started to let us know that we're in the area.
Q I see. All right. Who all else responded? Do you remember?
A Lieutenant White, Jackson, Cartlige.
Q Okay. Was this the first time that you had ever answered a call or been involved with gunshots at that trailer park?
A Yes, this is the first I had.
Q Okay. Other of your deputy associates had answered calls for gunshots at that trailer park before?
A I'm not sure.
Q Okay. All right. So eventually a number of the deputies arrived that you just

named, right?
A Right.
Q And what happened after they arrived? What were you doing?
A We were back on the west side at this time. And me and Parson started to make our way because we're getting information that the persons firing the gunshots were in the wooded area. They had went to the wooded area.
Q Okay.
A So we were -- Parson was trying to instruct the other deputy where to go in the wooded area, you know, because we were getting information. It's a fence that separates us, you know, from the other deputies. That separates the back of the trailer from the wooded area.
Q Okay. And describe the fence.
A It's an 8-foot fence, 6-feet fence. It's a chain fence in the back of the trailers that separates the woods from trailer homes.
Q Okay. When you say "chain fence," you can see through the fence?
A Yes, you can see through it.
Q It's not one of these decorative



fences?
A No. It's not a privacy fence.
Q You could see through it?
A You could see through it. It's a chain fence.
Q All right. And did you ever hear any gunshots coming from the woods?
A From the woods, no, I didn't.
Q All right. And you were there with Parson the whole time?
A Yeah, we were together.
Q All right. And did you ever see or hear anybody in those woods?
A Once I started walking towards the woods, me and Parson -- because Parson is giving the instructions. He said, hey, somebody had gave information that they were in the wooded area. He's giving instructions to the other officers.
I started to hear Lieutenant White. I could hear him giving verbal commands.
Q What's he's saying?
A He's giving commands get down, stay down, stop resisting, you know, stay down there. I've got the subject over here.



Q Okay. Had you seen Deputy Mack White before you heard him?
A When he came on scene, he identified that he was on scene in the area. We got our radios on.
Q Okay. Did you see him?
A Yeah, eventually I saw him out there in the area, in the wooded area.
Q You saw him in the wooded area?
A Yeah.
Q Before he went in the wooded area, did you see him in the trailer park?
A No. No.
Q The first time you saw him, he was in the wooded area?
A He was in the wooded area.
Q Okay. Describe what you saw the first time that you realized it was him and where he was.
A He was walking. He was -- Parson was giving commands, hey, come back this way, you know. And he was, you know, flashing his lights saying he was over here or walking this way, just communicating with --
Q Who was Parson talking about? Do you



know?
A He was talking about the subject.
Q Okay. And he was directing --
A Trying to direct him into the area that was being pointed at. Well, the information that was given that the subject was in that area.
Q And when you say direct him, who's him?
A He was trying to direct Lieutenant White.
Q Okay. So if I'm understanding you, Parson is standing in the trailer park next to the fence?
A Yeah. He's kind of walking up, you know.
Q And he's --
A Hollering and talking to Lieutenant White. And eventually another officer comes on scene.
Q On scene there with you?
A No. Other officers come into the wooded area.
Q I see. How many other officers?
A Cartlige.

Page 29

Q Anybody else?
A Jackson came. But I don't think -- I think he got in there later. And they kind of -- they didn't all come at the same time.
Q All right. So you had stated earlier you heard Lieutenant White say stop resisting?
A Giving verbal commands.
Q Okay. Could you see him?
A At this junction, no.
Q Okay. Were you concerned about his safety?
A Yeah, we were.
Q What, if anything, did you do?
A Well, like I say, it was a fence separating us. But it was another -- it was another deputy headed that way toward him.
Q And that would have been --
A Cartlige.
Q Cartlige. All right. Could you see Deputy Cartlige?
A I could see Deputy Cartlige periodically.
Q All right. When you heard Lieutenant White say stop resisting or something to that effect, where was Deputy Cartilge?

Page 30

A I don't know the exact distance he was from the lieutenant.
Q Was he --
A But he was a distance. I don't know the exact distance.
Q When you say "a distance," it wasn't just like they were right there together?
A No. I mean, it could have been 8, 10 feet. I don't know. It's a lot of woods and branches out there. But he was -- and Cartlige was trying to make his way over there.
Q Okay. All right. What, if anything, happened next? You heard -- he said stop resisting. What did you observe next?
A Well, we -- he eventually said he's got the subject in custody.
Q Who said that?
A Lieutenant White.
Q And when you say "eventually," between the time you heard him say stop resisting and eventually in custody, what happened?
A Cartlige got on scene. Parson got there. Lieutenant is telling them he knocked his radio off. He didn't have his radio on, to key up his mike so he can help find his radio.

Page 31

He was asking for handcuffs.
Q Who was that?
A Lieutenant White.
Q Lieutenant White was asking for handcuffs?
A Right.
Q Okay. Did you ever hear Prince say anything? Or the gentleman that later became identified as Prince, you ever hear him say anything?
A No, I didn't.
Q Did you ever visualize either one of those, Lieutenant White or Prince, from where you were standing in the trailer park?
A Like I say, I saw White. But I didn't see him when he made contact with Prince.
Q Okay. All right. When is the next time you saw White?
A Well, when they were -- when he was hollering at Parson to, you know, key up your radio. I lost my radio out here. Key up your radio. And by the time he stood up, he -- and they asked him for the cuffs. By this time, Cartlige was there with more light.
Q Could you see Prince at that time?

Page 32

A No, I didn't. No, I don't remember seeing Prince.
Q Okay. When is the next time you saw Prince?
A When he was brought to the car for Jackson to transport.
Q Okay. Did you ever see anyone tackle Prince?
A I didn't.
Q Did you ever see anyone put handcuffs on Prince?
A No, I didn't.
Q Did you ever see anyone strike Prince?
A No, I didn't.
Q Okay. So when the next time you saw Prince, what did he look like?
A Like he'd been in the woods. You know, he didn't have a shirt on. Appeared to be blood coming out of his mouth. He was being -- getting ready -- you know, he was getting ready for transport.
Q Okay.
A Because we had to get him across a ditch to get him in the car.
Q All right. When you saw him, blood

Page 33

was coming out of his mouth?
A That's what it appeared to be.
Q Okay. Did you mention that to anybody?
A I'm sure I put it in my report.
Q Okay. Where was Lieutenant White at that point when you saw the blood coming out of Prince's mouth?
A I'm not sure if Lieutenant White or Parson had already turned him over or Cartlidge had already turned Prince over to Jackson for transport.
Q Okay. So, I mean, literally, Prince was in the car ready for transport the first time you saw him; is that fair? Because I'm trying to figure out --
A No, no. He was being taken out of the woods.
Q And who was taking him out?
A That's what I'm saying, you had three officers there. You had Cartlige, White and Parson there at the time. I don't know who actually physically had hands on him. Because it's a ditch there. They had to get him across the ditch. So I'm sure all three of them

Page 34

helped him out. But from where I was standing by the fence making my way to the edge, I could see that.
Q Okay. And you saw a lot of blood? A little blood? Some blood?
A It could be a little blood.
Q All right. What does your training tell you to do when you see a suspect that's got blood in his facial area?
A Well, I ain't no medic. So if -- I mean, I had three other officers there that was closer to him than I was. And whatever their assessment was, that was the assessment that they made.
Q Okay. So you were relying on those three officers that were escorting him out of the woods to determine what, if anything, was wrong with Prince?
A Right. They had a better -- they were closer to him than I was.
Q All right. Did you just see him being put in the patrol car?
A Yeah, I did see that. They eventually got him in the partrol car.
Q Okay. At any point in time did you

Page 35

see Prince resisting arrest?
A No.
Q At any point in time did you see Mr. Prince fighting with any of the deputies?
A No, I didn't.
Q Okay. And did you ever see Prince again after he was put in a patrol car?
A I did.
Q Okay. Tell me about that.
A I got a call that morning to go out to the Regional jail and pick Prince up.
Q Okay. And what time was that?
A 3:00 in the morning.
Q Yeah, refresh your memory with whatever you need. That's fine.
A Yeah, at 3:46 a.m.
Q And tell me what happened.
A I went out to the jail. Well, it was Sergeant White at the time, but he called me and told me to go out to the jail and pick Prince up and take him to the E. R.
Q Okay. And did you do that?
A I did.
Q And what happened at the E. R.?
A Took him to the E. R., and the

Page 36

technician there started to, I guess, examine him.
Q And what did he look like when you took him to the E. R. physically? What was his physical appearance?
A I didn't pay close attention to him, but he needed some medical attention, I guess. They called to take him out there, so he needed some medical attention.
Q Okay. Somebody determined he needed medical attention. You were going to take him. Did you observe what he looked like?
A I'm sure I did. I came in contact with him. I put him in my car and took him to the E. R. But, I mean, to describe exactly how he looked, I can't.
Q Was there any blood? Did you see any blood anywhere?
A At this point, I can't remember.
Q Okay. What about a swollen face?
A I'm sure it was. I mean, I can't remember exactly.
Q Well, I'm asking what you --
A Well, I'm saying that because my job was to go get him and take him to the hospital.

Page 37

I wasn't trying to examine him. Put him in the back of my car and take him to the hospital like I was told.
Q Okay. Did he have any scars, bruises, cuts or anything on his body?
A Not that I know of.
Q All right. And did he still not have a shirt on?
A I'll say he had a shirt on at this junction.
Q Okay. All right. So the best you remember, you couldn't see his skin below the shirt, right?
A Right.
Q Okay. Was he complaining at all?
A If I can remember, he was talkative.
Q What was he saying?
A I don't remember.
Q Okay. Did he ever mention being hit by anyone?
A I do not remember.
Q Did he ever mention being struck by an object of any kind?
A I don't remember.
Q Did he ask you to let him go or

Page 38

anything?
A I would have remembered that. No, he didn't.
Q Okay. So you delivered him to the E. R. Did you stay there with him?
A I did.
Q Okay. And what happened? How long were you there?
A It was a while. And they were examining him. My experience with our E. R., we can be a little slow out there. But they were examining him.
Q Okay. So it took you a little while is what I gather.
A It did.
Q Were you in the room when the doctors examined him?
A Yeah. You know, I couldn't lose contact with him. I had to stay with him.
Q Okay. Was he --
A He's in my custody at the time.
Q Was he in handcuffs?
A Yeah, I'm sure he was. He was in my custody.
Q Okay. And do you recall anything that

Page 39

the doctors may have said?
A They were having discussions because, you know, it had got to a point where they were trying to determine what to do.
Q Okay. And did you receive any further instructions? Excuse me. Did you receive any instructions from the emergency department?
A No, I didn't.
Q Okay. At some point, did you transport Michael Prince somewhere else?
A I did.
Q Where did you go?
A Well, I called lieutenant to get further instructions on, you know, what to do with him.
Q Okay. What time was that?
A I guess about 6:00 now.
Q In the morning?
A Yeah.
Q And that would have been on the 17th?
A Yeah. It would be on the 18th.
Q On the 18th?
A It was in the a.m.
Q Can I see this document you keep referring to?

Page 40

A This is my initial report.
Q Sure. And that's document No. WCM-280, right, at the bottom right?
A That's correct.
Q That's the lawyer's stamp. Okay?
MR. HALL: Okay. I'm going to have this marked if I could.
(EXHIBIT 13 MARKED FOR THE RECORD.)
BY MR. HALL:
Q And you were referring to document No. WCM-280, which now is marked Exhibit -- a copy of which is marked as Exhibit 13. Do you agree with that?
A Yeah. That's it.
Q And this is your -- this is a report you did?
A It is.
Q All right. After looking at that, does this refresh your memory as to the date that you were transporting Mr. Prince? You said the 18th. But I want to make sure that you're not really meaning the 17th.
A It was the morning of the -- it was the a.m. of that next morning. The 17th is on the initial report.

Q Okay. Did you write this report?
A I did.
Q Okay. It's got three officers' names to it. It says received by Reynolds. But this is a report that you wrote?
A Yes, this is the report that I wrote.
Q Okay. All right. And you left the hospital with Prince. And where did you go next?
A Back to the Regional -- well, I talked to lieutenant. Whatever information he got, I was advised to take him back to the Regional Correctional Facility for release.
Q Okay. Now, your report says -- and did he get released from the Regional jail?
A He did.
Q Did you transport him anywhere else?
A No.
Q Okay. Did you transport him back to the trailer park?
A No.
Q Do you know if anyone did, any deputy sheriff? Put it that way.
A That I don't know.
Q Okay. All right. In your report, it



says that Steven Johnson was arrested there.
A He was.
Q Okay. Did you effect that arrest?
A Myself along with Parson.
Q Okay. And did you transport Steven Johnson to jail?
A No. I think Parson transported him.
Q Okay. And was Steven Johnson the person that or a person that Michael Prince was supposed to be involved in a previous altercation with at the trailer park?
A He was.
Q Okay. When I say previous, I mean, like, on the 16th?
A He was.
Q Okay. This was a verbal altercation, the one that you described, right?
A Right.
Q Okay. And was there any indication that Steven Johnson had a gun?
A No.
Q Okay. Did you investigate whether he had a gun or not?
A We searched him and we arrested him. We found out we had a warrant for him with the



Greenville Police Department, and we placed him under arrest.
Q Okay. And after reviewing your report, is this true and accurate to the best of your memory?
A To the best of my knowledge.
Q Anything on here that you would like to change?
A Not in my report.
Q Okay. And just to make certain that I didn't miss anything, you never saw Michael Prince being struck by any deputy?
A I didn't.
Q Okay. Has anyone told you that any deputy had struck Mr. Prince?
A No.
Q Okay. Other than this lawsuit, did you hear anything else about Michael Prince being hit on the 16th of March 2012?
A No.
Q And I'm assuming that you've read the lawsuit. That's why I said that.
A I haven't read the lawsuit.
Q Okay. All right.
A Oh, yeah, one other thing. My report



was done on the morning of 17th. That's what I've got here. My report was done on the morning of the 17th, but the initial incident started on the 16th.
Q Yeah. Is that what was confusing you?
A Yeah. I was just thinking that the night was long. We went off into the next --
Q Yeah, it sounds like a long night to me, too.
A So that's where I get the 17th. I didn't start the report until the next day.
Q Okay.
MR. HALL: I don't have any other questions.
MR. PHILLIPS: I have nothing.
MR. HALL: Good deal.
THE WITNESS: That's it?
MR. PHILLIPS: You're done. Thank you.
MR. HALL: Thank you. I appreciate your time.
(DEPOSITION CONCLUDED AT 4:44 p.m.)
****

SIGNATURE OF WITNESS

I, ______________________, do solemnly swear that I have read the foregoing pages and that the same is a true and correct transcript of the testimony given by me at the time and place hereinbefore set forth, with the following corrections:

PAGE: LINE: SHOULD READ: REASON FOR CHANGE:

_____ _____ ____________

________________

_____ _____ ____________

________________

_____ _____ ____________

________________

_____ _____ ____________

________________

____________________________

(SIGNATURE)

NOTARIZATION

I, ____________________, notary public for the State of ___________________, ____________ County, do hereby certify that __________________ personally appeared before



me this _____ day of ________________, 2014, at ____________________, __________________.

My Commission Expires

___________________

____________________

(NOTARY PUBLIC)



CERTIFICATE OF COURT REPORTER

I, Debra A. Williams, CCR, and Notary Public in and for the County of Madison, State of Mississippi, hereby certify that the foregoing pages, and including this page, contain a true and correct transcript of the testimony of the witness, as taken by me at the time and place heretofore stated, and later reduced to typewritten form by computer-aided transcription under my supervision and to the best of my skill and ability.

I further certify that I placed the witness under oath to truthfully answer the questions in this matter under the power vested in me by the State of Mississippi.

I further certify that I am not in the employ of or related to any counsel or party in this matter, and have no interest, monetary or otherwise, in the final outcome of the proceedings.

Witness my signature and seal this the _____ day of ________________________________

____________________________________

DEBRA A. WILLIAMS, CCR

My Commission Expires May 12, 2014