# In The Matter Of:

## *MICHAEL PRINCE vs*
## *WASHINGTON COUNTY, MISSISSIPPI*

JEFFREY PARSON
April 21, 2014



*Alpha Reporting Corporation*
*236 Adams Avenue*
*Memphis, TN 38103*
*901-523-8974*



Original File 28634ln.txt
Min-U-Script® with Word Index

EXHIBIT
"D"
PENGAD/Bayonne, N.J.

---

**Page 1**

1
2      IN THE UNITED STATES DISTRICT COURT
       NORTHERN DISTRICT OF MISSISSIPPI
3              GREENVILLE DIVISION
       _____
4    MICHAEL PRINCE,
5         Plaintiff,
6    Vs.              Case No. 4:13cv165-SA-JMV
7    WASHINGTON COUNTY, MISSISSIPPI
     SHERIFF MICHAEL GASTON, in his
8    Official Capacity, LIEUTENANT
     MACK WHITE, in his individual
9    and official capacity, DEPUTY
     MARVIN MARSHALL, in his
10   individual and official capacity,
     and JOHN DOES 1-10,
11
12        Defendants.
       _____
13
14       THE DEPOSITION OF JEFFREY PARSON
15             April 21, 2014
       _____
16
17
18
19
       _____
20
21        ALPHA REPORTING CORPORATION
22         SHERYL G. WEATHERFORD, RPR
                 236 Adams
23          Memphis, Tennessee 38103
                 901.523.8974
24
25

---

**Page 2**

1          The deposition of JEFFREY PARSON, taken
2    on this, the 21st day of April, 2014, on behalf of
3    the Plaintiff, pursuant to notice and consent of
4    counsel, beginning at approximately 1:00 p.m. in
5    the law offices of Campbell DeLong, LLP, 923
6    Washington Avenue, Greenville, Mississippi.
7          This deposition is taken in accordance
8    with the terms and provisions of the Federal Rules
9    of Civil Procedure.
10         All forms and formalities are waived.
11   Objections are [reserved/not reserved], except as
12   to form of the question, to be disposed of at or
13   before the hearing.
14         The signature of the witness is waived.
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1              - APPEARANCES -
2    For the Plaintiff:
3
4         MR. MICHAEL DUNCAN
          Attorney at Law
5         Duncan Kent
          571 Highway 51
6         Suite B
          Ridgeland, MS 39157
7         601-206-0288
          Michael@duncankentpllc.com
8    For the Defendant:
9         MR. P. SCOTT PHILLIPS
          Attorney at Law
10        MS. REBECCA GRAMLING
          Paralegal
11        Campbell DeLong, LLP
          923 Washington Avenue
12        Greenville, MS 38702-1856
          662-335-6011
13        Sphillips@campbelldelongllp.com
14   Reported by:
15
16        SHERYL G. WEATHERFORD
          Registered Professional
17          Reporter
          Alpha Reporting Corporation
18        236 Adams Avenue
          Memphis, TN 38103
19        901-523-8974
20
21
22
23
24
25

---

**Page 4**

1               - INDEX -
2    WITNESS:                         PAGE
3         JEFFREY PARSON
4    EXAMINATION
5    BY MR. DUNCAN                      5
6    EXAMINATION
     BY MR. PHILLIPS                   68
7    EXAMINATION
8    BY MR. DUNCAN                     77
9
10   EXHIBITS                         PAGE
11
     Exhibit No. 1   Notice of Deposition      5
12
13   Exhibit No. 2   Aerial Photograph         39
14
15   Exhibit No. 3   Supplementary Report by   69
                     Jeffrey Parson
16
17
18
19
20
21
22
23
24
25

Page 5

1   JEFFREY PARSON
2 Having been first duly sworn, was examined and
3 testified as follows:
4   **EXAMINATION**
5   **BY MR. DUNCAN:**
6 Q.  To begin, Jeffrey, I just ask you to state
7   your name for the record.
8 **A.  Jeffrey Parson.**
9   MR. DUNCAN: All right.  We are going
10 to waive all objections, save them.
11   MR. PHILLIPS: Except as to the form.
12   MR. DUNCAN: As to the form.  Okay.
13   MR. PHILLIPS: That's fine.
14   MR. DUNCAN: So we would stipulate to
15 that, and this deposition is being taken pursuant
16 to notice, and I would make that Exhibit 1.
17   (Whereupon, the above-mentioned
18 document was marked as Exhibit No. 1.)
19   BY MR. DUNCAN:
20 Q.  All right.  Jeffrey, have you ever given a
21   deposition before?
22 **A.  No, sir.**
23 Q.  Okay.  Just tell you a little bit about
24   what we are going to do today.  I'm going to ask
25   you some questions.  You have got your attorney

Page 6

1 here.  He may object to some of the questions I
2 ask, the way I ask them, and if he does that,
3 that's fine.  And if I ask you a question that you
4 don't understand the -- understand what I'm
5 asking, I ask you not to answer it.  Just ask me
6 to rephrase it or what have you, so I want to make
7 sure that you're understanding everything that I'm
8 asking.  Is that fair enough?
9 **A.  Yes, sir.**
10 Q.  Tell me what is your full name.
11 **A.  Jeffrey, J-E-F-F-R-E-Y, Parson,**
12   **P-A-R-S-O-N.**
13 Q.  And, Jeffrey, what is your address?
14 **A.**
15
16 Q.  And your social security number?
17 **A.**
18 Q.  And I see you're in uniform today, but I
19   would ask you to tell me what your occupation is.
20 **A.  I am the captain at Leland Police**
21   **Department in Leland, Mississippi.**
22 Q.  Okay.  And how long have you been employed
23   with Leland?
24 **A.  Since December of last year.**
25 Q.  December of 2012?

Page 7

1 **A.  2013.**
2 Q.  '13.  All right.  And prior to that, where
3   were you employed?
4 **A.  The Washington County Sheriff's**
5   **Department.**
6 Q.  What was your position or rank there at
7   the Washington County Sheriff's?
8 **A.  At the time when I left Washington County,**
9   **it was a lieutenant over a shift.**
10 Q.  Prior to that, was your rank, a sergeant
11   prior to that?
12 **A.  Yes, sir.**
13 Q.  When did you get the promotion from
14   sergeant to lieutenant?
15 **A.  I'm not for sure, but I think around July**
16   **of 2013.**
17 Q.  Okay.  And how long had you been with the
18   Washington County Sheriff's Department?
19 **A.  December 20th would have been 12 years for**
20   **me.**
21 Q.  So right before your 12-year
22   anniversary --
23 **A.  Yes, sir.**
24 Q.  -- you switched over to Leland?
25 **A.  Yes, sir.**

Page 8

1 Q.  And you're a captain there at Leland?
2 **A.  Yes, sir.**
3 Q.  And let me ask you this, are you married,
4   Jeffrey?
5 **A.  No, sir.**
6 Q.  Okay.  What about your education, where
7   did you go to school?
8 **A.  Rolling Fork High School, a graduate of**
9   **Rolling Fork High. Also I went to Moorhead**
10   **Mississippi Delta Community College.**
11 Q.  And there at junior college or community
12   college is that where you got your law enforcement
13   training?
14 **A.  Yes, sir.**
15 Q.  Can you explain to me a little bit about
16   what that training entailed?
17 **A.  It entails the constitutional laws.  It**
18   **tells you how to defend yourself.  It tells me the**
19   **different ways to make an arrest and it also tells**
20   **me -- first aid and CPR.**
21 Q.  Okay.  And can you tell me a little bit
22   about any family you have here in the area, here
23   in the Delta region?
24 **A.  I really don't have any family here.**
25 Q.  No parents, no brothers and sisters?

**Page 9**

1 A. My parents stays -- my mother stays in
2 Rolling Fork. My father is deceased.
3 Q. Siblings?
4 A. My sister -- I got one brother in Dallas
5 and one sister in Southaven.
6 Q. Nieces and nephews, cousins, anything like
7 that?
8 A. Not staying here in Greenville.
9 Q. What about the area?
10 A. I got a son.
11 Q. Okay.
12 A. Stays here in Greenville.
13 Q. All right. What is his name?
14 A. ▮▮▮▮▮▮▮
15 Q. But is he 18 years of age?
16 A. No, sir.
17 Q. Any other family over the age of 18 in the
18 Greenville area?
19 A. Greenville, no sir.
20 Q. Let me back up for just a second and tell
21 me when you left the Washington County Sheriff's
22 Department, was that your choice to leave?
23 A. Yes, sir. In reference to a blessing that
24 I have got to become second in charge of the
25 department that in the future possibly can be

**Page 10**

1 chief.
2 Q. So Leland approached you about coming
3 there?
4 A. Yes, sir.
5 Q. Back when you were originally hired in --
6 with Washington County Sheriff's Department, what
7 year was that again?
8 A. I was hired December the 20th of 2001.
9 Q. Okay. And when you were hired, did you at
10 any time receive a policy and procedures manual?
11 A. Yes, sir. From the sheriff at that time,
12 Victor Smith.
13 Q. Okay. From the sheriff that was there
14 then. And what year did that sheriff leave and
15 another sheriff come in?
16 A. I want to say 2004. I'm not real for
17 sure.
18 Q. 2004, 2005, something like that?
19 A. Yes, sir.
20 Q. All right. And at that time did you get
21 an updated policy and procedures manual?
22 A. Yes, sir.
23 Q. Do you remember when that was that you
24 got -- received that?
25 A. No, sir.

**Page 11**

1 MR. DUNCAN: Scott, I'm just going to
2 show him this at this point, and I think we can
3 back reference it to the other ones rather than
4 putting it in.
5 MR. PHILLIPS: That's fine. He may
6 or may not recognize them, but, yeah. Wait, wait.
7 I got this thing right here if you want me to just
8 have him look on.
9 MR. DUNCAN: It's Exhibit 7.
10 MR. PHILLIPS: Yeah, yeah. Let's do
11 it that what way. I'm sorry.
12 MR. DUNCAN: Or 6, I'm sorry. Or
13 which went into effect -- 7 went into effect in
14 '11.
15 MR. PHILLIPS: Well, yeah.
16 BY MR. DUNCAN:
17 Q. Do you recognize that document in front of
18 you, Jeffrey?
19 A. Yes, sir. This is the paper we had to
20 sign once we got the policy and procedure from the
21 Sheriff Gaston.
22 Q. So that was the one from Gaston?
23 A. Yes, if I'm not mistaken. Yes, sir.
24 Q. Okay. And let me ask you this: Did --
25 with your position on the sheriff's department,

**Page 12**

1 were you supervising other officers?
2 A. Yes, sir.
3 Q. And when I say were you, backing up to
4 when you were sergeant.
5 A. Yes, sir.
6 Q. Not after your promotion.
7 A. Yes, sir.
8 Q. Okay. So tell me a little bit about your
9 day in and day out stuff when you were a sergeant
10 with the Washington County Sheriff's Department.
11 A. I was a shift supervisor over I think at
12 that time I had five people maybe up under me.
13 Also at the time sometime we would have dispatch
14 up under us. They would come in and check the --
15 check with the sergeant that left off for the
16 other shift and talk to him and get assignments or
17 did he have people out in different locations that
18 need to be -- that needed to be relieved.
19 Q. Okay. And you said you had four to five
20 people under you, was that the same four to five
21 people all the time?
22 A. Yes, sir.
23 Q. Who were those people?
24 A. My shift changed so much. I had different
25 people coming in and out. I can't remember. I

---

Page 13

1    know some of them.
2    Q.   Fair enough. But in your position, you
3    did patrol; is that correct?
4    A.   Yes, sir.
5    Q.   And so you interacted with the citizens?
6    A.   The community, yes, sir.
7    Q.   The community. All right. And what were
8    your duties when you were on patrol?
9    A.   Basically to supervise the gentlemen or
10   the officers that was up under me and to make sure
11   that the citizens of Washington County were safe.
12   Q.   But you would be dispatched out to
13   locations; is that correct?
14   A.   Yes, sir.
15   Q.   And before coming here today, have you
16   reviewed any files relating to Michael Prince?
17   A.   Only what I read -- what I wrote at the
18   time of the --
19   Q.   The report that you --
20   A.   That I wrote, yes, sir.
21   Q.   All right. And that report has been
22   turned over to your attorney; is that correct?
23   A.   Yes, sir.
24        MR. DUNCAN: And it was provided to
25   us?

---

Page 14

1        MR. PHILLIPS: Yeah, it's in the
2    disclosure.
3    Q.   And other than that document, you hadn't
4    reviewed any other documents relating to that
5    incident?
6    A.   No, sir.
7    Q.   Have you talked with anybody about the
8    incident?
9    A.   My attorney.
10   Q.   Okay. Other than your attorney, any of
11   the other deputies or anything like that?
12   A.   No, sir.
13   Q.   Or the sheriff?
14   A.   No, sir.
15   Q.   So the one page that you actually produced
16   is the only thing that you reviewed?
17   A.   Yes, sir. As far as paperwork, yes, sir.
18   Q.   You haven't reviewed my client's history
19   or background or anything like that?
20   A.   No, sir.
21   Q.   Tell me as a sheriff's deputy in
22   Washington County, y'all were required to abide by
23   those policies and procedures that we just looked
24   at; is that correct?
25   A.   Yes, sir.

---

Page 15

1    Q.   And your job not only as a deputy but also
2    as a supervising deputy is to make sure that
3    yourself, as well as those that you're
4    supervising, adhere and follow by those policies
5    and procedures; is that correct?
6    A.   Yes, sir.
7    Q.   Do you know a person who was a deputy by
8    the name of Marvin Marshall?
9    A.   Yes, sir.
10   Q.   And how do you know him?
11   A.   He's a deputy that was on another shift,
12   and sometime my shift will cross over. On certain
13   shift that we work, he was -- we probably work
14   probably three hours together.
15   Q.   All right. Let me ask you this: Did your
16   employment with Washington County Sheriff's
17   Department start first or did his?
18   A.   Mine.
19   Q.   So you were here when he was hired?
20   A.   Yes, sir.
21   Q.   Did you have any involvement with his
22   hiring?
23   A.   No, sir.
24   Q.   Did you know him prior to him coming on to
25   the Washington County Sheriff's Department?

---

Page 16

1    A.   No, sir.
2    Q.   So other than the three hours that y'all
3    would work together, did y'all interact with each
4    other outside --
5    A.   Yes, sir. I mean, as co-workers, yes, we
6    did talk occasionally on phones or, you know, we
7    might have Bible studies together or whatever,
8    but, yes, sir.
9    Q.   And was that three-hour overlap that you
10   were discussing --
11        (Off the record.)
12        BY MR. DUNCAN:
13   Q.   I should have said that earlier, at any
14   point in time that you need to stop, just say I
15   need to stop to use the restroom or whatever it
16   might be. Okay?
17   A.   Yes, sir. Yes, sir.
18   Q.   And what I was asking is that three-hour
19   overlap that you just described, was that a daily
20   thing when y'all were working?
21   A.   No, it wasn't a daily thing. It would
22   only depend on the shifts or days off.
23   Q.   Okay. All right. But it was a pretty
24   regular occurrence?
25   A.   Well, once every two months.

---

**Page 17**

1 Q. So it was only one day out of two months?
2 A. Well, I'm saying one shift every two
3 months. It might -- depend on what my days off
4 and his days off. Sometime -- if I'm working 4:00
5 to 1:00, 4:00 p.m. to 1:00 a.m., they would come
6 out at 10:00 and work 10:00 to 6:00 and that was
7 the overlapping shift. And if his two days were
8 different from my two days, that mean we only work
9 one day. It just depends on how the days off
10 fell, my days off and his days off.
11 Q. Sometimes you took vacation and sometimes
12 he took vacation?
13 A. Yes, sir.
14 Q. Fair enough. I understand that. And what
15 about Deputy Mack White, do you know him?
16 A. I knew him prior to coming to Washington
17 County, and he worked at Greenville Police
18 Department with me.
19 Q. So you worked with the Greenville Police
20 Department prior to that?
21 A. Yes, sir.
22 Q. And you and Mr. White were on the
23 Greenville PD together?
24 A. Yes, sir, for a brief time. Because by
25 the time he got hired over there, I was leaving.

**Page 18**

1 Q. Coming to here.
2 A. Coming to SO, yes, sir.
3 Q. Prior to -- and this is backing up some
4 again. But other than your time now with Leland,
5 your time with the Washington County Sheriff's
6 Department, your time with the Greenville Police
7 Department, do you have any other law enforcement
8 experience?
9 A. Yes, sir. I had a year and a half in
10 dispatching at Sharkey County Sheriff's Department
11 and also about a year and a half as a deputy there
12 at Sharkey SO back in 19 -- I started in
13 dispatching probably 1995.
14 Q. So you were there like '95 to --
15 A. '96, '97.
16 Q. '96, '97?
17 A. Yes.
18 Q. And then you went from there to
19 Greenville?
20 A. Well, I got out of law enforcement for
21 about a year and a half and I got back in law
22 enforcement in '98, July of '98, when I got back
23 in law enforcement at Greenville PD.
24 Q. Anything in particular that made you get
25 out of law enforcement?

**Page 19**

1 A. Well, I injured myself. So I went to EMT
2 school and got certified as an EMT over there at
3 Mississippi Delta and worked for an ambulance
4 service.
5 Q. Good deal. Any of your leaving, whether
6 it be from the Sharkey Sheriff's Department,
7 Greenville Police Department, we have addressed
8 but we will include, Washington County Sheriff's
9 Department, all those you weren't terminated on
10 any of them?
11 A. No, sir. No, sir.
12 Q. You left voluntarily?
13 A. Yes, sir.
14 Q. Were the terms that you left under good
15 terms?
16 A. It was good terms, yes, sir.
17 Q. All right. And so you came to the
18 Washington County Sheriff's Department again
19 before Mr. White did?
20 A. Yes, sir.
21 Q. And similar to the question I asked you
22 about Mr. Marshall, were you involved at all in
23 his coming over here to the sheriff's department?
24 A. No, sir, I -- I didn't have nothing to do
25 with the interviews or anything. No, sir.

**Page 20**

1 Q. So you had nothing to do with the hiring
2 process?
3 A. No, sir.
4 Q. I want to go through a few things and just
5 ask you to put some of these words that I'm going
6 to ask you, I want you to define them in your own
7 way. Okay?
8 A. Yes, sir.
9 Q. Can you tell me what it means to use --
10 when I say use of force?
11 MR. PHILLIPS: Object to the form.
12 Q. Could you tell me what training --
13 MR. PHILLIPS: You want him to answer
14 it?
15 Q. Yeah. Go ahead and answer.
16 A. Use of force means it can go to deadly
17 force or just whatever that takes above the norm
18 to make an arrest or to subdue a person.
19 Q. Okay.
20 A. And that can go to use of mace or baton,
21 just different stages that we have.
22 Q. Well, let me ask you that since you
23 specifically refer to those two things. In your
24 training with the Washington County Sheriff's
25 Department, were you trained on how to use mace?

JEFFREY PARSON
April 21, 2014

MICHAEL PRINCE vs
WASHINGTON COUNTY, MISSISSIPPI

---

Page 21

1 A. Yes. At the police academy, yes, sir.
2 Q. So at the police academy?
3 A. Yes.
4 Q. Not at the sheriff's department?
5 A. No. You get that training at the police
6 academy.
7 Q. What about the use of baton?
8 A. At the police academy.
9 Q. And were both the use of baton and the use
10 of mace allowed under the policies and procedures
11 of the Washington County Sheriff's Department?
12 A. Yes, sir.
13 Q. So you carried a baton with you?
14 A. No, sir.
15 Q. Did you carry mace with you?
16 A. No, sir.
17 Q. But had you wanted to provide your own --
18 A. Oh, they would have provided it, but I
19 just didn't.
20 Q. But under the policies and procedures it
21 would have been an okay avenue for you to use?
22 A. Yes, sir, due to I was certified with
23 those items.
24 Q. And if you could, define for me the term
25 excessive force.

---

Page 22

1      MR. PHILLIPS: Object to the form.
2 Q. Go ahead and answer.
3 A. To excessively due bodily harm to a person
4 that is not necessary.
5 Q. And during your time with the Washington
6 County Sheriff's Department, did you ever use
7 excessive force against someone?
8 A. I have never been alleged to have used
9 excessive force, no.
10 Q. In your opinion would -- have you ever
11 seen another -- another deputy use excessive
12 force?
13 A. I can't answer that because I don't know
14 what they call excessive force, but I have never
15 been alleged in one.
16 Q. Fair enough. And talking about the
17 policies and procedures manual, are you aware that
18 there is or is not a use of force policy in place?
19      MR. PHILLIPS: Object to the form.
20 A. There was a brief one in Sheriff Gaston,
21 but I can't remember. Like I say, I'm trying to
22 learn a whole other policy and procedure.
23 Q. You're dealing with your own now trying
24 to --
25 A. Trying to make one.

---

Page 23

1 Q. Trying to make sure Leland has got one in
2 place.
3 A. Yes, sir.
4 Q. I understand. Define for me reasonable
5 suspicion.
6      MR. PHILLIPS: Object to the form.
7 A. Reasonable suspicion is anything that you
8 have an idea of that a crime has been committed.
9 Q. Okay. What about probable cause?
10      MR. PHILLIPS: Object to the form.
11 A. Probable cause is a reason to know that a
12 crime has been committed.
13 Q. Okay. And to you what does it mean when
14 you place somebody under arrest?
15 A. Is to detain them and take their freedom
16 from them.
17 Q. And would you agree with me that there is
18 a difference between what a detainee is and what
19 an arrestee is?
20 A. Yes, sir.
21 Q. Okay. And explain the difference to me.
22 A. Well, a detainee he has the right to leave
23 at any time. Even if you detain him, if you don't
24 have a reason to arrest him, he has the right to
25 walk out and tell you he don't want to talk to

---

Page 24

1 you. Arrestee is that you have arrested him and
2 he can't leave.
3 Q. Can you handcuff a detainee?
4 A. For safety reasons, yes, but you have to
5 explain to him that he's not being arrested. He's
6 just only being detained for safety purpose.
7 Q. Okay. All right. We talked about use of
8 force and excessive force, but what would -- to
9 you what would be reasonable force?
10      MR. PHILLIPS: Object to the form.
11 A. It's just a minimum amount of force needed
12 to make an effective arrest.
13 Q. Okay. And in police lingo y'all use some
14 codes and stuff, right?
15 A. Yes, sir.
16 Q. Can you tell me what a 10-23 is?
17 A. It's different with everybody.
18 Q. When you were at the Washington County
19 Sheriff's Department, what was a 10-23?
20 A. On scene.
21 Q. So that means that you're calling in to
22 dispatch and letting --
23 A. That you're on scene.
24 Q. And let them and everybody else know with
25 the sheriff's department that you're on scene at a

---

Page 25

1   location?
2  A.  Yes, sir.
3      MR. PHILLIPS: Jeffrey, let him
4  finish asking his -- let him finish asking.
5      THE WITNESS: Okay.
6      MR. PHILLIPS: Before you answer.
7  Okay?
8      THE WITNESS: Yes, sir.
9      BY MR. DUNCAN:
10  Q.  Thank you.  And when you were with the
11  Washington County Sheriff's Department, what was a
12  10-8?
13  A.  Mean in service for calls.
14  Q.  So that's after you would leave a location
15  you would say, I'm 10-8, I'm back patrolling?
16  A.  Yes, sir.  Or even when you first get in
17  service for today, for that day.
18  Q.  So when you come on your shift and get in
19  your car, you're 10-8, leaving the station?
20  A.  Yeah.
21  Q.  And when you were with the sheriff's
22  department, did you have a local area that you
23  patrolled, or were you county-wide, north only,
24  south only, east only, west only?
25  A.  At the time of the incident, I was a

Page 26

1  roamer because I was a supervisor.
2  Q.  So in March of 2012, you were a roamer?
3  A.  Yes, sir.  I was a supervisor.
4  Q.  You went wherever the dispatch told you?
5  A.  Yes, sir.
6  Q.  Or you could go any part of the county?
7  A.  Yes, sir.
8  Q.  All right.  In your opinion is the
9  striking of an arrestee or detainee in the head,
10  would that be excessive force?
11      MR. PHILLIPS: Object to the form.
12  A.  Yes.
13  Q.  Okay.  In any way?
14  A.  Sir?
15  Q.  In any way?
16      MR. PHILLIPS: Object to the form.
17  A.  I'm not going to say -- yes, sir.  Yes,
18  sir.
19  Q.  All right.  Tell me when you were with the
20  sheriff's department under y'all's policies and
21  procedures, under what situations were y'all
22  authorized to activate y'all's emergency lights?
23  A.  The policy changed that really you
24  couldn't without getting permission from the
25  supervisor.

Page 27

1  Q.  Okay.  Even you as a sergeant at the time
2  you had to get permission?
3  A.  Well, not -- I didn't have to, but I had
4  to know the situation, the totality of the call
5  and the emergency part of the call of -- that I
6  was being responded to, that I was being
7  dispatched to.
8  Q.  So you gathered information?
9  A.  Yes, sir.
10  Q.  Before making that determination?
11  A.  Yes, sir.
12  Q.  Where would you gather that information
13  from?
14  A.  From the dispatcher.
15  Q.  Okay.  And was that a communication
16  between just you and dispatch or was that all
17  through all the cars?
18  A.  That was just through all the cars.
19  Q.  Okay.  So dispatch would call out to every
20  vehicle, tell them the circumstances of what was
21  happening; is that correct?
22  A.  No, sir.  She would dispatch certain units
23  to certain locations.
24  Q.  Okay.  And she would tell you, y'all go
25  here and have your blues on?

Page 28

1  A.  No, sir.  No, sir.  She would dispatch you
2  to say a wreck.  A wreck on 82, multiple injuries,
3  roadblock.  That's what she would say and
4  ambulance en route, rescue en route.  She would
5  tell you those type, but she couldn't tell you
6  when to run your lights and sirens.
7  Q.  So it was a determination left up to the
8  officers?
9  A.  Well, basically the supervisor.  That's
10  what the policy and procedure says.
11  Q.  So the policy and procedure said that no
12  patrolman turns their lights on unless the
13  supervisor based on what dispatch says makes the
14  call?
15  A.  Basically that's what it says, yes, sir.
16  Q.  All right.  Other than being handed the
17  manual that we have just talked about -- and for
18  reference it's Exhibit 6 to prior depositions.  Is
19  that fine?
20      MR. PHILLIPS: Yes.
21  Q.  Other than receiving that manual, did you
22  have any classroom or meetings within the
23  sheriff's department about the policies and stuff?
24  A.  Yes, sir.  Yes, sir.
25  Q.  Did y'all have -- was that on a schedule?

Page 29

1   I mean, did you do it once a month, quarterly?
2 A. Yes, sir. Just quarterly. Sometimes just
3   when the sheriff felt that we needed some more
4   training or he wanted to have a meeting about
5   things.
6 Q. And when you say he would decide
7   that y'all -- he wanted to have more training, did
8   officers with the department do it or did he have
9   outside people come in and do training?
10 A. He did it himself, but it was basically
11   like a meeting.
12 Q. So it was in a meeting setting?
13 A. Setting, yes, sir.
14 Q. Would that be department-wide or --
15 A. Yes, sir.
16 Q. -- did y'all come in in groups?
17 A. No, department-wide.
18 Q. All right. And again it's communicated to
19   you there as far as your policies and procedures
20   when you sign on you're given that and then you
21   have some meetings that just update it and that
22   sort of stuff; is that correct?
23 A. Yes, sir. Yes, sir.
24 Q. And at different times did y'all have
25   memos that you're supposed to add to your

Page 30

1   policies?
2 A. Yes, sir.
3 Q. And how did that happen?
4 A. You had to sign for it and then you --
5   they tell you to add it to your book.
6 Q. That's under Sheriff Gaston.
7 A. Yes, sir.
8 Q. Is that the way it was under the prior
9   sheriff as well?
10 A. I didn't work under him that long.
11 Q. So you can't remember?
12 A. I can't remember.
13 Q. Did you keep any of the memos that you got
14   and that sort of stuff?
15 A. Now? No, sir, I put them all in my book.
16 Q. So you had a book that you kept?
17 A. Yes, sir.
18 Q. Where is that book now?
19 A. I turned it back in to Washington County
20   Sheriff's Department.
21 Q. So you had a book that had all your memos,
22   all your policies and procedures and all that sort
23   of stuff and you have given it to the sheriff's
24   department?
25 A. Back, yes, sir.

Page 31

1   MR. DUNCAN: Is that included in our
2   disclosures that I got?
3   MR. PHILLIPS: I think.
4 A. I mean, that was part of your stuff you
5   had to turn it back in.
6   MR. PHILLIPS: There are memos
7   attached to the end of this policies and
8   procedures. Whether that's all of them, this is
9   what I was given.
10   MR. DUNCAN: That's what you got.
11   Okay. Fair enough.
12   BY MR. DUNCAN:
13 Q. To your knowledge, Jeffrey, have Mr. White
14   or Mr. Marshall ever been investigated for use of
15   excessive force?
16 A. Not to my knowledge, no, sir.
17 Q. And you have already stated it, but just
18   to make sure, you have never been investigated for
19   it?
20 A. No, sir.
21 Q. Okay. All right. To the best of your
22   knowledge, were all the people that were under
23   your supervision aware of the use of force policy
24   that was in place?
25 A. Yes, sir, to my -- to the best of my

Page 32

1   knowledge.
2 Q. Did you ever talk with them about it
3   individually as their supervisor?
4 A. Yes, sir, sometime.
5 Q. And what kind of stuff would you tell
6   them?
7 A. I mean, just -- I would tell them about
8   lawsuits and use of force and then tell them to go
9   back to their academy training.
10 Q. In your time with the Washington County
11   Sheriff's Department, was there a policy in place
12   that said if there was a claim of excessive force
13   what you as the officers were supposed to do as
14   far as reporting it?
15 A. Supposed to do a report, I know that.
16 Q. Did that mean that all of the officers
17   involved were supposed to do a report if there was
18   a --
19 A. Yes, sir. If there was I guess you would
20   call it a claim made.
21 Q. And were you under a duty as well
22   to report anything if you saw any of that?
23 A. Yes, sir. Yes, sir.
24 Q. And was there a time frame of when you're
25   supposed to document that sort of stuff?

Page 33

1 A. I mean, if you -- something that you had
2 to document, you had to document it right then.
3 Q. Okay. And how was it documented? Did
4 y'all have a form or did you just write it out --
5 A. Offense report.
6 Q. Just offense -- just a generic --
7 A. Yes.
8 Q. -- offense report. Y'all didn't have a
9 special form for excessive force or anything like
10 that?
11 A. No, sir. No, sir.
12 Q. Or when a detainee or arrestee was
13 injured, y'all didn't have a special report on
14 that?
15 A. No, sir. Not one that I can remember.
16 Q. Fair enough. And you have already said
17 that you were -- at your time with the sheriff's
18 department you were authorized to use a baton, you
19 were authorized to use mace, correct?
20 A. Through my training, yes, sir. It wasn't
21 something that the sheriff's department directly
22 told us, but through my police academy training I
23 was.
24 Q. But you were told you could not use mace
25 or could not use baton through the sheriff's

Page 34

1 department?
2 A. No, sir. No, sir.
3 Q. What about a flashlight, were you told you
4 could use a flashlight?
5 A. Yeah, to see, yes, sir.
6 Q. Were you issued a flashlight by the
7 sheriff's department?
8 A. Most cars had flashlights.
9 Q. Okay. So were they the type of
10 flashlights that were in the car and had a
11 charging unit in the car?
12 A. Yes, sir. Yes, sir.
13 Q. What type of flashlight was that?
14 A. Some were Maglites. Some was -- what is
15 the other brand? I can't think of the other
16 brand. It was Maglites and -- I can't think of
17 the other one. But I had my own Stinger, little
18 Stinger. It's called a Stinger light.
19 Q. So you carried a Stinger, your personal
20 Stinger with you?
21 A. Yes, sir.
22 Q. But if you needed to, say you forgot your
23 Stinger, was your car equipped with a Maglite?
24 A. No.
25 Q. But some of the cars were?

Page 35

1 A. Some of them, yes, sir.
2 Q. What about a slap stick, did y'all have
3 slap sticks?
4 A. No, sir. No, sir.
5 Q. And again if you were to have witnessed an
6 officer doing something, any type of criminal
7 activity, you were required to report that?
8 A. Yes, sir.
9 Q. Did you ever report any officer?
10 A. I have wrote -- I think I wrote one
11 officer up. I can't remember. I think I did. I
12 don't think -- no, it wasn't for excessive force,
13 no, sir.
14 Q. In any type of criminal activity?
15 A. No, sir. Never wrote them up.
16 Q. And often times when y'all go out on a
17 call, they will be five, six, seven deputies; is
18 that correct?
19 A. No, sir.
20 Q. Three, four?
21 A. Two to three maybe.
22 Q. Two to three maybe. Okay. And if, for
23 instance, an arrest is made and there's three of
24 y'all on the scene, does each person do a report
25 or was it the person that actually --

Page 36

1 A. That actually did -- the person that did
2 the arrest and the person that -- if that's two
3 different people, the person that did the arrest
4 and the person that took the initial call, it just
5 depends.
6 Q. Okay. Fair enough. And did y'all in
7 y'all's policy and procedures have a standard way
8 of reporting when -- or, excuse me, what steps
9 would y'all take in reporting? You just did the
10 form and turned it in?
11 A. Yes, sir. You wrote it up, turned it in,
12 and dispatch typed it.
13 Q. Okay. And you reviewed it for accuracy
14 I'm assuming?
15 A. Well, yes, sir. You do -- everybody could
16 see your report.
17 Q. Okay. How do you mean everybody could see
18 it?
19 A. Whatever deputy -- whatever deputy came in
20 for that shift, your reports were left out there
21 so they could see it. So they'll know what is
22 going on, what had happened that day.
23 Q. Okay. And was it supervised? I mean, did
24 you have to turn them in to a higher ranking
25 officer to let them review it and sign off on it

Page 37

1   or --
2   A. Sometime we would review them and sometime
3   we would just let them go ahead and turn it in.
4   Q. Okay. With your time with the Washington
5   County Sheriff's Department, did you ever see
6   Mr. White or Mr. Marshall with or carrying a
7   baton?
8   A. No, sir.
9   Q. What about mace?
10  A. I think Mr. Marshall carried mace on his
11  belt.
12  Q. Okay. All right. Flashlights, did you
13  ever see their cars? Could you give your -- could
14  you give any type of testimony about what --
15  A. No, sir.
16  Q. What their cars were equipped with and
17  were not?
18  A. No, sir.
19  Q. To your knowledge did they have personal
20  Stingers?
21  A. I think -- I think Lieutenant -- well,
22  Sergeant White at the time did.
23  Q. All right. Is that a common flashlight
24  for police officers to use?
25  A. Yes, sir.

Page 38

1   Q. Can you tell me about how big it is?
2   A. It's about that long (indicating). It's
3   just an LED -- well, now they're LEDs, about that
4   long. They ain't very long.
5   Q. About 10 inches?
6   A. Yeah, probably.
7   Q. All right. Prior to -- or not even prior
8   to, did you talk with Mr. Prince on the night of
9   March the 16th of 2012, late hours of that date
10  and early hours of March the 17th, 2012?
11  A. No, sir.
12  Q. So you had no communication with him
13  whatsoever?
14  A. No, sir.
15  Q. Prior to that?
16  A. No, sir.
17  Q. Subsequent to that?
18  A. No, sir. Never met him in my life.
19  Q. Never met him?
20  A. No, sir.
21  Q. Never talked with him?
22  A. No, sir.
23  Q. Did you see him that night?
24  A. I saw him when I gave -- briefly in the
25  dark when I gave Lieutenant -- well, Sergeant

Page 39

1   White at the time my handcuffs to place on him.
2   Q. All right. We are going to get to that in
3   a minute. The trailer park where this happened,
4   what was it called?
5   A. Pearson Trailer Park.
6   Q. And where is it located?
7   A. 25 -- you got 2587 Old Leland Road and
8   2588. It's on different sides of the road, but
9   both of them are called Pearson Trailer Park.
10  Q. Okay. Now, I would ask you to take a look
11  at that.
12  A. Yes, sir.
13  Q. That's an aerial photo of what I believe
14  to be that location. Would you agree with that?
15  A. Yes, sir.
16  MR. DUNCAN: Mark that as Exhibit 2.
17  (Whereupon, the above-mentioned
18  document was marked as Exhibit No. 2.)
19  Q. We are going to use that in a minute.
20  Prior to that night, again late hours of March
21  the 16th, early hours of March the 17th of 2012,
22  had you ever responded to that location?
23  A. Yes, sir.
24  Q. How many times?
25  A. I can't tell you. I can't even imagine to

Page 40

1   start to guess how many times. Well, we had calls
2   out there frequently.
3   Q. More than ten?
4   A. What are you talking about, in what time
5   span?
6   Q. Your time with the sheriff's department.
7   A. Oh, yes, sir.
8   Q. Okay. Just back it up to say a six-month
9   window of time. Do you think you had gone there
10  ten times in the prior six months?
11  A. Yes, sir.
12  Q. Is it fair to say that you regularly went
13  there, not just yourself, but the Washington
14  County Sheriff's Department?
15  A. Yes, sir.
16  Q. What type of calls did y'all go out there
17  on?
18  A. It's different. Burglaries, disturbance,
19  kids standing in the street, loud music, dog
20  calls, and all kinds of calls there.
21  Q. Did you happen to ever have any contact
22  with the trailer park manager there?
23  A. Yes, sir.
24  Q. Okay. And who would that be?
25  A. Ms. Bobbie White at that time.

MICHAEL PRINCE vs.
WASHINGTON COUNTY, MISSISSIPPI

JEFFREY PARSON
April 21, 2014

---

**Page 41**

1  Q.  And what were your interactions with her?
2  A.  I mean, sometimes she would be the one to
3     call. Just whatever the situation was at the
4     time. It depends.
5  Q.  But she didn't call you directly, right,
6     she would call dispatch?
7  A.  Yeah, she would call dispatch. Not me,
8     no, sir.
9  Q.  So you had occasion to respond when she
10    had called?
11 A.  Yes, sir.
12 Q.  What kind of complaints was she making?
13 A.  Loud music, unwanted guests, people
14    stealing out of their trailers once they move.
15 Q.  I understand your testimony that y'all
16    went out there a whole lot. Did y'all make a lot
17    of arrests when y'all went out there?
18 A.  Well, we made some. I wouldn't say a
19    whole lot, but we made some.
20 Q.  Prior to the night in question, again
21    March 16, 2012, had anybody made any complaints to
22    you about things that were happening at the
23    trailer park?
24 A.  I might have been out there earlier that
25    day on a call. I can't remember.

---

**Page 42**

1  Q.  Had anybody ever talked with you about
2     altercations between citizens out there and the
3     sheriff's department?
4  A.  Between citizens and sheriff's department?
5     No, sir. No, sir.
6  Q.  Okay. Had anybody ever talked with you
7     about contacting the sheriff's department
8     regarding the way the deputies were acting?
9  A.  No, sir. Not to me.
10 Q.  Towards the citizens.
11 A.  No, sir.
12 Q.  Okay. Not to you. To your knowledge do
13    you know if anybody at the trailer park contacted
14    the sheriff's department about the way the
15    sheriff's deputies were --
16 A.  I mean, that's natural. That's -- you're
17    going to get complaints regardless of whether
18    you're doing right or wrong if they don't like
19    what you do. I mean, if you're upholding the law
20    and they think that they're above the law, they're
21    going to complain. That's just -- I mean, that's
22    just the way it goes.
23 Q.  So you do know of complaints?
24 A.  I don't know none directly, no. But I'm
25    pretty sure there was.

---

**Page 43**

1  Q.  All right. But you personally did not
2     have a conversation with anybody regarding the --
3  A.  No, sir.
4  Q.  Any deputies' conduct there at the trailer
5     park?
6  A.  No, sir.
7  Q.  Tell me -- let's go -- on that night where
8     were you when the call came in to dispatch?
9  A.  Sir, I really can't -- I don't know. I
10    mean, I have been on probably three or four
11    hundred more calls since then.
12 Q.  And you did a report. Does that report
13    tell you anything about that?
14 A.  No, sir.
15 Q.  But you did have an occasion to go there
16    on the night of March 16, 2012?
17 A.  Yes, sir.
18 Q.  Okay. Is this one of the situations where
19    you had your blue lights on?
20 A.  No, sir.
21 Q.  Were you the first officer to respond?
22 A.  I think me and Marshall -- Deputy Marshall
23    got there around the same time from different
24    locations, but I can't remember, sir. I don't
25    know whether I was the first one or the second

---

**Page 44**

1     one.
2  Q.  Fair to say that you were either the first
3     or the second?
4  A.  Yes, sir.
5  Q.  And how many other officers arrived out
6     there that night?
7  A.  Eventually probably two to three more.
8  Q.  Other than yourself?
9  A.  And Marshall.
10 Q.  And Marshall.
11 A.  Yes, sir.
12 Q.  Okay. Would one of them be Mr. White?
13 A.  Yes, sir.
14 Q.  Who would the others be?
15 A.  Sir, I -- I can't remember. Like I say,
16    I've got a lot going on in Leland. A lot -- it's
17    not anything the sheriff's department did to me,
18    but I just leave that there so I can concentrate
19    on what I have in --
20 Q.  Cartilage ring a bell?
21 A.  He might have come out there. I think he
22    did. I'm not for sure, sir.
23 Q.  Okay. And what time did the call happen?
24 A.  About 11 o'clock, 11:00 p.m.
25 Q.  All right. Do you recall the nature of

---

Page 45

1   what dispatch told y'all?
2   A.  It was in reference to a disturbance
3   between neighbors.
4   Q.  Okay.  Disturbance.  All right.  And you
5   said the call came in around 11 o'clock.  You and
6   Marshall were the first two to get there?
7   A.  Yes, sir.
8   Q.  Tell me what y'all did.
9   A.  We responded to the location that we got
10  to -- that we were dispatched to.  And we made
11  contact with several people.  And then they said
12  that one party had ran in the woods I believe, if
13  I'm not mistaken.  And that the suspect, one of
14  the people that was -- I am not going to say
15  suspect.  One of the people that was involved in
16  the disturbance had ran out in the woods.  I would
17  hear somebody out there, and I went to the edge of
18  the fence to try to locate and see.
19  Q.  All right.  When you were dispatched, were
20  you dispatched to a particular trailer or just to
21  the trailer park?
22  A.  I want to say we were just -- I want to
23  say we were dispatched to a particular trailer.
24  There was a lot number out there.
25  Q.  Do you remember which one it was?

Page 46

1   A.  Lot 24, that's what I wrote in my report.
2   Q.  Looking at this map, can you tell me where
3   Lot 24 is?
4   A.  Coming off -- let's see, somewhere up in
5   here.  I don't know.  Because this --
6   Q.  So it was on the south side of Old Leland
7   Road?
8   A.  Of the trailer park, yes, sir.  It was on
9   the south side of Old Leland Road on the south
10  side of the trailer park, if I remember right.
11  Q.  Okay.  And you're not sure which one it
12  was?
13  A.  No, sir.
14  Q.  Okay.  On this exhibit, on Exhibit 2 that
15  you're looking at, previously there has been a
16  line drawn.  Do you see this line?
17  A.  Yes, sir.
18  Q.  Is that where the fence is located that
19  you're talking about?
20  A.  Yes, sir.
21  Q.  So you heard a suspect, correct?
22  A.  I heard something in the woods.
23  Q.  Okay.  You heard something.
24  A.  Yes, sir.
25  Q.  And you went over there to investigate; is

Page 47

1   that correct?
2   A.  Yes, sir.
3   Q.  Could you please make an asterisk of the
4   location of where you think it was.
5   A.  Because I can't -- I don't know exactly
6   where the trailer is at.  It was -- if that's
7   Raceway, it was -- estimated somewhere up in here
8   (indicating).
9   Q.  Okay.  All right.
10  A.  I'm not for sure.  Like I say, I don't
11  even know where the trailer is that I went to
12  exactly.
13  Q.  Understood.  And so you heard some
14  rustling of some leaves and that sort of thing?
15  A.  Yes.  Some tree limbs breaking.
16  Q.  And what did you do at that point in time?
17  A.  I think we finished talking to the people,
18  and while we was out there, a shot was fired.
19  Q.  Okay.
20  A.  And that's when we went towards -- that's
21  when I got on the radio and called for some more
22  units out there.
23  Q.  So you heard shots fired?
24  A.  I heard a shot, yes, sir.
25  Q.  You heard a shot, a single shot?

Page 48

1   A.  Yes, sir.
2   Q.  Okay.  What -- since you don't know which
3   trailer it was, do you know where you had stopped
4   your vehicle that night?
5   A.  Sir, no, sir.  Somewhere up in here.  I
6   don't know.  Somewhere in the middle of the
7   trailer park.
8   Q.  In the common drive that separates the two
9   rows of trailers?
10  A.  Yes, sir.
11  Q.  Is where you had parked your car?
12  A.  Somewhere in there, yes, sir.
13  Q.  And is that where you had talked to the
14  individual you just described, or were you going
15  from door to door talking to people?
16  A.  Well, just somewhere in there was where I
17  made contact with the person that called the
18  sheriff's department.
19  Q.  And who was that?
20  A.  Sir, I don't know because Deputy Marshall
21  took the original report.
22  Q.  Why was it that Deputy Marshall did it
23  rather than you?
24  A.  I mean, he was the original one
25  dispatched, I believe, and plus I was the

MICHAEL PRINCE vs
WASHINGTON COUNTY, MISSISSIPPI

JEFFREY PARSON
April 21, 2014

**Page 49**

1  supervisor.
2  Q.  Okay.  So --
3  A.  Most of the time he's the type of deputy
4  that don't want the supervisor to do too much.
5  You know, he will do the report.
6  Q.  So it had -- didn't have anything to do
7  with your rank.  You didn't order him to do that
8  or anything like that?
9  A.  No, sir.  No, sir.
10  Q.  Is it fair to say that this direction is
11  south, this direction is north?
12  A.  Yes, sir.
13  Q.  This is east and this is west?
14  A.  Yes, sir.
15  Q.  From your location I know it wasn't -- you
16  don't have an exact location, but you were
17  somewhere in this common drive area?
18  A.  Uh-huh.
19  Q.  What directions was the single shot that
20  you heard fired?
21  A.  Southeast from where I was standing.
22  Q.  Southeast from where you were standing, so
23  that would be this direction?
24  A.  Somewhere in that direction, yes, sir.
25  Q.  I know you're trained in firearms,

**Page 50**

1  correct?
2  A.  I'm not an expert in firearms, no, sir.  I
3  was trained to carry one, yes, sir.
4  Q.  Are you familiar with the different sounds
5  that firearms make?
6  A.  I'm not an expert, no, sir.
7  Q.  So you wouldn't be able to tell the
8  difference between, say, a shotgun and a pistol?
9  A.  Yes, sir.
10  Q.  Based on your knowledge, what type of
11  weapon --
12  A.  Sound like a handgun.
13  Q.  If you could, again I know you don't know
14  exactly where you were, put a square, a green
15  square, in the location of where you think the
16  shot came from.
17  A.  Southeast, so somewhere up in here
18  (indicating).  That's just an estimate.
19  Q.  Okay.  And when you heard the single shot,
20  it was just you and Deputy Marshall there?
21  A.  Yes, sir.
22  Q.  All right.  What did y'all do when y'all
23  heard the shot?
24  A.  I called for some more units because I
25  didn't know because of the safety of the citizens

**Page 51**

1  in the trailer park.
2  Q.  Is it possible that what you heard was a
3  car backfiring?
4  MR. PHILLIPS: Object to the form.
5  A.  No, sir.  It wasn't no -- I didn't see any
6  vehicles at the time.
7  Q.  Well, you couldn't see --
8  A.  I couldn't see there.  No, sir, I don't
9  know.
10  Q.  Firecracker, could it have been a
11  firecracker?
12  MR. PHILLIPS: Object to the form.
13  A.  I don't know.
14  Q.  All right.  So you called dispatch.  What
15  did Marshall do?
16  A.  I think he went towards the fence line
17  also, me and him both.
18  Q.  Tell me about what y'all did once you got
19  to the fence line.
20  A.  We started looking -- we was getting ready
21  to go out there, then heard another disturbance
22  out there in the area where we were -- where we
23  had just left from, and that's when we went back
24  to the disturbance.
25  Q.  In the common drive area?

**Page 52**

1  A.  Yes, sir.
2  Q.  What type of disturbance was that?
3  A.  It was just some people yelling and
4  screaming.
5  Q.  Okay.  From the time that you got there to
6  the time that you first went to the fence line,
7  how long had y'all been out there talking with the
8  people?
9  A.  I can't remember.
10  Q.  How long were you at the fence when this
11  second disturbance occurred?
12  A.  I can't recall exactly how long or
13  estimated time either.
14  Q.  Did this second disturbance occur like
15  right there in front of y'all's police cars?
16  A.  Somewhere in the common drive somewhere.
17  I couldn't -- because we was on the back side of
18  the trailers then.  This happened in the common --
19  so if we was back here close to the fence and the
20  disturbance happened somewhere over there.  We
21  went to a trailer house over there somewhere in
22  this area on the north side.
23  Q.  So y'all just forgot about the gunshot for
24  the time being?
25  A.  Well, the gunshot hadn't happened yet.  I

Page 53

1  think we was -- the gunshot didn't start until --
2  I can't -- I think it started --
3  Q.  Y'all wouldn't have been over there at the
4  fence if the gun had not happened; is that
5  correct?
6      MR. PHILLIPS: Object to the form.
7  A.  Yes, sir.  You're correct, I think.  Yes,
8  sir.
9  Q.  So you hear a gunshot, go to the fence,
10  then hear people -- so you're saying disturbance,
11  were they hollering?
12  A.  Yelling and screaming and cursing, yes,
13  sir.
14  Q.  And y'all go back and y'all just --
15  A.  Separate them, yes, sir.
16  Q.  Leave the gunshot alone for the time
17  being?
18  A.  Yes, sir.
19  Q.  Based on your experience with the
20  sheriff's department when you place that phone
21  call into dispatch or that radio transmission into
22  dispatch and ask for assistance to get those other
23  officers, would that have been an emergency
24  situation they all would be coming with their
25  blues on?

Page 54

1  A.  I ain't going to say, but that's up to
2  them.  I mean, that's up to -- I can't say what
3  they came there with.  I mean, that was not a shot
4  person so, no, sir, probably not.
5  Q.  Okay.  All right.  Fair enough.  And so
6  you disband the people that were there in the
7  common area causing the ruckus; is that right?
8  A.  Yes, sir.  I think we made an arrest also.
9  Q.  Do you know who it was you arrested?
10  A.  No, sir.  I can't -- it was somebody with
11  a warrant.
12  Q.  Somebody that had a warrant.  All right.
13  And you said that Mr. Marshall made contact with
14  the person that called in.  Were you there with
15  him when he was talking to that person?
16  A.  Yes, sir, I was there for backup.
17  Q.  Do you have any conversation with them?
18  Could you hear their conversation?
19  A.  I don't remember the conversation.
20  Q.  And as far as the sound that you heard in
21  the woods, did you just hear the sound and
22  investigate it, or did somebody tell you y'all
23  need to look in the woods?
24  A.  Well, originally when I -- if I'm not
25  mistaken, originally when we got there they said

Page 55

1  that it was somebody that had just jumped the
2  fence.  After the shot, there was some more people
3  that said they heard the shot.  I don't know who
4  they were, but they said they ran out and said
5  they heard a shot too.
6  Q.  Okay.  This is other people there at the
7  trailer park, other people that lived there?
8  A.  Yes, sir.
9  Q.  This fence, is it a fence you can jump
10  over easily?
11  A.  No, sir.
12  Q.  Okay.  After y'all disbanded the ruckus
13  that was going there in the common areas, tell me
14  kind of what happened after that.  I mean, there's
15  other officers --
16  A.  Others were coming, but while we was over
17  there talking to them and disbanded, we heard
18  Sergeant White yelling, get down.  Stop resisting.
19  And that's when we ran -- because from where we
20  had to run, I know we was down here, and we could
21  hear over here.  So we had run down to the end and
22  go around the fence and then get out there where
23  he was.
24  Q.  So while y'all are dealing with the ruckus
25  is when Mr. White got there; is that correct?

Page 56

1  A.  Yes, sir.  He was out in the woods, yes,
2  sir.
3  Q.  How long had he been there?
4  A.  I don't even know, sir, because I was
5  dealing with the people in the trailer park.
6  Q.  Did he not come over the radio?
7  A.  He probably did, but sometimes, sir, when
8  you're in the middle of a bunch of people, you
9  don't hear that radio, especially if you're trying
10  to concentrate on that.
11  Q.  So you were concentrating on the ruckus.
12  You weren't worried about that gunshot?
13  A.  Not at the time because anyway I didn't
14  know what was -- I didn't want nobody to get hurt
15  in the trailer park.
16  Q.  So at some point in time while you're
17  getting rid of the people that are making the
18  ruckus, telling them to go on, dispatch, get away,
19  you hear Sergeant White in the woods?
20  A.  Yes, sir.
21  Q.  And again what did you hear him say?
22  A.  I heard him say, stop running, stop
23  resisting, get down.
24  Q.  Okay.  Where -- would you have been close
25  to the fence at that time or still in the common

Page 57

```
 1   area?
 2  A.  In the common area.
 3  Q.  Okay.  So there's no way you could see
 4   where he was?
 5  A.  No, sir.
 6  Q.  Okay.  So you didn't see him hit
 7   Mr. Prince?
 8  A.  No, sir.
 9  Q.  When -- or explain to me -- you have shown
10   it on the diagram how you ran around the fence.
11   When did you first come into contact with
12   Mr. Prince that night?
13  A.  I never really actually come into contact
14   with him.  I gave Lieutenant White -- when I first
15   got over there where I was, there was a subject
16   laying down, didn't know who he was.  And he asked
17   me for my handcuffs, and I gave him my handcuffs
18   and he told me to key up my radio so he could find
19   his radio.
20  Q.  Okay.  You got close enough to the subject
21   to hand him your handcuffs?
22  A.  Yes, sir.
23  Q.  So you made -- you saw the suspect at that
24   point in time?
25  A.  Well, he was laying down.
```

Page 58

```
 1  Q.  Was he resisting?
 2  A.  Sir?
 3  Q.  Was he resisting arrest?
 4  A.  At that time, no.
 5  Q.  Can you explain what Sergeant White's
 6   positioning on him was?
 7  A.  He was standing over him I know that much.
 8   I can't really explain.  I don't -- he had him
 9   down, and I don't know if he had his hand in his
10   back or he was just standing over him.  I think he
11   just had his hand in his back.
12  Q.  Like kneeling down beside him?
13  A.  Yeah, and holding him down.
14  Q.  Okay.  Did Sergeant White explain to you
15   why he needed your handcuffs?
16  A.  He had lost all his stuff, his handcuffs
17   and his radio, if I'm not mistaken.  I didn't ask
18   him.  I don't -- things like that you don't ask.
19   You just -- if he asks for something, your
20   handcuffs, you give them to him.
21  Q.  Okay.  Sergeant White's weapon wasn't out
22   when you went there, was it?
23  A.  No, sir.  No, sir.
24  Q.  Okay.  But you did not see Sergeant White
25   strike Mr. Prince?
```

Page 59

```
 1  A.  I was a hundred yards away.  He was in the
 2   dark in the woods, no, sir.
 3  Q.  You had no way of seeing it?
 4  A.  No way of seeing it.
 5  Q.  So you don't know what happened out there
 6   in the woods?
 7  A.  I don't know what happened in the woods,
 8   no, sir.
 9  Q.  So when you first walked up, Mr. White was
10   kneeling over --
11  A.  Beside him, yes, sir.
12  Q.  Beside Mr. Prince.
13  A.  If I remember right, he was kneeling
14   beside him.
15  Q.  Kneeling beside him, had his hand on his
16   back?
17  A.  If I remember.  I can't remember.  But
18   like I say, I think that's what he did.  He just
19   had his hand in his back.
20  Q.  Mr. Prince wasn't resisting?
21  A.  No, sir.
22  Q.  And you're -- I want to make sure, this
23   isn't a lit area.  You're out there with your
24   flashlight, right?
25  A.  I'm out there -- yeah, it's very dark.
```

Page 60

```
 1  Q.  So you're shining your light and you can
 2   see them?
 3  A.  Well, I can shine my light once I get to
 4   them, yes, sir.
 5  Q.  Prior to that when y'all were at the
 6   fence, were y'all shining y'all's lights out there
 7   and that sort of stuff?
 8  A.  Yes, sir, but you couldn't see a stick out
 9   there.
10  Q.  You never saw anybody out there in the
11   woods --
12  A.  No, sir.
13  Q.  -- until you heard Sergeant White --
14  A.  Yelling, yes, sir.
15  Q.  -- yelling get down.  Okay.  Did you stay
16   there with Sergeant White?
17  A.  No, sir.  I started looking for -- because
18   the guy didn't have his shirt on, I started
19   looking for his shirt, me and Deputy Marshall.
20  Q.  You say Mr. Prince didn't have his shirt
21   on?
22  A.  Yes, sir.
23  Q.  So the two of y'all, you and Deputy
24   Marshall just start canvassing the area?
25  A.  Canvassing the area looking for a gun and
```

Page 61

```
 1  a shirt.
 2  Q.  Looking for anything else?
 3  A.  Sir?  A gun and a shirt.
 4  Q.  Were y'all looking for anything else?
 5  A.  No, sir.
 6  Q.  You were talking about keying a mic up
 7     because it's --
 8  A.  Well, that's when we first got over there,
 9     Lieutenant White had -- Sergeant White had lost
10     his radio, so -- right in the area and we keyed
11     the radio up and he finally found it.
12  Q.  Did he lose anything else that day?
13  A.  Like I say, he may have lost his
14     handcuffs.  I can't remember.  I know about the
15     radio because he told me to key my radio.
16  Q.  Were y'all able to find it?
17  A.  Yes, sir.
18  Q.  And tell me what happens at that point.
19  A.  They walked -- they escorted Mr. Prince
20     out.  I got back -- well, after about 20 or
21     30 minutes we are searching the area looking for
22     the shirt or gun, they're gone.
23  Q.  You're saying "they," you mean you and
24     Mr. Marshall?
25  A.  Yeah, me and Mr. Marshall was looking for
```

Page 62

```
 1     the shirt and the gun, yes, sir.
 2  Q.  And 20, 30 minutes of that, where is
 3     Mr. White and Mr. Prince?
 4  A.  I have no idea.  They walked out to the
 5     front.  I have -- once I gave him my cuffs and he
 6     got him up and he started walking, I never had any
 7     more contact.  I went back over in the common area
 8     to finish the call.
 9  Q.  Okay.  Where did Mr. White take
10     Mr. Prince?
11  A.  To jail I guess.
12  Q.  Okay.  Do you know where his car was
13     parked?
14  A.  It had to be parked on the highway because
15     he couldn't get in the bushes.
16  Q.  When you say "highway," you mean --
17  A.  The Raceway Road.
18  Q.  -- Raceway Road?
19  A.  Yes, sir.
20  Q.  So to the best of your knowledge, the
21     defendant was escorted out towards the east to
22     Raceway Road?
23  A.  Yes, sir.
24  Q.  And from there he was taken to the police
25     station?
```

Page 63

```
 1  A.  Yes, sir, to my knowledge.
 2  Q.  Do you know who transported him?
 3  A.  No, sir.
 4  Q.  So the only time you ever saw Mr. Prince
 5     was in the woods?
 6  A.  Yes, sir.
 7  Q.  You never saw him in the common area?
 8  A.  No, sir.
 9  Q.  Again it's dark, and I realize that.  You
10     had a flashlight.  Did you see any injuries to
11     Mr. Prince?
12  A.  No, sir.
13  Q.  So you didn't visually see anything wrong?
14  A.  I didn't visually see anything, because
15     when I got there, he was laying down.
16  Q.  Okay.  Did you ever at any point in time
17     see somebody running into the woods that night?
18  A.  No, sir.
19  Q.  Okay.  Do you know about whether or not
20     Mr. Prince was searched that night?
21  A.  I don't know, no, sir.
22  Q.  You don't know.  Okay.
23  A.  I didn't.
24  Q.  You did not search him.  Okay.  You and
25     Mr. Marshall spent 20 or 30 minutes out there
```

Page 64

```
 1     looking, did y'all find a shirt?
 2  A.  No, sir, I don't think we did.  No, sir.
 3  Q.  Did y'all find a firearm of any kind?
 4  A.  No, sir.
 5  Q.  Did you find any spent casings of any
 6     kind?
 7  A.  No, sir.
 8  Q.  So that night y'all didn't recover any
 9     weapons whatsoever?
10  A.  No, sir.
11  Q.  Did y'all look specifically right in the
12     area where Mr. Prince had been?
13  A.  Well, we did a grid, yes, sir.
14  Q.  Y'all sectioned it off into grids?
15  A.  Yes, sir.
16  Q.  You and Marshall walked lines back and
17     forth looking?
18  A.  Yes, sir.
19  Q.  No weapons were found?
20  A.  No, sir.
21  Q.  And you don't -- you don't have any
22     knowledge that Mr. Prince discarded anything, do
23     you?
24  A.  Oh, no, sir, I don't.
25  Q.  When I asked you originally about the
```

Page 65

1  trailer park, you said you had been there a whole
2  bunch and you kind of grinned.
3  **A. Yes, sir.**
4  Q. Tell me about the trailer park.
5  **A. I mean, it's a place where people stay. I**
6  **mean, it's a trailer park.**
7  Q. And is it a rough area, is it a --
8  **A. Sometimes, sometimes it's not.**
9  Q. Okay.
10 **A. It's not nothing that I -- you know, I**
11 **can't say that it's just a bad place.**
12 Q. Most of the stuff that you described
13 earlier is misdemeanor activity. I think you said
14 something about a burglary.
15 **A. Yes, sir.**
16 Q. Was anybody arrested on that burglary to
17 your knowledge?
18 **A. Probably so. Some. I can't remember.**
19 **I'm just saying overall that's the different type**
20 **of calls that would come to that location.**
21 Q. And you, other than in the woods, you
22 never saw Mr. Prince any more that night?
23 **A. No, sir. No, sir.**
24 Q. When did you do your report?
25 **A. The next day because I didn't know nothing**

Page 66

1  **about the injuries or none of that until the next**
2  **day.**
3  Q. Okay. The next day did you see Mr. Prince
4  at all?
5  **A. No, sir.**
6  Q. Since that night you saw him in the
7  woods --
8  **A. I have not.**
9  Q. -- to the best of your knowledge have you
10 seen him?
11 **A. If I have, I wouldn't know who he was. To**
12 **be honest if he walked up to me now, I wouldn't**
13 **know him.**
14 Q. Understood. Had you seen injuries to
15 Mr. Prince that night, would you have done a
16 report?
17 **A. Yes, sir.**
18 Q. You would have done a report. When did
19 you find out that he was injured?
20 **A. The next day.**
21 Q. But you didn't do a report then?
22 **A. Yes, sir. That's when I did my report,**
23 **the next day.**
24 Q. You didn't do a report regarding
25 specifically about just a detainee being injured?

Page 67

1  **A. I did an offense report, yes, sir, on what**
2  **happened.**
3  Q. What you would have normally done?
4  **A. Yes, sir.**
5  Q. And that was the reason you did it?
6  **A. Yes, sir.**
7  Q. Had you not known that he had been
8  injured, you would not have done one?
9  **A. No, sir.**
10 Q. Did anybody that supervised you tell you
11 to do it?
12 **A. Well, I knew we had to do one because of**
13 **the injury. That was --**
14 Q. Nobody specifically told you. It's just
15 you knew as part of y'all's policies and
16 procedures you were supposed to do one?
17 **A. Yes, sir.**
18 Q. Did you do it the next morning or was it
19 when you came in on the next shift?
20 **A. When I came in the next shift when I found**
21 **out about it because I got off that night.**
22   **MR. DUNCAN:** I don't have anything
23 else, Scott.
24   **MR. PHILLIPS:** I just have a few
25 questions. I'm going to get this marked. This is

Page 68

1  his report.
2    **THE WITNESS:** I wrote on the back of
3  it.
4    **MR. PHILLIPS:** Oh, you did. Well,
5  here, Rebecca, go make me a copy of that. I'll
6  ask you -- talk to you about that. We are going
7  to mark it.
8    **EXAMINATION**
9    **BY MR. PHILLIPS:**
10 Q. This report, what is the date on that
11 report, Mr. Parson?
12 **A. 3-16-12.**
13 Q. Would you agree with me -- or let me ask
14 you this: Was your memory better on March 16,
15 2012?
16 **A. Yes, sir.**
17 Q. Than it is today?
18 **A. Yes, sir.**
19 Q. Today we are more than two years after
20 this incident, right?
21 **A. Yes, sir.**
22 Q. I just want to kind of -- because I want
23 to make sure I understand the chain of events.
24 Okay?
25 **A. Yes, sir.**

Page 69

1 Q. This report, which we are going to have
2 marked when it gets back, says on March 16th at
3 approximately 11:00 p.m. I, Sergeant Parson,
4 responded to 2587 Old Leland Road, Lot 24 in
5 reference to a disturbance in progress. That's
6 right?
7 A. Yes, sir.
8 Q. Upon arrival Deputy Marshall was already
9 on scene gathering information for a report.
10 (Whereupon, the above-mentioned
11 document was marked as Exhibit No. 3.)
12 Q. It says, "while standing in the roadway at
13 Pearson Trailer Park, I, Sergeant Parson, heard
14 two gunshots coming from southeast of the location
15 where I Sergeant Parson and Deputy Marshall was
16 standing." You see that?
17 A. Yes, sir.
18 Q. Now, earlier you said it was a single
19 shot?
20 A. Yes, sir. It was a mistake because, I
21 mean, that's been two years ago.
22 Q. Right. You would -- your memory was
23 better when you did this?
24 A. Yeah, this would be more accurate.
25 Q. Okay. All right. So -- and then it says

Page 70

1 at that time -- do you know what -- do you
2 remember what you were doing when you heard the
3 gunshots?
4 A. We were just standing in the roadway
5 talking to I think some citizens.
6 Q. Were you talking to the person who had
7 called in about the complaint?
8 A. Most likely, yes, sir.
9 Q. Do you remember if you were talking to
10 males, females or both?
11 A. Both. I think it was both.
12 Q. Okay. Do you -- and do you remember any
13 of their names, male or female?
14 A. No, sir.
15 Q. Does the name Steven Jackson ring a bell?
16 A. I want to say that's the gentleman that we
17 had a warrant -- or Greenville PD had a warrant
18 on. I'm not 100 percent sure. But I know there
19 was -- I think Steven Jackson was the one that we
20 arrested for a warrant for Greenville.
21 Q. Do you know if -- do you remember if
22 Steven Jackson was there when you and Mr. Marshall
23 heard the shots?
24 A. Heard the shots. Yes, sir.
25 Q. He was there?

Page 71

1 A. Yes, sir.
2 Q. He didn't have a gun in his hand, did he?
3 A. No, sir.
4 Q. Were you able to rule out that it was not
5 Steven Jackson who fired the shots that you heard?
6 A. Yes, sir.
7 Q. Okay. And do you remember whether you had
8 knowledge already that somebody had run from the
9 scene?
10 A. Yes, sir.
11 Q. Somebody had already told you that?
12 A. That somebody ran from the scene, yes,
13 sir.
14 Q. And that was before you even heard the
15 shots; is that right?
16 A. Yes, sir. Yes, sir.
17 Q. And according to this it says, after you
18 heard the shots, you and Deputy Marshall went to
19 the area where you thought you heard the shot was
20 coming from?
21 A. Yes, sir.
22 Q. Does that jive with your recollection?
23 A. Yes, sir.
24 Q. And then it says: "While on the way to
25 that area, I, Sergeant Parson, got on the radio

Page 72

1 and advised dispatch and other deputies that
2 someone was shooting close to the area." Does
3 that jive with your recollection?
4 A. Yes, sir.
5 Q. And it sounds like that's when you:
6 "While searching the back of the trailers close to
7 the fence, I, Sergeant Parson, heard some movement
8 directly across from my location in a wooded
9 area."
10 A. Yes, sir.
11 Q. Does that sound right?
12 A. Yes, sir.
13 Q. So you went to the back of the trailer and
14 you heard somebody in the woods?
15 A. Yes, sir.
16 Q. And at that time I, Sergeant Parson,
17 radioed to Sergeant White and advised him that
18 there was someone in the woods running. You could
19 hear somebody running?
20 A. I could hear sticks and leaves and stuff
21 being -- yes, sir.
22 Q. So at that time you were under -- you knew
23 that Sergeant White had made it to the scene?
24 A. I can't remember whether he was already on
25 the scene or he was just about there or what. I

Page 73

1  can't remember that.
2  Q.  Good enough.  But you had radioed and told
3  him -- yeah, you radioed to him and told him that
4  there was someone in the woods, right?
5  A.  Yes, sir.
6  Q.  And I stayed -- "I, Sergeant Parsons,
7  stayed on the north side of the fence so I could
8  show Sergeant White where I heard the noise."
9  A.  Yes, sir.
10  Q.  And do you remember trying to show him
11  where the noise was coming from?
12  A.  Yes, sir, with my flashlight.
13  Q.  So by that time he was in the woods too?
14  A.  Yes, sir.
15  Q.  Once Sergeant White got to where I was
16  standing, he went out through the woods -- in the
17  weeds in the woods. I, Sergeant Parson, started
18  to go to assist Sergeant White in the woods.  That
19  sounds --
20  A.  Yes, sir.
21  Q.  Then you heard two people arguing real
22  loud so you and Deputy Marshall had to go back to
23  where you had just come from, right?
24  A.  Yes, sir.  Yes, sir.
25  Q.  And that's when the citizens were out

Page 74

1  there arguing with one another?
2  A.  Yes, sir.
3  Q.  Do you recall whether the citizens who
4  were in the argument were the same people you had
5  just been over there --
6  A.  I think it was a female and a male, yes,
7  sir.
8  Q.  Do you know if the male was the one who
9  eventually was arrested on the warrant?
10  A.  Yes, sir. I think that's what it was.
11  Q.  And do you know who the female was?
12  A.  It was whoever the complainant was, the
13  female. I don't know what her name. I never got
14  a --
15  Q.  So you're saying Jackson and the
16  complainant were arguing?
17  A.  Yes.
18  Q.  Do you know if anybody who was friends
19  with Michael Prince was also in that altercation?
20  A.  I think the girl, the young lady was his
21  girlfriend. I'm not for sure. I don't know.
22  Q.  Right. I understand. I understand. You
23  don't even know who that was?
24  A.  No, sir.
25  Q.  Her name.

Page 75

1  A.  No, sir.
2  Q.  And while you were over there separating
3  the male and female, again I'm paraphrasing from
4  your report --
5  A.  Uh-huh.
6  Q.  -- that's when you heard Sergeant White
7  yelling out, and I'm reading from your report,
8  "stop running, lay down"?
9  A.  Yes, sir.
10  Q.  You remember that?
11  A.  Yes, sir.
12  Q.  But you weren't anywhere within eyesight
13  of that?
14  A.  No, sir.
15  Q.  But after you heard him say that it says,
16  at the time Deputy Marshall and I, Sergeant
17  Parsons, started running to the wooded area where
18  we heard Sergeant White yelling from -- and while
19  you were running, you could hear Sergeant White
20  yelling, "let me see your hands, and don't move"?
21  A.  Yes, sir.
22  Q.  Does that sound right?
23  A.  Yes, sir.
24  Q.  And it looks like, just paraphrasing from
25  your report, once you and Marshall got there,

Page 76

1  that's when he had the black male with no shirt
2  detained at that time?
3  A.  Yes, sir.
4  Q.  That's when he keyed up the radio and you
5  gave him your handcuffs?
6  A.  Yes, sir.
7  Q.  Do you recall whether Sergeant White
8  had said he had lost his flashlight or not, do you
9  recall one way or another?
10  A.  I can't -- no, sir.
11  Q.  Okay. Did you hear Mr. Prince make any
12  comments or statements?
13  A.  No, sir.
14  Q.  When you heard Sergeant White yelling,
15  "stop running, lay down, let me see your hands,
16  don't move," did you ever hear Mr. Prince yelling
17  anything?
18  A.  No, sir.
19  Q.  Like I'm not resisting?
20  A.  No, sir.
21  Q.  Or I am lying down?
22  A.  I never heard him say anything.
23  Q.  Did you ever hear him say, don't hit me?
24  A.  No, sir.
25  Q.  Do you remember when he was asking you

Page 77

1    questions and it was about citizens complaints
2    about their displeasure with law enforcement?
3  **A.  Yes, sir.**
4  Q.  You made some comment, I'm paraphrasing,
5    that they are always going to complain when you're
6    doing your job and they don't think what you're
7    doing -- they think they're above the law?
8  **A.  Yes, sir.**
9  Q.  You were making that in a general
10   statement, right?
11 **A.  Just general statement, yes, sir.**
12 Q.  That would hold true with at your time at
13   Sharkey Sheriff's Department?
14 **A.  Yes, sir.  Greenville Police Department,**
15   **yes, sir.**
16 Q.  And now at Leland, right?
17 **A.  Yes, sir.**
18 Q.  Do you know if Mack White also carried a
19   Stinger flashlight?
20 **A.  I'm almost positive he did.**
21   **MR. PHILLIPS:** That's all I have.
22   **EXAMINATION**
23   **BY MR. DUNCAN:**
24 Q.  Just a couple of follow-up questions.
25   When I had asked you some questions about when

Page 78

1    Officer White arrived, you said that you
2    couldn't -- you don't remember hearing him come
3    over the dispatch and said he arrived?
4  **A.  Yes, sir.**
5  Q.  But you did radio him about the sounds you
6    were hearing?
7  **A.  Yes, sir.  I knew he was on the way.**
8  Q.  Okay.  But you didn't know if he was
9    coming from --
10 **A.  I didn't know which way he was coming**
11   **from.**
12 Q.  You didn't know if he was coming down Old
13   Leland Road from the east or from the west, did
14   you?
15 **A.  No, sir.**
16 Q.  You said that you heard Officer White say,
17   stop running, lay down?
18 **A.  Yes, sir.**
19 Q.  When you got to the location where Officer
20   White was, was Mr. Prince -- had he stopped
21   running?
22 **A.  Yes, sir.  He was laying down.**
23 Q.  And he was laying down?
24 **A.  Yes, sir.**
25 Q.  Did you ever hear Officer White say, stop

Page 79

1    resisting?
2  **A.  Yes, sir.  That was prior to I got -- to**
3    **me getting over there.**
4  Q.  Did you put that in your report?
5  **A.  Yes, sir -- no, I didn't.  I put in there**
6    **stop running, lay down, let me see your hands.**
7  Q.  And that was when it was fresh in your
8    mind again, right?
9  **A.  Sir?  Yes, sir.  This is when I was --**
10 Q.  And you didn't remember at that time him
11   saying anything about stop resisting?
12 **A.  No, sir.**
13 Q.  And who was it that told you somebody had
14   run?
15 **A.  I don't know who the citizen was.**
16 Q.  Do you remember if it was a male or
17   female?
18 **A.  No, sir.**
19 Q.  Would it have been the complainant?
20 **A.  I don't know.**
21 Q.  That night did you see Mr. Prince
22   resisting in any way?
23 **A.  No, sir.**
24 Q.  And you didn't put it in your report that
25   you heard Officer White saying stop resisting?

Page 80

1  **A.  No, sir.**
2    **MR. DUNCAN:** Nothing else.
3    **MR. PHILLIPS:** Thank you.
4    (Deposition concluded at 2:25 p.m.)
5    AND FURTHER DEPONENT SAITH NOT
6    (Signature waived)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 81

1                    COURT REPORTER'S CERTIFICATE

2    STATE OF TENNESSEE:

3    COUNTY OF SHELBY:

4
         I, SHERYL G. WEATHERFORD, LCR #027, CSR, RPR,
5    and Notary Public, Shelby County, Tennessee,
     CERTIFY:
6
         1.  The foregoing deposition was taken before
7    me at the time and place stated in the foregoing
     styled cause with the appearances as noted;
8
         2.  Being a Court Reporter, I then reported
9    the deposition in Stenotype to the best of my
     skill and ability, and the foregoing pages contain
10   a full, true and correct transcript of my said
     Stenotype notes then and there taken;
11
         3.  I am not in the employ of and am not
12   related to any of the parties or their counsel,
     and I have no interest in the matter involved.
13
         4.  I FURTHER CERTIFY that this transcript is
14   the work product of this court reporting agency
     and any unauthorized reproduction AND/OR transfer
15   of it will be in violation of Tennessee Code
     Annotated 39-14-104, Theft of Services.
16

17       WITNESS MY SIGNATURE, this, the 6th day of
     May, 2014.
18

19   _____
20              SHERYL G. WEATHERFORD
                Registered Professional Reporter,
21              Tennessee Licensed Court Reporter
                #027, Arkansas Certified Court
22              Reporter #500, Notary Public
                for the State of Tennessee at
23              Large  ***

     My commission expires:
24   June 5, 2016

25